UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA             :
             :
      -against-            :
             :      NOTICE OF MOTION
BERNARD AUGUSTINE,           :
             :      18-cr-393 (SJ)
             :      Oral Argument Requested
           Defendant.     :
-------------------------------------------------------X

PLEASE TAKE NOTICE, that the defendant **Bernard Augustine**, by his attorneys **Samuel Jacobson** and **Allegra Glashausser**, of the Federal Defenders of New York, and upon the accompanying memorandum of law, and exhibits will move the Court, before the Honorable Sterling Johnson, Jr., United States District Judge for the Eastern District of New York, for an Order:

1. Dismissing the indictment against Mr. Augustine;

   a. Because the indictment fails to state an offense;

   b. Because ISIL Libya was not a designated foreign terrorist organization at the time Mr. Augustine is alleged to have attempted to provide support to it;

   c. Because, no reasonable jury could find Mr. Augustine guilty of an attempted violation of Section 2339B;

   d. Because it violates Mr. Augustine's rights to travel, expression, and association, running afoul of the First and Fifth Amendments;

    e.  Because this prosecution follows a conviction for the same offence in Tunisia with substantial cooperation by U.S. federal agents, placing Mr. Augustine twice in jeopardy for the same offense;  and

    f.  Because it violates the non-delegation doctrine.

2.  Granting such other and further relief as the Court may deem just and proper.

DATED:    BROOKLYN, N.Y.
             September 20, 2019

                            _____/s/
                            Samuel Jacobson
                            Allegra Glashausser
                            Attorneys for Mr. Bernard Augustine
                            Federal Defenders of New York, Inc.
                            1 Pierrepont Plaza, 16th Floor
                            Brooklyn, N.Y. 11201
                            (212) 417-8739

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA       :

   -against-                :

BERNARD AUGUSTINE,        :

                                 18-CR-393 (SJ)

       Defendant.        :
-----------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF BERNARD AUGUSTINE'S MOTION TO DISMISS

SAMUEL I. JACOBSON
ALLEGRA GLASHAUSSER
Attorneys for Defendant
BERNARD AUGUSTINE
Federal Defenders of New York, Inc.
One Pierrepont Plaza - 16th Floor
Brooklyn, New York 11201
Tel.: (718) 330-1204


CC:   RICHARD DONOGHUE, United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
Attn: CRAIG R. HEEREN and MICHAEL T. KEILTY
Assistant United States Attorney

CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ........................................................................ 2

STATUTORY FRAMEWORK ........................................................................ 5

ARGUMENT........................................................................................ 7

I.   THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO
     STATE AN OFFENSE........................................................................ 7

   A. The Indictment Fails to Sufficiently Specify the Type of Material Support Mr.
      Augustine Attempted to Provide ........................................................ 8

   B. The Indictment Fails to Allege That Mr. Augustine Was Attempting to "Work
      Under" the "Direction and Control" of a Terrorist Organization ...................... 9

II.  BECAUSE ISIL IN LIBYA WAS NOT A DESIGNATED TERRORIST
     ORGANIZATION AT THE TIME MR. AUGUSTINE IS ALLEGED TO
     HAVE ATTEMPTED TO PROVIDE SUPPORT, THE CHARGE UNDER
     SECTION 2339B MUST BE DISMISSED.................................................. 12

III. THE ALLEGED CONDUCT DOES NOT, AS A MATTER OF LAW,
     CONSTITUTE ATTEMPTED MATERIAL SUPPORT TO A FOREIGN
     TERRORIST ORGANIZATION .......................................................... 16

   A. The Evidence of Intent is Insufficient................................................ 18

   B. The Evidence of Travel, Without More, is Insufficient to Constitute a
      "Substantial Step" Towards Providing Material Support ............................. 22

IV.  EVEN IF THE EVIDENCE WERE SUFFICIENT, THE MATERIAL
     SUPPORT STATUTE WOULD BE UNCONSTITUTIONAL AS APPLIED
     TO MR. AUGUSTINE BECAUSE IT VIOLATES HIS FIRST AND FIFTH
     AMENDMENT RIGHTS ................................................................ 25

A. When All Other Evidence is De Minimis, Relying on Speech to Prove Criminal Attempt Amounts to Prosecution of the Speech Itself ...................................... 26

B. The Only Non-Speech Conduct—Travel to a Country Mr. Augustine Was Legally Permitted to Visit—is Facially Innocent and Constitutionally Protected ................................................................................................................. 28

V. BECAUSE MR. AUGUSTINE WAS PREVIOUSLY CONVICTED FOR THE SAME CONDUCT IN TUNISIA, HE CANNOT BE TWICE PUT IN JEOPARDY FOR THE SAME OFFENCE ........................................................... 30

VI. SECTION 2339B(g)(6) IMPROPERLY DELEGATES LEGISLATIVE AUTHORITY TO THE SECRETARY OF STATE ........................................... 34

A. The Constitution Prohibits Congress From Delegating its Legislative Powers, Particularly in the Criminal Context ...................................................................... 35

B. Section 2339B(g)(6) Violates the Nondelegation Doctrine ................................. 38

CONCLUSION ......................................................................................................... 50

## PRELIMINARY STATEMENT

The government has charged Bernard Augustine under 18 U.S.C. § 2339B with attempting to provide material support to ISIS, which is designated by the State Department as a "foreign terrorist organization" ("FTO") under 8 U.S.C. § 1189. Both the indictment charging Mr. Augustine and the material support statute under which he is charged suffer from a multitude of legal infirmities which require dismissal of the indictment.

*First*, the indictment should be dismissed because it fails to state an offense. It does not specify with sufficient particularity the type of support Mr. Augustine attempted to provide, nor does it allege that Mr. Augustine sought to work under the direction and control of a foreign terrorist organization, an essential element of the offense. 18 U.S.C. § 2339B(h).

*Second*, ISIL Libya was not a designated foreign terrorist organization at the time Mr. Augustine is alleged to have attempted to provide support to it.

*Third*, viewing the evidence in the light most favorable to the government, no reasonable jury could find Mr. Augustine guilty of an attempted violation of Section 2339B. There is no evidence that he intended to work under an FTO's "direction or control," no "substantial step" towards doing so, and no "foreign terrorist organization" to trigger the statute in the first place. The indictment should be dismissed for insufficient evidence to make out a crime.

1

*Fourth*, as applied to Mr. Augustine the material support statute is unconstitutional because it violates his rights to travel, expression, and association, running afoul of the First and Fifth Amendments.

*Fifth*, this prosecution follows a conviction for the same offence in Tunisia with substantial cooperation by U.S. federal agents, placing Mr. Augustine twice in jeopardy for the same offense.

*Sixth*, section 2339b(g)(6) improperly delegates legislative authority to the secretary of state, and is invalid.

## **FACTUAL BACKGROUND**

Viewing the evidence in the light most favorable to the government, the Complaint and Affidavit in Support of the Arrest Warrant establish the following facts:

Before his arrest, Bernard Augustine, a teenager, was living in Keyes, California with his mother and two sisters. His family is Jehovah's Witnesses. Mr. Augustine was 19 years old, when, in December 2015, he searched the internet for, among other things, "how to safely join isis" and clicked on one of the search results, a website entitled "How does a Westerner join ISIS? Is there a recruitment or an application process?" Compl. ¶ 26. He looked up the "main language in the islamic state." *Id.* Two months later, on February 18, 2016, he got on an airplane from San Francisco to Tunisia, with a layover in Istanbul. Compl. ¶ 11. Although he originally bought a one-

2

way ticket, airline workers required him to purchase a return ticket, which he did, for March 3, 2016. Compl. ¶ 12. He told a CBP officer that he was traveling for vacation. Compl. ¶ 13.

Mr. Augustine's mother informed the government that Mr. Augustine had been "constantly on the internet" at home. Compl. ¶ 16. He had sent her a text message with a song "from the Islamic state" and asked "would an evil people make something like this?" *Id.* He also told her he would show her a video of Eid celebrations in Syria, saying "I swear you will see that it's not bad or evil or any of the lies people are saying about it." *Id.* She also said that she saw an "image of a child holding a machine gun," apparently in a video on Mr. Augustine's phone. *Id.* Mr. Augustine had blocked his family from social media after his flight. *Id.*

The agents also saw an email he sent to his mother from Tunisia saying, "My purpose in life is to seek the ultimate justice. I see a lot of very wrong and truly evil things happening in this world…I really truly am on a path to fight for justice and if I see unjustified where I'm going I promise I will fight that also. True justice. I can't…sit in ignorance." Compl. ¶ 17. He continued, "The good people in this world bring balance and push back against evil. And give their lives freely in the process. Today in this day and age I believe this is the right path." *Id.*  Mr. Augustine's ex-girlfriend said that on one occasion in January 2016 he had "mentioned" a "desire to travel to Syria." Compl. ¶ 19.

The Complaint further recounts text message discussions between Mr. Augustine and his mother about religion. Compl. ¶ 18. On February 10, 2016, he wrote that "If I ever get lucky enough to live in khilafeh, I'll burn my own passport lol…If Ma[ybe] you understood it you wouldn't want to live here either." *Id*. A search of his computer showed that he had viewed "well-known" ISIL-produced videos and religious sermons by "well-known" "public supporters of ISIL." Compl. ¶ 21-22. The Complaint also recounts additional internet searches for "jihadology" and ISIS-related videos. Compl. ¶ 26. Mr. Augustine also searched for directions to Raqqa, Syria. *Id*.

After his arrest by the local police in Monastir, Tunisia, Mr. Augustine was convicted in Tunisian court of entering with the intent to travel to Libya to join a terrorist organization and with having the intent to provide support for a terrorist organization. Compl. ¶ 10. The Tunisian authorities sentenced him to 2 years imprisonment. *Id*. When he was arrested in Tunisian, U.S. government officials "observed" him on multiple occasions. *Id*. His passport expired on March 13, 2016. Compl. ¶ 9.

On December 9, 2016, Mr. Augustine was charged by complaint in the Eastern District of New York, and on July 30, 2018 he was indicted on one count of attempting to provide material support "including personnel, including Augustine himself, to a foreign terrorist organization to wit: the Islamic State of Iraq and al-Sham." Indictment ¶ 1.

4

## **STATUTORY FRAMEWORK**

The government has charged Mr. Augustine with violating 18 U.S.C. § 2339B, which makes it a crime punishable by up to 20 years in prison to provide "material support or resources" to a "foreign terrorist organization."

Under Section 2339B(g)(6), the term "foreign terrorist organization" is cross-referenced to the definition at 8 U.S.C. § 1189.  Under that statute, the Secretary of State is authorized to designate an organization as a "foreign terrorist organization" if it determines that the organization is: (a) "foreign"; (b) engages in "terrorist activity" or "terrorism"; and (c) "threatens the security of United States nationals" or the "national security of the United States."  8 U.S.C. § 1189(a)(1).

Under Section 2339B(g)(4), the term "material support or resources" is cross-referenced to the definition at 18 U.S.C. § 2339A(b)(1) as follows:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

In 2000, the Ninth Circuit declared the term "personnel" in Section 2339B to be unconstitutionally vague. *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1138 (9th Cir. 2000). In 2004, the court granted en banc rehearing of its earlier decision.

*Humanitarian Law Project v. Dep't of Justice*, 382 F.3d 1154, 1155 (9th Cir. 2004). Three days after reargument in the case, Congress amended § 2339B to further clarify the meaning of the term "personnel" and to attempt to rectify the constitutional infirmity. Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), § 6603, 118 Stat. 3762–3764; *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 12 (2010). The amended section narrows the scope of criminal liability for the provision of "personnel" as a form of material support by providing that:

> (h) Provision of Personnel.—
> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C. § 2339B(h).  The Supreme Court has held that "[s]ection 2339B does not criminalize mere membership in a designated foreign terrorist organization. It instead prohibits providing 'material support' to such a group." *Humanitarian Law Project*, 561 U.S. at 18.

# **ARGUMENT**

## I.   THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO STATE AN OFFENSE

Here, the indictment is over-inclusive, specifying one form of material support—Mr. Augustine himself as personnel—while leaving the door open to others, such as currency, expert advice, or training. *See United States v. Awan*, 459 F. Supp. 2d. 167 (E.D.N.Y. 2006) (dismissing indictment under § 2339A for failure to specify the kind of material support). The word "including" allows the government to pivot to another theory of material support, if its personnel theory were to prove fruitless. This deprives him of fair notice of the charges against him. *See Russell v. United States*, 369 U.S. 749, 766 (1962) (discussing a "cryptic form of indictment . . . [that would] require[] the defendant to go to trial with the chief issue undefined").

At the same time, the indictment is also under-inclusive, failing to allege an essential fact – that he attempted to work under an organization's direction and control – required for a theory of "personnel." 18 U.S.C. § 2339B(h). Indictment on all the elements of a crime is a "substantial safeguard against oppressive and arbitrary proceedings." *Smith v. United States*, 360 U.S. 1, 9 (1959).

The Sixth Amendment guarantees that a defendant shall be "informed of the nature and cause of the accusation" against him, U.S. Const. amend. VI. The Fifth Amendment protects a defendant's "substantial right to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Gonzalez*, 686

F.3d 122, 147 (2d Cir. 2012) (citing *United States v. Miller*, 471 U.S. 130, 140 (1985)).

The indictment here fails to meet these requirements.

## A. The Indictment Fails to Sufficiently Specify the Type of Material Support Mr. Augustine Attempted to Provide

An indictment should be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The indictment must "contain[ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend." *Hamling v. United States*, 418 U.S. 97, 117. If an indictment describes the offense in the words of the statute, "those words . . . themselves [must] fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Carll*, 105 U.S. 611, 612; *see also United States v. Cruikshank*, 92 U.S. 542, 558 (1875) (where the definition of the offense includes generic terms, "it must descend to particulars"); *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995)("implied, necessary elements, not presented in the statutory language, must be included"). The indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Walsh*, 194 F.3d at 44 (citation omitted).[1]

---

[1] Although the defense has requested a bill of particulars, the government has not yet provided one. In any event, an invalid indictment cannot be saved by a bill of particulars. *Russell*, 369 U.S. at 770 (holding that indictments charging refusal to answer certain questions before a congressional

Failure to hold an indictment to this constitutional standard would force a court to "guess as to what was in the minds of the grand jury [and] deprive the defendant of a basic protection which the . . . grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Russell*, 369 U.S. at 770. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Id.* at 764. Here, because the indictment does not limit the types of material support that the government alleges Mr. Augustine provided, it does not meet this standard.

### B. The Indictment Fails to Allege That Mr. Augustine Was Attempting to "Work Under" the "Direction and Control" of a Terrorist Organization

The plain language of Section 2339B(h) is that "[n]o person may be prosecuted" under a personnel theory of material support "unless" the person is working under the direction or control of the organization. Without work under the direction or control, there is no provision of personnel. Without personnel, there is no material support. And without material support, there is no crime. Because "direction or control" goes to the "very core of criminality" under the statute, it must

---

committee must identify the subject under inquiry, which is the "very core of criminality" under the statute).

be pleaded in the indictment. *See Russell*, 369 U.S. at 750. Just as an indictment for tax fraud on a theory of omission must allege a duty to disclose, *United States v. Pirro*, 212 F. 3d 86, 92, and an indictment for antitrust violations on a domestic effects theory must allege a direct effect on domestic commerce, *United States v. Hui Hsiung*, 778 F.3d 738, 756 (9th Cir. 2015), an indictment for material support on a personnel theory must allege direction or control. This is because Section 2339B(h) prevents the government from prosecuting anyone under a personnel theory if the direction or control condition is not met.

Instead of providing the element of direction and control, Mr. Augustine's indictment misdirected the grand jury to the definitional provision § 2339A(b) without mentioning the "direction and control" requirement of § 2339B(h). "Defects in an indictment *short of* a failure to charge all of the statutory elements do not undermine subject-matter jurisdiction." *United States v. Yousef*, 750 F.3d 254, 259 (2d Cir. 2014) (emphasis added). But the defect here is indeed "a failure to charge all of the statutory elements." *See id.*

Two alternative readings of subsection (h) have been put forward in the district courts. The first is that the provision supplies an affirmative defense, where a defendant would bear the burden of proving at trial that he was not working under the direction or control of an FTO. *See United States v. Ahmed*, No. 15-49 (MJD/FLN), 2015 U.S. Dist. LEXIS 171561, at *4–5 (D. Minn. Sep. 1, 2015). The second is that subsection (h) merely clarifies the definition of "personnel" and is not an element of

10

the offense. *See United States v. Shafi*, 252 F.Supp.3d 787, 795 (N.D. Cal. 2017); *United States v. Pugh*, No. 15-CR-116 (NGG), 2015 WL 9450598, at *8 (E.D.N.Y. Dec. 21, 2015); *United States v. Ludke*, No. 16-CR-175, 2017 WL 9772960, at *6 (E.D. Wis. Dec. 11, 2017). No court of appeals has yet ruled on these interpretations.

Both of these readings rely on erroneous interpretations of the statutory language and legislative history of § 2339B(h). Indeed, the district courts have acknowledged their lack of certainty regarding the role played by subsection (h). *See, e.g.*, *Ludke*, 2017 WL 9772960, at *6 ("[the defendant's] arguments have some appeal"); *Pugh*, 2015 WL 9450598, at *8 ("In making this determination, the court recognizes that plausible alternative readings of the statute are defensible.").

Subsection (h) does not create an exception to the crime defined in subsection (a). *Compare* § 2339B(h) (creating the requirement that "[n]o person may be prosecuted . . . *unless*" there is direction or control), *with* § 2339B(j) (creating the exception that "[n]o person may be prosecuted . . . *if*" they are acting on instructions from the U.S. government) (emphasis supplied). Subsection (h) creates a positive condition that must be met before prosecuting conduct as criminal. Among the universe of people who might appear to be supporting an FTO, *only* those who "work under" the "direction or control" of the FTO are considered "personnel" for the purposes of material support.

Without the direction or control requirement, § 2339B would criminalize constitutionally protected conduct. *See infra* Section IV. The statute itself makes clear

11

that "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the . . . organization's direction and control." § 2339B(h).

## II. BECAUSE ISIL IN LIBYA WAS NOT A DESIGNATED TERRORIST ORGANIZATION AT THE TIME MR. AUGUSTINE IS ALLEGED TO HAVE ATTEMPTED TO PROVIDE SUPPORT, THE CHARGE UNDER SECTION 2339B MUST BE DISMISSED.

Mr. Augustine is charged with attempting to support ISIL in Libya, but ISIL in Libya was not designated as a foreign terrorist organization when Augustine traveled to Tunisia. An attempt to support for an organization that is not yet designated as an FTO cannot support a charge under § 2339B. To avoid this difficulty, the government instead indicted Mr. Augustine for trying to join the Islamic State of Iraq and al-Sham, which *had* been designated as a terrorist organization, but which was based in Iraq and Syria—2,000 miles away across the Mediterranean Sea. The distinction between these two organizations is not a minor detail. Congress created a procedure by which the Secretary of State may designate foreign terrorist organizations, record those designations, review them, revoke them, and amend them. 8 U.S.C. § 1189(a)-(b). Only those organizations that have properly been designated by the Secretary of State may form the basis of liability under § 2339B. To allow unelected prosecutors to adjust the boundaries of a designated organization to suit their needs in any given case would grant power to the Department of Justice to rewrite the laws. Because the

government's case rests on attempted travel to join ISIL in Libya, when that group had not been designated as a terrorist organization by the Secretary of State, the material support statute does not apply as a matter of law.

Congress made it a crime to provide, attempt to provide, or conspire to provide support to a "foreign terrorist organization," defined as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act." 18 U.S.C. § 2339B(g)(4). Section 219, in turn, provides that:

> The Secretary [of State] is authorized to designate an organization as a foreign terrorist organization in accordance with this subsection if the Secretary finds that—
>
> (A) the organization is a foreign organization;
>
> (B) the organization engages in terrorist activity (as defined in section 1182(a)(3)(B) of this title or terrorism (as defined in section 2656f(d)(2) of title 22), or retains the capability and intent to engage in terrorist activity or terrorism); and
>
> (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

8 U.S.C. § 1189(a)(1). The Immigration and Nationality Act created a formal process by which the Secretary of State was authorized to designate foreign terrorist organizations, and only those organizations designated pursuant to that process fall under the jurisdiction of the material support statute.

The designation of ISIS is a bit unusual. In 2004, the State Department designated "al-Qaida in Iraq" and its aliases. Designation of Jam'at al Tawhid Wa'al-

Jihad et al., 69 Fed. Reg. 75,587 (Dec. 17, 2004). In 2012, the Deputy Secretary of State reviewed the designation, determined that it was still warranted, but changed it to include the alias "Islamic State in Iraq." Review and Amendment of the Designation of al-Qa'ida in Iraq, 77 Fed. Reg. 4082 (Jan. 26, 2012). In 2014, the designation was further amended to include several new aliases, including "Islamic State of Iraq and the Levant," "Islamic State of Iraq and al-Sham," and "Islamic State of Iraq and Syria." Amendment of the Designation of al-Qa'ida in Iraq, 79 Fed. Reg. 27,972 (May 15, 2014). Additional aliases were added in 2015. Amendment of the Designation of Islamic State of Iraq and the Levant, 80 Fed. Reg. 58,804 (Sept. 30, 2015). The organization's many aliases confirm that it is located in Iraq and Syria, with references to historical geographic terms such as al-Sham and Mesopotamia, also in Western Asia.

One thing that is conspicuously absent in the many amendments to the ISIS designation is any alias mentioning Libya or its provinces. That is because, when the State Department made the determination that ISIL-Libya was a terrorist group, it did so under a *new* designation—denoting a separate foreign terrorist organization. *See* Designation of ISIL-Libya, 81 Fed. Reg. 32,004. Whatever nefarious factions Mr. Augustine might have encountered had he made the long journey from Tunisia to Libya, those groups could not give rise to criminal liability under § 2339B unless they themselves had been designated by the Secretary of State at the time of travel.

14

The State Department has consistently issued new designations for overseas branches of terrorist organizations rather than amending the original designation to add new aliases. *See, e.g.*, Designation of ISIS in the Greater Sahara, 83 Fed. Reg. 23,987 (May 23, 2018); Designation of ISIS-West Africa, 83 Fed. Reg. 8730 (Feb. 28, 2018); Designation of ISIS-Philippines, 83 Fed. Reg. 8730 (Feb. 28, 2018); Designation of ISIS-Bangladesh, 83 Fed. Reg. 8729 (Feb. 28, 2018); Designation of ISIL Khorasan, 81 Fed. Reg. 1983 (Jan 14, 2018). The material support statute could not be applied, as a matter of law, to any support these organizations received before the dates of their designation. So it is with ISIL-Libya, which did not become a terrorist organization within the meaning of § 2339B until May 20, 2016. Designation of ISIL-Libya, 81 Fed. Reg. 32,004 (May 20, 2016).

When the Secretary of State designated ISIL-Libya in May 2016, he made the determination that the group was no longer a loose affiliation of ISIS-inspired rebels but instead one of a select group of organizations "so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act, § 301(a)(7), 11 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose). That designation marked the day that material support to ISIL-Libya became a criminal act under § 2339B. Before May 20, 2016, ISIL-Libya was not a designated terrorist organization.

This designation, the first for any branch of ISIL in Libya, came three months *after* Mr. Augustine's arrest in Tunisia. Because the grand jury could not have returned

an indictment naming a group that was not a designated FTO at the time of travel, the government instead named the Islamic State of Iraq and al-Sham (ISIS) in the indictment. But there is no indication Mr. Augustine was trying to support ISIS in Iraq or al-Sham. Instead, the evidence is insufficient to support that Mr. Augustine attempted to support a *designated* terrorist organization.

## III.   THE ALLEGED CONDUCT DOES NOT, AS A MATTER OF LAW, CONSTITUTE ATTEMPTED MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION

On February 18, 2016, Mr. Augustine traveled to Tunisia. The government alleges that he also held radical views about Islam. To find attempted material support in the form of personnel, a jury would need to conclude that Augustine (1) attempted (2) knowingly (3) to work under the direction or control or to organize, manage, supervise, or otherwise direct the operation of (4) a designated FTO, (5) knowing that it was a designated FTO or engaged in terrorism. *See* 18 U.S.C. § 2339B. The indictment and complaint fail to allege facts upon which a reasonable jury could find the substantial step needed for attempt, the element of direction or control, and the mens rea requirement.

A defendant may challenge the sufficiency of the evidence in a pretrial motion if "the government has made what can fairly be described as a full proffer of the evidence it intends to present a trial." *United States v. Alfonso*, 143 F.3d 772, 776-777 (2d Cir. 1998). Here, as far as the defense is aware, the allegations in the complaint,

16

the search warrant affidavits, and the discovery materials proffer all evidence relevant to the material support charge.[2] Viewing the evidence in the light most favorable to the government, *see United States v. Delvecchio*, 816 F.2d 859, 862 (2d Cir. 1987), the facts at best suggest that Mr. Augustine traveled to Tunisia in February 2016, did some sightseeing in Tunis before asking directions to Libya, expressed views in favor of Islamic Law, and voiced an interest in experiencing or living in an Islamic state. This is insufficient for attempt to provide material support for terrorism.

Specifically, no reasonably jury could find the two elements necessary to make out a crime of attempt: the intent to commit a crime, and a substantial step toward the commission of that crime. The Second Circuit has adopted a two-step inquiry to determine whether conduct rises to the level of attempt:

> Initially, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime he is charged with attempting. Then, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime, conduct strongly corroborative of the firmness of the defendant's criminal intent.

---

[2] The government has had over three years to gather evidence. However, if this is *not* at full proffer, the defense invites the prosecution to complete its proffer at this stage. This benefits both parties: It allows the defense to raise all of its pretrial sufficiency claims and allows the prosecution to appeal an adverse judgement. *See Alfonso*, 143 F.3d at 777 n. 7 ("in some cases the government may actually favor such a pretrial ruling" because "that would permit an immediate appeal from a ruling adverse to the government").

*United States v. Stallworth*, 543 F.2d 1038, 1040 (2d Cir. 1976). Here, there is no evidence that Mr. Augustine intended to join, fight for, or otherwise work under the direction and control of ISIS. And there is no evidence of a substantial step when all Mr. Augustine is accused of doing is traveling to Tunisia—an innocent act that is far from "strongly corroborative" of firm criminal intent.

## A. The Evidence of Intent is Insufficient

The mens rea requirement for the crime of material support is twofold. The defendant must (1) "knowingly provide[ ] material support or resources to a foreign terrorist organization" and (2) "have knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1). "Designated terrorist organization" is defined by reference to Section 219 of the Immigration and Nationality Act. "Terrorist activity" is defined by reference to 8 U.S.C. § 1182(a)(3)(B)(iii) as any of a list of activities including hijacking, kidnapping, assassination, and the use of biological weapons or explosives, or any "threat, attempt, or conspiracy" to do one of those things, so long as it is unlawful in the place where it is done or would be unlawful in the United States. "Terrorism" is defined in 22 U.S.C. § 2656f(d)(2) as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."

The Model Penal Code provides that:

> A person acts knowingly with respect to a material element of an offense when:
> (i)   if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
> (ii)  if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

Model Penal Code §2.02; *see also United States v. Bailey*, 444 U.S. 394, 404 (1980).

The facts alleged in this case, in the light most favorable to the government, reveal a young man who was curious but deeply confused about the Islamic State. They are insufficient to establish the mens rea required by § 2339B. Even the evidence that speaks most directly to Mr. Augustine's intentions—evidence obtained coercively in a joint operation of U.S. and Tunisian officials, and subject to a separate motion to suppress—makes clear that he did not have the intent required for the commission of material support. *See Stallworth*, 543 F.2d at 1040 ("the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime he is charged with attempting").

The facts relied on by the government to prove that Mr. Augustine knew ISIS was a terrorist organization instead demonstrate that he was confused and naive about the violent aspects of the Islamic State. A text message to his mother, with a link to a song that the government acknowledges "does not expressly reference or advocate

violence," is accompanied by the messages "would an evil people make something like this" and "I swear you will see that it's not bad or evil or any of the lies people are saying about it." Compl. 7-8. When interrogated by Tunisian and U.S. officials, he allegedly said that he believed attacks attributed to ISIS were "false flag operations," that "mistakes can be made in asymmetrical warfare," and that "any civilians killed by the Islamic State were probably as a result of these mistakes." BA10. Web search results obtained by government warrant suggest an interest in ISIS but confusion about the group's status and aims. For example, he viewed an article in *Foreign Affairs*, a reputable news source, with the headline "ISIS Is Not a Terrorist Group." https://www.foreignaffairs.com/articles/middle-east/2015-02-18/isis-not-terrorist-group. And although he allegedly viewed multiple violent videos put forth by ISIS and posted online about the "blood of the *mujahideen*," Compl. 11, 15, he also seems to have believed that the role of the *mujahideen* was to protect non-Muslims who were being oppressed, *see, e.g.*, BA225 ("a non muslim who lives under shariah and is paying jizya will be the best guests in khilahaf. If they are being attacked and oppressed by other Muslims, the mujahideen will fight the oppressors on their behalf.").

There is even less evidence that Mr. Augustine believed it was "practically certain" he would have to fight for or work under the direction and control of ISIS if he went to visit the caliphate, as required under Subsection (h) of 2339B. Although he allegedly made reference to the mujahideen, or fighters, there is no evidence that he wanted to become one of them. Mr. Augustine never spoke to an ISIS recruiter,

never communicated with an ISIS handler or facilitator, and had no contact whatsoever with anyone involved with ISIS, in Libya or elsewhere.

Instead, at most, it appears he may have bought into a fantasy about civilian life under Sharia law. In that utopia, anyone of any religion who worked hard would be "[r]ewarded with wives, and children and land and wealth." BA225. The government will point to an interview with Tunisian and U.S. officials in which Mr. Augustine allegedly "discussed the fact that there is compulsory service in the Islamic State and that he may have to fight." BA10. But an acknowledgment that he "may have to fight" is not the same as being "practically certain" he would have to fight. Moreover, the email to his mother in which he spoke of being "on a path to fight for justice," Compl. ¶ 9, provides no context from which to infer a literal interpretation of the word "fight" rather than the common figurative use. *See also* BA10 ("Augustine will not be recruited by the Islamic State because if he sees them doing evil he would not support them and would just leave them.").

Because Mr. Augustine did not intend to provide material support to ISIS and did not know that ISIS was a designated terrorist organization or engaged in terrorism, he did not have the necessary mental state to make out the crime of attempt under § 2339B.

## B. The Evidence of Travel, Without More, is Insufficient to Constitute a "Substantial Step" Towards Providing Material Support

A substantial step must be "some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime." *United States v. Manley*, 632 F.2d 978, 988 (2d Cir. 1980). It "must be something more than mere preparation." *United States v. Martinez*, 775 F.2d 31 (2d Cir.1985). The Second Circuit has expressed concern "that attempt liability, with its accompanying heavy penalties, not be imposed for remote preparatory acts insufficiently corroborative of a firm criminal purpose." *United States v. Ivic*, 700 F.2d 51, 67 (2d Cir. 1983), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994). Because the provision of oneself as personnel under the material support statute requires working under the direction and control of a foreign terrorist organization, *see supra* Section I.B, an attempt to complete that crime must include some effort toward working under the organization's direction or control. Without an actual attempt to contact and work for a terrorist organization, everything else is bluster. *See United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008) ("The requirement of proving a substantial step serves to distinguish people who pose real threats from those who are all hot air.").

Mr. Augustine's case is an outlier in two respects. First, he was never in touch with anyone who was or purported to be a member of ISIS. And second, he did not commit a single overt act corroborative of criminal intent, such as purchasing

weapons. His only real action is traveling to Tunisia, where he allegedly asked at a fruit stand for directions to Libya. Web browsing history, internet comments, and texts to his family do not turn that into a "substantial step strongly corroborative of the firmness of [his] criminal intent," *Stallworth*, 543 F.2d at 1040.

It has become common for law enforcement to arrest U.S. citizens at the airport for attempting to travel overseas, charging them with material support in the form of personnel. *See* Alexander Meleagrou-Hitchens et al., *The Travelers: American Jihadists in Syria and Iraq* 1 (2018). In a typical sting operation, an FBI agent poses undercover as an ISIS recruiter or facilitator, convinces an American to travel to Iraq or Syria to join ISIS, then arrests the target when they check in for a flight overseas. *See, e.g.*, *United States v. Abdin*, No. 17 Cr. 283 (RMG) (D.S.C.) (defendant communicated with undercover agent posing as an ISIS recruiter, boasted of his close combat experience, suggested conducting an attack in the U.S., and ultimately arrested at Charleston airport). A similar pattern involves a confidential source who knows of the target's interest in ISIS and keeps the FBI apprised of their plans until the date of travel.

In all of these cases there is something additional—other than travel and undirected speech—that corroborated the defendant's intent to provide material support to ISIS. *See, e.g.*, *United States v. Leon Nathan Davis*, No. 15 Cr. 59 (JRH) (S.D. Ga.) (defendant posted photo of himself online holding a shotgun and surrounded by other illegal firearms with the caption "ready for jihad," posted online that "one of

23

[his] greatest desires is to kill Zionists," had a plan to be smuggled into Syria by a facilitator and work as an ISIS recruiter, and ultimately arrested at Atlanta airport); *United States v. Omar al Hardan*, No. 16 Cr. 3 (S.D. Tex.) (defendant communicated with confidential informant, discussed his desire to be trained in building improvised explosive devices, showed informant the circuit board he built to be used as a detonator, took an oath of loyalty to ISIL, and participated in tactical weapons training with an AK-47).

Mr. Augustine is different because the government's case rests *only* on travel and web browsing and web comments. He had no in-person or virtual communication with anyone in ISIS. He undertook no other suspicious actions corroborative of criminal intent, such as purchasing weapons or combat gear. That is because there is no evidence that he had the intention of joining or fighting for ISIS.

Convictions for attempted material support upheld on appeal illustrate the distance between the alleged conduct here and the criminal conduct proscribed by the material support statute. *See, e.g.*, *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) (upholding substantial step where defendant swore allegiance to al-Qaeda, met up with an undercover agent posing as a terrorist, and promised to provide medical services for al-Qaeda); *United States v. Kaziu*, 559 Fed. App'x. 32 (2d Cir. 2014) (unpublished) (upholding substantial step where defendant traveled to Egypt and worked with an al-Shabaab facilitator to arrange travel to Somalia, and fellow traveler testified to their intent to fight).

## IV.   EVEN IF THE EVIDENCE WERE SUFFICIENT, THE MATERIAL SUPPORT STATUTE WOULD BE UNCONSTITUTIONAL AS APPLIED TO MR. AUGUSTINE BECAUSE IT VIOLATES HIS FIRST AND FIFTH AMENDMENT RIGHTS

The conduct in this case consists entirely of protected speech and travel, and any criminal proscription of these activities would be an unconstitutional deprivation of liberty, freedom of expression, and freedom of association. The statute as applied to Mr. Augustine impermissibly restricts his rights under the First and Fifth Amendments.

The freedom to express ideas and the liberty to move about the world are fundamental to our constitutional heritage. U.S. Const. amend. I; *Aptheker v. Sec'y of State*, 378 U.S. 500, 505–06 (1964). "Those who won our independence believed that the final end of the state was to make men free to develop their faculties . . . . They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring) (overruled in part by *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (holding that the State cannot proscribe advocacy unless it amounts to incitement of imminent unlawful action)).

"Like the right of assembly and the right of association, [freedom of movement] often makes all other rights meaningful—knowing, studying, arguing, exploring, conversing, observing and even thinking. Once the right to travel is curtailed, all other rights suffer." *Aptheker*, 378 U.S. at 520 (Douglas, J., concurring).

25

Prosecuting Mr. Augustine for nothing more than words and travel is antithetical to these constitutionally-protected notions.

### A. When All Other Evidence is De Minimis, Relying on Speech to Prove Criminal Attempt Amounts to Prosecution of the Speech Itself

The First Amendment "protects against government regulation and suppression of speech on account of its content." *United States v. Caronia*, 703 F.3d 149, 162–63 (2d Cir. 2012). Content-based regulation of speech must be "narrowly tailored to . . . promote a compelling state interest" and is "presumptively invalid." *Id.* at 163. Laws that impose criminal sanctions "must be scrutinized with particular care." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987). Political speech, in particular, "is central to the meaning and purpose of the First Amendment." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 329 (2010). And *religious* speech is not only "as protected by the Constitution as other forms of private speech" but also "receives *preferential* treatment under the Free Exercise Clause." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 767 (1995); *see also* U.S. Const. amend. I. "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).

The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). But "[s]uch testimony is to be scrutinized with care to be certain the statements are not expressions of mere lawful and permissible difference

of opinion with our own government." *Id.* at 489 (quoting *Haupt v. United States*, 330

U.S. 631, 641 (1947)). And a prosecution will "run afoul of the First Amendment" if

"speech alone [is] the proscribed conduct." *Caronia*, 703 F.3d at 162 (jury instructions

and government summation were improper because they "left the jury to understand

that [defendant's] speech was itself the proscribed conduct").

Here, the government's case against Mr. Augustine consists of one act: his trip

to Tunisia.  That act is innocent and, as discussed below, itself protected conduct. *See*

*infra* Section IV.B. Everything else is pure speech protected by the First Amendment

due to its political and religious dimensions. *See Citizens United*, 558 U.S. at 329

(heightened protection for political speech); *Capitol Square*, 515 U.S. at 767 (heightened

protection for religious speech). The government will argue that Mr. Augustine's

speech is being used merely as evidence of criminal intent, and not as the proscribed

conduct itself. *See Mitchell,* 508 U.S. 476. But here, all other evidence is so scant that

the case would rest entirely on the admission into evidence of protected speech. Every

other piece of evidence the government can produce is a text message, an online

posting, a web search, or some other morsel of protected expression. Convicting Mr.

Augustine based on this evidence would amount to condemning him for his speech.

*See Caronia*, 703 F.3d at 161 (vacating E.D.N.Y. conviction because "the government

clearly prosecuted [the defendant] *for* his words—for his speech"). Here, Mr.

Augustine's protected speech is not being used merely as evidence of intent. It is the

entirety of the government's case.

27

Here, the statements on which the government will rely are not one-half of an agreement with terrorists for the provision of material support. *Compare United States v. Amawi,* 695 F.3d 457, 482 (6th Cir. 2012) ("Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech."). Instead, they are simply talk—messages to family members wholly unconnected to the world of the Islamic state, independent web searches, and comments sent off into the void of the internet. *See United States v. Gladish,* 536 F.3d 646, 650 (7th Cir. 2008) ("Treating speech (even obscene speech) as the 'substantial step' would abolish any requirement of a substantial step. . . . The requirement of proving a substantial step serves to distinguish people who pose real threats from those who are all hot air.").

### B. The Only Non-Speech Conduct—Travel to a Country Mr. Augustine Was Legally Permitted to Visit—is Facially Innocent and Constitutionally Protected

Mr. Augustine, a U.S. citizen with a valid passport, was at liberty to travel to Tunisia. That act of exploration is protected by the Fifth Amendment. The Supreme Court recognized the fundamental value of freedom of movement in 1958:

> The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment. . . . Travel abroad, like travel within the country, . . . may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values.

*Kent v. Dulles*, 357 U.S. 116 (1958) (holding that Congress had not delegated to the Secretary of State the authority to deny passports to Communists or to those traveling abroad to further Communist causes). In 1964, the Court set clear constitutional limits on Congress's ability to deny the right to travel based on association, striking down the section of the Subversive Activities Control Act that made it unlawful for a member of the Communist party to apply for a U.S. passport. *Aptheker*, 378 U.S. at 505 ("[The law] too broadly and indiscriminately restricts the right to travel and thereby abridges the liberty guaranteed by the Fifth Amendment."). The *Aptheker* court noted the implications for First Amendment freedoms, too: "Since freedom of association is itself guaranteed . . . , restrictions imposed upon the right to travel cannot be dismissed by asserting that the right to travel could be fully exercised if the individual would first yield up his membership in a given association." *Id.* at 507.

Here, Mr. Augustine is subject to criminal sanctions for traveling abroad while having expressed interest in and support for Islamic law. This deprivation of the right to travel on the basis of speech and association is precisely what the Court condemned over five decades ago in *Aptheker*. But the material support statute does not actually authorize the application of criminal penalties solely based on travel and speech. The statute requires more—it requires a showing of direction or control by an organization designated by the Secretary of State according to a formal procedure. Such a delegation would be unconstitutional and a narrower reading of the statute is warranted. *See Kent*, 357 U.S. at 129 ("Where activities or enjoyment, natural and often

29

necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them."). To permit this prosecution to move forward would expand the reach of the material support statute to criminalize a substantial amount of protected activity.[3]

## V.   BECAUSE MR. AUGUSTINE WAS PREVIOUSLY CONVICTED FOR THE SAME CONDUCT IN TUNISIA, HE CANNOT BE TWICE PUT IN JEOPARDY FOR THE SAME OFFENCE

The Double Jeopardy Clause of the Fifth Amendment provides that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court recently reaffirmed that the Double Jeopardy Clause does not ordinarily apply to successive prosecutions by different sovereigns. *Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019). But the Court has also

--------------------------------

[3] Particularly as applied to Mr. Augustine, Section 2339B criminalizes not only speech but thought, because the crime of attempting to provide material support is doubly inchoate. Substantive material support for a terrorist organization under Section 2239B is a complicity-based inchoate offense because it is preventive in nature—it proscribes mostly facially harmless and mundane conduct on the theory that the conduct makes the ultimate future harm of terrorism more likely to occur. Attempting to provide material support when material support is itself comprised of fundamentally inchoate conduct is thus a doubly inchoate form of liability.  *See* Norman Abrams, *A Constitutional Minimum Threshold for the Actus Reus of Crime? MPC Attempts and Material Support Offenses*, 37 Quinnipiac L. Rev. 199 (2019); *see also* Herbert Wechsler et al., *The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy*, 61 Colum. L. Rev., 571, 620-21 (1961). In a doubly inchoate attempt, the conduct is so far removed from any actual harm that the *mens rea* itself becomes the crime. Especially where the sole conduct is constitutionally protected speech, travel, or association, criminalizing attempts offends basic notions of due process and violates the rights described above. Furthermore, Subsection (h) of 2339B is void for vagueness on its face and as applied because there is no fair notice as to how to distinguish protected membership, association, and independent advocacy from direction and control.

carved out "[a] narrow exception [that] bars a second prosecution where one prosecuting sovereign can be said to be acting as a 'tool' of the other . . . or where the second prosecution amounts to a 'sham and a cover' for the first." *United States v. Aboumoussallem*, 726 F.2d 906, 910 (2d Cir. 1984) (citing *Bartkus v. Illinois*, 359 U.S. 121, 123–24 (1959)); *see also Gamble*, 139 S. Ct. at 1994 n.3 (Ginsburg, J., dissenting) (same). *Bartkus* "stands for the proposition that federal authorities are proscribed from manipulating state processes to accomplish that which they cannot constitutionally do themselves." *United States v. Liddy*, 542 F.2d 76, 79 (D.C. Cir. 1976).

Where there is such manipulation, "the notion of two supposedly independent prosecutions is merely a sham." *United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996). The dual sovereign rule does not apply, and the defendant is protected by the Double Jeopardy Clause. If the defendant can "produce some evidence tending to prove that the rule should not apply because one sovereign was a pawn of the other," then "the government must shoulder the burden of proving that one sovereign did not orchestrate both prosecutions." *Id.* A defendant may offer various clues as evidence of manipulation. For example, if prosecution by a foreign country poses strategic advantages, the United States might prefer that prosecution to proceed first. "[A] prosecutorial advantage, coupled with some evidence that the United States had helped bring it about, or that its existence had induced the United States to prefer and promote the foreign prosecution, might help support the 'tool' inference." *United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000). Another clue goes to the

motive—or lack thereof—of the sovereign being used as a tool. If "a nation pursued a prosecution that did little or nothing to advance its independent interests," that might also be a sign that the prosecution was a sham. *Id.* at 1283.

Here, Tunisian authorities offered to let the United States government take custody of Mr. Augustine instead of charging him in Tunisia. The United States declined. That is a strong indicator both that Tunisia lacked an independent interest in prosecuting Mr. Augustine and that the United States helped orchestrate or promote the Tunisian prosecution. The United States might have had several reasons to prefer Tunisian prosecution at the outset. First, Mr. Augustine was apparently not on the FBI's radar until he was apprehended in Tunisia. The United States had no case against Mr. Augustine and no cause to detain or arrest him. Detention in Tunisia bought time for the United States to develop a case against Mr. Augustine without having to consider the strictures of American due process. Second, the Tunisians employed interrogation methods that would be unlawful in the United States. They did not advise Mr. Augustine of his *Miranda* rights and they subjected him to extreme physical and psychological coercion to extract information. The United States government was aware of Mr. Augustine's mistreatment at the hands of Tunisian interrogators and did nothing to prevent it.

In *United States v. Rashed*, the D.C. Circuit asked whether Greece, in prosecuting the defendant for multiple acts of international terrorism, was "a tool of the United States." 234 F.3d at 1284. The United States had sought to extradite the defendant,

but Greece had steadfastly refused. "Far from being controlled by the United States, the Greek trial occurred only because Greece rejected U.S. demands for Rashed's extradition." *Id.* at 1281. Because the defendant did not "claim that the United States preferred prosecution to extradition, or that further discovery would uncover evidence of such a preference," the court found the sham prosecution defense implausible. *Id.* at 1286.

Here, the facts are reversed: Tunisia did not have an interest in prosecuting Mr. Augustine. The Tunisian authorities offered to turn him over to the U.S. government, indicating that two French detainees with similar cases were recently transferred to French custody instead of facing charges in Tunisia. *See* Def. Mot. to Suppress at 11. But the United States did not file a complaint in the Eastern District of New York until ten months after Mr. Augustine's initial detention in Tunisia and one month after his conviction. During those months, U.S. agents coordinated closely with the Tunisian investigation and prosecution. *See, e.g.*, Def. Mot. to Suppress at 10-12.

The Second Circuit has held that "irrespective of minimum constitutional standards, we may in a given situation want to exercise our supervisory power to remedy abuses of a district court's process." *United States v. Reed*, 639 F.2d 896, 903 (2d Cir. 1981). Prior to his prosecution in the Eastern District of New York, Mr. Augustine had already served a harrowing two-year sentence for the same alleged conduct. The Tunisian Ministry of Justice, in negotiating deportation plans with Legat Tunis, stated that "an individual can not be tried for the same crime twice" and that

33

Mr. Augustine "would NOT be extradited to face US. Charges for the same crime." Ex. A, Letter from Legat Tunis to FBI Special Agent Larkin, BA 311. The Tunisians, at least, believed there was a mutual understanding that if he served his time in Tunisia Mr. Augustine would not be punished twice for the same offence.

To allow this prosecution to go forward would be to implicitly endorse the government's strategy of orchestrating the Tunisian prosecution, engaging in a joint venture with Tunisian authorities involving unlawful interrogation methods, and finally initiating its own prosecution contrary to the Tunisian government's double jeopardy concerns. The indictment should be dismissed.

## VI. SECTION 2339B(G)(6) IMPROPERLY DELEGATES LEGISLATIVE AUTHORITY TO THE SECRETARY OF STATE

The power to decide if countless private citizens around the world are subject to criminal liability in the United States is an immense one. The Constitution vests that power exclusively in Congress. But under 18 U.S.C. § 2339B(g)(6), Congress tied the criminal material support statute to the definition of a foreign terrorist organization in 8 U.S.C. § 1189, which expressly delegates the authority to designate FTOs to the Secretary of State. Under this statutory scheme, the State Department, rather than Congress, has the unguided and unchecked power to decide which organizations are or are not subject to criminal liability under Section 2339B. This is plainly unconstitutional.

### A. The Constitution Prohibits Congress From Delegating its Legislative Powers, Particularly in the Criminal Context

The authority to legislate is entrusted solely to Congress. U.S. Const. Art. I §§ 1, 8. "Congress manifestly is not permitted to abdicate or transfer to others the legislative functions" with which it is vested. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421 (1935). This "nondelegation doctrine is rooted in the principle of separation of powers . . . ." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

Because of its focus on protecting individual liberty, the nondelegation doctrine is enforced most rigorously in the criminal context.  Several specific constitutional provisions safeguard the separation of powers in the criminal context. While Congress may single out parties to a civil suit, *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1327 (2016), the Bill of Attainder Clause, U.S. Const. art. I, § 9, prevents Congress from singling out persons for criminal punishment. This protection is "an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *United States v. Brown*, 381 U.S. 437, 442 (1965).

The Framers recognized that, with "criminal subjects," Congress should "leave as little as possible to the discretion of those who are to apply and to execute the law." James Madison, *The Report of 1800*, *in* 14 *The Papers of James Madison* 266, 307, 324 (Robert A. Rutland et al. eds., 1983). As a result, the Court has made clear that "defining crimes" is a "legislative" function, *United States v. Evans*, 333 U.S. 483, 486

(1948), and that Congress cannot delegate "the inherently legislative task" of determining what conduct "should be punished as crimes." *United States v. Kozminski*, 487 U.S. 931, 949 (1988); *see also United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) ("It is the legislature . . . which is to define a crime, and ordain its punishment.").

This special prohibition on congressional delegation of criminal lawmaking power is reflected in the Court's void-for-vagueness doctrine. Vague criminal statutes are prohibited both because individuals are entitled to sufficient notice as to what constitutes a crime and to prevent legislatures from "abdicat[ing] their responsibilities for setting the standards of the criminal law." *Smith v. Goguen*, 415 U.S. 566, 574-75 (1974); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (vague laws "impermissibly delegate[] basic policy matters to policemen"); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921) (invalidating vague criminal statute as delegation to define crimes). "In that sense, the [void-for-vagueness] doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

The Court has not "exactly drawn" the line separating "legislative" from executive or judicial powers, *see Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825), but one thing is clear: the power to enact generally applicable, binding rules of private conduct is "legislative." *See Yakus v. United States*, 321 U.S. 414, 424 (1944); *see*

36

*also The Federalist No. 75*, at 450 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The essence of the legislative authority is to enact laws, or, in other words, to prescribe rules for the regulation of the society.").

While the nondelegation doctrine does not prevent Congress from "obtaining the assistance of its coordinate Branches," it can do so only if it provides clear guidance. *Id.* at 372-73. "So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not forbidden delegation of legislative power.'" *Id.* at 372 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928)).

In both *Panama Refining Co.* and *Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), the Supreme Court held that Congress had unconstitutionally authorized the Executive to make laws because "Congress had failed to articulate any policy or standard that would serve to confine the discretion of the authorities to whom Congress delegated power." *Mistretta*, 488 U.S. at 374, n.7. Similarly, in Sections 1189 and 2339B(G)(6), Congress failed to articulate any policy to guide the Secretary of State in exercising this delegated authority to designate FTOs. Because Section 2339B(G)(6) grants the Secretary of State unfettered discretion to determine who is subject to criminal liability without an "intelligible principle" to guide her, it plainly violates the nondelegation doctrine.

## B. Section 2339B(g)(6) Violates the Nondelegation Doctrine

Section 2339B(g)(6) violates the Constitution under any formulation of the nondelegation doctrine. First, the delegation is invalid under an originalist understanding of the nondelegation doctrine because the statute transfers to the Secretary of State what can only be described as legislative authority. Second, the statute is unconstitutional because it fails to provide a sufficiently intelligible principle to cabin and direct the Secretary of State's exercise of the delegated powers.

1. <u>Section 2339B(g)(6) Impermissibly Delegates Quintessentially "Legislative" Powers</u>

Section 2339B(g)(6) grants, in the context of the material support statute, the Secretary of State quintessentially legislative powers: it allows her to prescribe who is subject to criminal sanctions, potentially governing the conduct of hundreds of thousands of private individuals, both in the United States and abroad, including Mr. Augustine.  It affects the substantive liberty interests of these individuals in the most profound way.

Under an originalist interpretation of the Constitution, the legislative nature of these delegated powers ends the inquiry and requires this Court to invalidate the delegation. *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225, 1246 (2015) (Thomas, J., concurring) ("[T]he original understanding of the federal legislative power . . . require[s] that the Federal Government create generally applicable rules of private conduct only through the constitutionally prescribed legislative process.");

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825) ("It will not be contended that Congress can delegate . . . powers which are strictly and exclusively legislative. . . . [Those powers] must be entirely regulated by the legislature itself."); *Field v. Clark*, 143 U.S. 649, 692 (1892) ("That congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution.").

2. Section 2339B(g)(6)'s Delegation to the Secretary of State Fails the Intelligible Principle Test

In addition to violating originalist constitutional principles governing delegations of power, Section 2339B(g)(6) fails the Court's prevailing "intelligible principle" test because it fails to provide sufficiently clear guidance on fundamental policy question.

a. To state an Intelligible Principle, a Statute Must Provide Sufficiently Clear Guidance on Fundamental Policy Questions

While affirming that Congress cannot delegate its legislative powers, the Supreme Court has recognized that "separation-of-powers principle[s] . . . do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). The Court's modern jurisprudence has been "driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.*

The Court developed the "intelligible principle" test to evaluate such congressional delegations of power. Under this test, if "Congress shall lay down by legislative act an intelligible principle to which the person or body [to whom power is delegated] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

When Congress lays down a sufficiently clear guiding principle, the Court has construed the powers delegated not to be "legislative," even if they involve some degree of discretion, because Congress itself has made all of the fundamental policy decisions—i.e., it has done the "legislative" work. *See J.W. Hampton, Jr., & Co.*, 276 U.S. at 407. As the Court explained in *J.W. Hampton, Jr. & Co.*, when Congress delegates pursuant to an "intelligible principle" it "is not an exact statement" to claim that the Executive is exercising "legislative power" because such "power has already been exercised legislatively by the body vested with that power." *Id.*; *accord Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 85 (1932) ("[T]he legislative power of Congress cannot be delegated . . . . But Congress may declare its will, and, after fixing a primary standard, devolve . . . the 'power to fill up the details' . . . .").

In addition to being clear enough to guide the Executive, this intelligible principle must enable courts to determine whether the delegate has acted within the bounds of the delegated authority and in accordance with Congress's expressed will.

*See, e.g.*, *Yakus v. United States*, 321 U.S. 414, 423, 425 (1944) (courts must be able to see "in an appropriate proceeding" that there is a "substantial basis" for the executive action and that the "will of Congress has been obeyed"); *Indus. Union Dep't AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 686 (1980) (Rehnquist, J., concurring) (intelligible principle requirement "ensures that courts . . . reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards").

The intelligible principle requirement thus preserves "both sets of constitutional checks—judicial and political—on the exercise of coercive authority in a 'government of laws.'" Laurence H. Tribe, *American Constitutional Law* 985 (3d ed. 2000). It permits a court to police delegations to ensure the delegate does not exceed Congress's grant of authority and follows Congress's will. And by requiring Congress to provide adequate guidance in the first instance, the intelligible principle test ensures that Congress itself makes the critical legislative policy decisions.

Under the intelligible principle test, the amount of required congressional guidance depends on the "extent and character" of the power conferred. *See J.W. Hampton, Jr., & Co.*, 276 U.S. at 406; *see also Whitman*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."). Congress itself must regulate certain "important subjects," but may more freely delegate to the executive in areas of "less interest." *Wayman*, 23 U.S. (10 Wheat.) at 43. Thus, while Congress "must provide substantial guidance on setting air standards that affect the entire national economy," far less

41

guidance is necessary when the Executive determines relatively minor matters, like the definition of "country elevators." *Whitman*, 531 U.S. at 475.

Congress must speak with particular clarity when it confers powers that "touch[] constitutionally sensitive areas." Tribe, *supra* at 987. "[A]ction . . . in areas of doubtful constitutionality[] requires careful and purposeful consideration by those responsible for enacting and implementing our laws." *Greene v. McElroy*, 360 U.S. 474, 507 (1959); *see also Kent v. Dulles*, 357 U.S. 116, 129 (1958) ("If . . . 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress."); Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 317(2000) (noting that the nondelegation doctrine's "most convincing claim" is "that certain highly sensitive decisions should be made by Congress").

When transferring powers that touch upon these areas, Congress must provide sufficiently clear directives to show that it deliberated and made the required "legislative judgment." *United States v. Robel*, 389 U.S. 258, 275 (1967) (Brennan, J., concurring) ("The area of permissible indefiniteness [of a delegation] narrows, however, when the regulation invokes criminal sanctions and potentially affects fundamental rights"); *see also Bilski v. Kappos*, 561 U.S. 593, 649 (2010) (Stevens, J., concurring) ("[A]t the 'fringes of congressional power,' 'more is required of legislatures than a vague delegation to be filled in later[.]'") (quoting *Barenblatt v. United States*, 360 U.S. 109, 139-40 (1959) (Black, J., dissenting)). This principle is of course

42

manifest in the requirement that Congress—not the Executive—decide the scope of criminal laws.

        b.  <u>Given the Character and Significance of the Power Conferred by Section 2339B(g)(6), and the Absence of Guidance, This Delegation is Unconstitutional</u>

Section 2339B(g)(6) defines the term "terrorist organization" as "an organization designated as a terrorist organization under Section 219 of the Immigration and Nationality Act."  Section 219 of the INA, as amended by AEDPA, is codified at 8 U.S.C. § 1189, and provides that the Secretary of State, "in consultation with the Secretary of the Treasury and the Attorney General," may designate an organization as an FTO if she finds: (1) it is foreign; (2) it is engaged in "terrorist activity" or "terrorism," or has the "capability and intent" to do so; and (3) "the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States."  8 U.S.C. § 1189(a)(1), (d)(4).[4]

---

[4] Moreover, Section 1189(a)(8) specifically precludes a criminal defendant from challenging the Secretary of State's designation:

      If a designation under this subsection has become effective under paragraph (2)(B) a defendant in a criminal action or an alien in a removal proceeding shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing.

At its heart, the Section 2339B(g)(6) cross-reference to Section 1189 permits the Secretary of State to designate as foreign terrorist organizations any foreign organizations engaged in terrorist activity or terrorism.  The circularity of this Congressional guidance falls far below what is required to pass muster under the nondelegation doctrine.

The point is not that DOJ's prosecutions under the Secretary of State's historical FTO designations represent good or bad policy. The point is that the Constitution requires Congress—not the Secretary of State—to make these sorts of fundamental legislative choices and for Congress's choices to be reflected in the guidance it provides in any delegation.

The lack of guidance attending this delegation makes Section 2339B(g)(6) akin to the statutes the Supreme Court invalidated in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). Both cases involved laws backed by criminal sanctions, and that fact, coupled with the overall significance of the delegated authority, weighed in the Court's holdings that Congress had not sufficiently constrained Executive power in its delegations. *See Fahey v. Mallonee*, 332 U.S. 245, 249 (1947) (distinguishing *Panama Refining* and *Schechter Poultry* because they "dealt with delegation of a power to make federal crimes of acts that never had been such before").

In *Panama Refining*, 293 U.S. at 406, the Court struck down a statutory provision "authoriz[ing] [the President] to prohibit the transportation in interstate and foreign

commerce of petroleum" products produced in excess of state production quotas, so called "hot oil." The Court noted that whether oil could be transported in interstate commerce was "obviously [a question] of legislative policy." *Id.* at 415. It therefore looked to the statute to see whether Congress had properly "set up a standard for the President's action; [or] . . . required any finding by the President in the exercise of the authority to enact the prohibition." *Id.*

The statute did not do so. It did not state "whether or in what circumstances or under what conditions" the President was to ban hot oil, nor provide any criteria to govern his decision. *Panama Refining*, 293 U.S. at 415. The statute instead endowed the President with "unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit," unguided by any "standard or rule." *Id.* at 415, 418. Thus, "[i]nstead of performing its lawmaking function," Congress had "transfer[red] that function to the President." *Id.* at 430.

Similarly, in *Schechter Poultry*, 295 U.S. at 529, the Court struck down a statute authorizing the President to adopt a code of industrial conduct that fostered "fair competition." The Court held that "[i]n view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes . . . is virtually unfettered." *Id.* at 541-42. It invalidated Congress's attempt to "abdicate or transfer to others the essential legislative functions with which it is vested." *Id.* at 529.

45

The dearth of guidance in Section 2339B(g)(6), and in the statutes struck down in *Schecter Poultry* and *Panama Refining*, stand in marked contrast to statutes where the Court has upheld congressional delegations to the Executive in the criminal lawmaking context.

In *Touby v. United States*, 500 U.S. 160, 168-69 (1991), for example, the Supreme Court ruled that Congress had provided sufficient guidance in permitting the Drug Enforcement Agency to temporarily schedule, and thereby criminalize the possession or distribution of, new drugs under the Controlled Substances Act (CSA). Before exercising this power, Congress required the DEA to find that scheduling a new drug was "necessary to avoid an imminent hazard to the public safety." *Id.* at 163 (citing 21 U.S.C. § 811(h)). In making that determination, Congress further required the DEA to consider three factors: the drug's "history and current patterns of abuse"; "[t]he scope, duration and significance of abuse"; and "[w]hat, if any, risk there is to the public health." *Id.* at 166 (citing 21 U.S.C. §§ 811(c)(4)-(6), 811(h)(3)). Congress also made clear that the DEA needed to make a panoply of other specific findings. *Id.* at 166-67 (citing § 202(b), 21 U.S.C. § 812(b)).

The Court determined that even if "greater congressional specificity [regarding a delegation] is required in the criminal context," the detailed directives in the CSA satisfied these requirements because they "meaningfully constrain[ed]" the Secretary of State's discretion. *Touby,* 500 U.S. at 166. Indeed, the statute at issue in *Touby* resembles some of the earliest delegations approved by the Court, which conditioned

46

executive action on the making of specific factual findings. *See, e.g., Field v. Clark,* 143 U.S. 649, 693 (1892) (holding President was not "making laws" where delegation required him to act if he found a particular fact).

The Supreme Court most recently revisited its nondelegation jurisprudence in June 2019. The case, *Gundy v. United States*, 139 S. Ct. 2116 (2019), involved a provision of the Sex Offender Registration and Notification Act ("SORNA") that confers on the Attorney General the authority to "specify the applicability" of SORNA's registration requirement to "sex offenders convicted before" the date of SORNA's enactment. In a 5-3 decision, the Court held that construed narrowly the relevant statutory section required the Attorney General simply to apply SORNA "to all pre-Act offenders as soon as feasible." *Gundy*, 139 S. Ct. at 2123. It did not empower the Attorney General to create, remove, or otherwise revise registration requirements for these offenders. Accordingly, the Court held that the delegation in *Gundy* passed muster because it directed the Attorney General to "implement" Congress' legislation, *id.* at 2130, not to itself legislate. The delegation was "distinctly small-bore." *Id.*

Unlike the statute at issue in *Gundy*, Section 2339B(g)(6) does far more than "implement [Congress'] programs." *See id.* at 2130. The instant statute effectively endows the Secretary of State with the power to write her own criminal code. *See id.* at 2131 (Gorsuch, J., dissenting). Section 2339B(G)(6) contains no goal specifically relating to the delegation; no criteria to constrain the Secretary of State's exercise of

47

the delegated power; and no standards by which a court can evaluate any executive action.

The question before this Court is not whether a defendant can raise at trial whether the FTO designation was proper, as was the issue in *United States v. Ahmed*, 94 F. Supp. 3d 394 (E.D.N.Y. 2015) (SLT), or whether Section 1189 violates the nondelegation doctrine because designations are not subject to judicial review, as in *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157 (E.D.N.Y. 2008) (BMC). In *Taleb-Jedi*, Judge Cogan did address, briefly, the wider constitutional question, opining that FTO designation delegation is permissible because "Congress has established detailed procedures to designate organizations as FTOs and it retains the power to revoke such a designation when made." *Id.* at 172. But a "detailed procedure" is not the same as the constitutionally required "substantial guidance," and the power to override agency action by statute does not save otherwise unlawful delegation of legislative authority, because agency action can always be undone by statute. The question is whether "procedure" is a constitutionally valid replacement for actual guidance when Congress seeks to give away its legislative power. It is not.

To be clear, our issue is also not with the idea that Congress can delegate the designation of FTOs to the Secretary of State—although that might be impermissible too—but with the practice, implemented through Section 2339B(g)(6), that those same agency-determined FTO designations are in turn used to support the proscription of private conduct without additional Congressional action. In other

48

words, we are not challenging Section 1189 itself, or any of the myriad non-criminal statutes or programs that depend on Section 1189.  Whereas matters relating to foreign affairs and the military are the executive branch's traditional domain, in the context of material support laws the designation of FTOs takes on a legislative valence, because it affects not only foreign policy determinations but also the regulation and criminalization of private conduct.

Under Section 2339B, which criminalizes the provision of material support to an FTO, the Section 1189 delegation grants broad and plenary power on the Secretary of State without substantial guidance.  It is thus unconstitutional under *Whitman*.  *See* 531 U.S. at 475.  The delegation involves exactly the sort of significant and constitutionally sensitive decisions that require careful legislative deliberation and especially clear legislative guidance.

*　　*　　*

In enacting Section 2339B(g)(6), Congress improperly transferred its legislative power to the Secretary of State without telling her how, or even whether, to exercise it. The nondelegation doctrine thus requires the Court to invalidate this definitional section of the material support statute.  Doing so will reaffirm basic separation-of-powers principles, thereby protecting individual liberty, preserving democratic accountability, and vindicating the rule of law.  By tying Section 2339B(g)(6) to the plenary delegation authorized at 8 U.S.C. § 1189, Congress unconstitutionally

conferred unguided and unchecked power to create criminal liability upon an executive agency.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the motion and dismiss the indictment against Mr. Augustine.

DATED:    BROOKLYN, N.Y.
           September 20, 2019

                                      _____/s/_____
                                    Samuel Jacobson
                                    Allegra Glashausser
                                    Attorneys for Mr. Bernard Augustine
                                    Federal Defenders of New York, Inc.
                                    1 Pierrepont Plaza, 16th Floor
                                    Brooklyn, N.Y. 11201
                                    (212) 417-8739