UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,

    -against-

BERNARD RAYMOND AUGUSTINE,

                                Defendant.
-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
18 CR 393 (SJ)(RML)

LEVY, United States Magistrate Judge:

        Defendant Bernard Raymond Augustine ("defendant") is charged with attempting to provide material support to a foreign terrorist organization ("FTO"), the Islamic State of Iraq and al-Sham ("ISIS"),[1] in violation of 18 U.S.C. § 2339B. On October 24, 2019, the Honorable Sterling Johnson, United States District Judge, referred defendant's motions to dismiss the indictment and for a bill of particulars to me for Report and Recommendation.[2] Defendant additionally has a pending motion to compel discovery. I heard oral argument on December 19, 2019 and January 3, 2020. (See Transcript of Oral Argument, dated Dec. 19, 2019 ("Dec. 19

---

[1] The FTO at issue in this case uses a variety of names, including the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and the Levant ("ISIL"), and the Islamic State. (See Complaint and Affidavit in Support of Arrest Warrant, sworn to Dec. 9, 2016 ("Compl."), Dkt. No. 1, ¶ 2.) I will use these terms interchangeably herein.

[2] Judge Johnson additionally referred defendant's motion to suppress statements made while in the custody of the Tunisian government. Due to the ongoing COVID-19 pandemic, and with the consent of the parties, the suppression hearing has been continued without date; therefore, I make no findings at this time with respect to that motion. As discussed at the July 1, 2020 status conference, the suppression hearing will be rescheduled for a reasonable time before trial, with a Report and Recommendation to follow.

Tr."), Dkt. No. 58; Transcript of Oral Argument, dated Jan. 3, 2020 ("Jan. 3 Tr."), Dkt. No. 61.)

For the reasons explained below, I respectfully recommend that defendant's motions be denied.[3]

## BACKGROUND AND ALLEGED FACTS[4]

1. Defendant's Growing Interest in ISIS

Defendant is a United States citizen and, prior to his arrest, was a resident of

Keyes, California.  (Memorandum of Law in Support of Motion to Dismiss, dated Sept. 20, 2019

("Def.'s Mem."), Dkt. No. 36, at 2; Memorandum of Law in Opposition to Pretrial Motions,

dated Oct. 21, 2019 ("Govt.'s Opp."), Dkt. No. 37, at 4.)  Beginning in October 2015, defendant,

who had previously identified as an atheist and whose family members are Jehovah's Witnesses,

began engaging his mother on topics of Islam and ISIS, including sending her text messages

extolling the virtues of living in the Islamic State and expressing his desire to travel there.

(Govt.'s Opp. at 4; Def.'s Mem. at 2; see also Complaint and Affidavit in Support of Arrest

Warrant, sworn to Dec. 9, 2016 ("Compl."), Dkt. No. 1, ¶¶ 16, 18.)

During this same time period, defendant began to search the Internet for

information on ISIS, how to join ISIS, violent jihadist propaganda, and firearms.  (Govt.'s Opp.

at 4-5.)  For example, he conducted searches for "Jihadi John," a British ISIS spokesperson who

appeared in videos ordering and participating in executions; Abu Musab Al Zarqawi, a former

senior al-Qaeda leader in Iraq; Abu Bakr al-Baghdadi, the current leader of ISIS; Ayman al

Zawahiri, the current leader of al-Qaeda; and Osama Bin Laden.  (Id. at 4; Compl. ¶ 26(a), (j).)

---

[3] On April 27, 2020, defendant filed a *pro se* motion seeking to revoke each of his pending motions.  (See Letter Motion to Revoke Motions, dated Apr. 23, 2020, Dkt. No. 75.)  At a status conference held on July 1, 2020, defendant withdrew that motion and indicated that he would instead like the court to rule on his motions.  (See Minute Entry, dated  July 1, 2020.)

[4] The facts are drawn from the complaint, the indictment, and the parties' submissions in connection with the instant motions.

2

He also viewed videos of ISIS members engaged in violent acts, including an ISIS-produced video of the beheading of twenty Ethiopian Christians who had been kidnapped in Libya, and posted numerous messages on social media that were supportive of violent Jihad and of ISIS. (Compl. ¶¶ 21, 28.)  For example, in January 2016, he posted "The Islamic State is the true Islam."  (Id. ¶ 28(i)).  In February 2016, he posted "True Islam can't be implemented without khilafah[5] and khilafah can't be established and maintained except through the blood of the mujahedeen[6] who practice the true belief based on quaran and the sunnah of the prophet."  (Id. ¶ 28(c) (footnote added).)  On December 15, 2015, he conducted an Internet search for "how to safely join ISIS" and clicked on one of the search results, which was an Internet page titled "How does a Westerner join ISIS?  Is there a recruitment or application process?"  (Id. ¶ 26(b).)

      2.  <u>Defendant's Travel to Tunisia</u>

On February 18, 2016, defendant traveled from San Francisco, California to Tunis, Tunisia (via Istanbul, Turkey).  (Id. ¶ 11.)  On February 17, 2016, the day prior to his travel, he had purchased a one-way ticket to Tunisia; however, upon his arrival at the airport, the airline required him to purchase a return ticket and he selected the least expensive option.  (Id. ¶ 12.)  Prior to departing, he was interviewed by United States Customs and Border Protection and stated that he was traveling to Tunisia for vacation.  (Id. ¶ 13.)

Shortly after arriving in Tunisia, defendant contacted his family via a social media platform and stated that he was "in north africa bodering [sic] the mediterrainarian [sic]."

---

[5] According to the complaint, ISIS commonly uses the term "khilafa" to refer to their purported Islamic state, or caliphate.  (See Compl. ¶ 18(b) n.10.)

[6] According to the complaint, mujahideen is the plural form of mujahid, which is the term for one engaged in jihad.  (See Compl. ¶ 28(c) n.16.)

(Id. ¶ 16(g)).  He then blocked all of his family members on that social media platform.  (Id.)  On February 21, 2016, he sent his mother the following message:

> My purpose in life is to seek the ultimate justice.  I see a lot of very wrong and truly evil things happening in this world, things you dont know about, im not mad or mentally ill.  I really truly am on a path to fight for justice and if I see unjustified where I'm going I promise I will fight that also.  True justice.  I can't … sit in ignorance.  There is no other meaning in life to me.  There is two reasons why this is the best path in life for me.  1.  When I die, if God accept me.  We will all live in paradise forever.  2.  If I pass on before you, you and [name redacted] and [name redacted] will learn to see the injustice and because of you being able to see it you will be able to defend yourselves against it.  I'm doing this so you and [name redacted] and [name redacted] will learn how to protect yourselves from the manipulation of the masters of evil and their lies.  …  The good people in this world bring balance and push back against evil.  And gives their lives freely in the process.  Today in this day and age I believe this is the right path.

(Id. ¶ 17 (redactions in original).)

   3.  Defendant's Conviction and Imprisonment in Tunisia

On February 22, 2016, defendant was arrested by Tunisian law enforcement in Monastir, Tunisia on suspicion that he was traveling to Libya to join ISIS.  (Govt.'s Opp. at 6.)  He was subsequently charged under Tunisian law with (a) entering Tunisia with the intent to travel to Libya to join a terrorist organization, and (b) intent to join, participate in training, and provide support to a terrorist organization.  (Compl. ¶ 10.)  He was convicted of those charges in November 2016 and served a two year prison sentence in Tunisia.  (Id.)

   4.  United States Charges Against Defendant

On December 9, 2016, defendant was charged by complaint in the Eastern District of New York with attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B.  (Govt.'s Opp. at 8; see also Compl.)  On February 27, 2018, following his release from Tunisian custody, he was arrested by FBI agents in Tunisia.  (Govt.'s

4

Opp. at 8.)  On June 30, 2018, a grand jury sitting in the Eastern District of New York indicted

him on the same charge alleged in the complaint.  (Id. at 8-9; see also Indictment, filed June 30,

2018, Dkt. No. 15.)  The indictment charges:

> In or about and between October 2015 and February 2016, both
> dates being approximate and inclusive, within the extraterritorial
> jurisdiction of the United States and elsewhere, the defendant
> BERNARD RAYMOND AUGUSTINE did knowingly and
> intentionally attempt to provide material support and resources,
> as defined in Title 18, United States Code, Section 2339A(b),
> including personnel, including AUGUSTINE himself, to a
> foreign terrorist organization, to wit: the Islamic State of Iraq and
> al-Sham, which, at all times relevant to this Indictment, had been
> designated by the Secretary of State as a foreign terrorist
> organization pursuant to Section 219 of the Immigration and
> Nationality Act, knowing that the organization was a designated
> terrorist organization and that the organization had engaged in
> and was engaging in terrorist activity and terrorism, the defendant
> being a national of the United States (as defined in Section
> 101(a)(20) of the Immigration and Nationality Act) who, after the
> conduct required for this offense occurred, was first brought to
> and found in the Eastern District of New York, and the offenses
> having occurred in part within the United States and in and
> affecting interstate and foreign commerce.

(See Indictment ¶ 1.)

**DISCUSSION**

A.  Motion to Dismiss the Indictment

Defendant moves to dismiss on six grounds.  I will address each in turn.

1.  **Failure to State an Offense**

Defendant argues that the indictment fails to state an offense two reasons: (1) it

fails to specify the type of material support he is charged with attempting to provide, and (2) it

fails to allege that he was attempting to "work under" the "direction and control" of an FTO,

which he asserts is an essential element of the offense.  (Def.'s Mem. at 7-12.)

5

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires an indictment to contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" FED. R. CRIM. P. 7(c)(1). "[A]n indictment is sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974)). Courts in this circuit "have consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000) (quoting United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999)). At the same time, in order to comply with the protections of the Fifth and Sixth Amendments, an indictment must contain enough factual particularity to provide the defendant "with reasonable certainty, of the nature of the accusation against him" so that he knows "what he must be prepared to meet" at trial. Russell v. United States, 369 U.S. 749, 763-65 (1962) (citations and quotations omitted). An indictment must also be sufficiently specific "to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." Pirro, 212 F.3d at 92 (quoting Walsh, 194 F.3d at 44.)

The indictment in this case charges defendant with attempting to provide material support "*including* personnel, *including* Augustine himself" to ISIS. (Indictment ¶ 1 (emphases added) (capital letters omitted).) Defendant argues that the presence of the word "including" makes it unclear which forms of material support he is accused of attempting to provide and leaves the door open for the government to pursue other theories of material support at trial. (Def.'s Mem. at 7-9.) The government avers in its papers that it does not intend to argue that defendant attempted to provide any form of support beyond personnel. (Govt.'s Opp. at 12.)

6

Two other courts in this district have directly considered the issue of whether an indictment charging material support was sufficiently specific with respect to the type of support provided.  In United States v. Awan, on the one hand, the indictment did not list *any* specific forms of material support.  459 F. Supp. 2d 167, 175 (E.D.N.Y. 2006), aff'd, 384 F. App'x 9 (2d Cir. 2010.  Instead, it merely "use[d] the generic expression 'material support,' as defined in 18 U.S.C. § 2339A(b), [7] without specifying which of a variety of activities, any one of which would be criminal, that the defendant must defend against or which the grand jury considered."  Id. (footnote added).  While the government had indicated in its papers that it intended to prove that the defendant had provided money and personnel, the court could not be sure whether the grand jury had considered those categories, since they were omitted from the indictment, and thus it dismissed the indictment without prejudice as to the affected counts.[8]  Id.  at 175-76.

In United States v. Taleb-Jedi, on the other hand, the court upheld an indictment containing virtually identical language to that used here.  566 F. Supp. 2d 157, 165-66 (E.D.N.Y. 2018).  The indictment in Taleb-Jedi charged the defendant with providing material support and resources "including personnel (herself)" to an FTO.  Id. at 165.  The court held that the indictment "[met] the standard for specificity and provide[d] defendant with adequate notice of

---

[7] "Material support" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."  18 U.S.C. § 2339A(b)(1).

[8] A superseding indictment, which charged the defendant with conspiring to provide material support and resources "to wit: currency, monetary instruments, financial services and personnel," and with providing each of those categories, save for personnel, was later accepted by the court. (See Superseding Indictment, United States v. Awan, No. 06 CR 154 (E.D.N.Y Oct. 25, 2006), Dkt. No. 86, ¶¶ 14, 17); Minute Entry, United States v. Awan, No. 06 CR 154 (E.D.N.Y. Nov. 16, 2006), Dkt. No. 106.)

the charges" because it "charge[d] defendant with knowingly providing material support and resources, including personnel, to [an FTO] and provide[d] the approximate time span and locations of the offense." Id.  The court also noted that the government had stated at a hearing that it did not intend to prove any theories of support beyond personnel and that, unlike in Awan, it could be sure that the personnel theory was considered by the grand jury because it was included in the indictment.  Id. at 165-66.  I agree with this analysis and find that the indictment in this case also meets the standard for specificity, particularly given the government's representation that is only pursuing a personnel theory.[9]

Defendant's second argument is that the indictment is insufficient because it fails to allege an essential element of the offense—that he attempted to work under the direction and control of ISIS, as is required under section 2339B(h) of the material support statute.  (Def.'s Mem. at 9-12.)  Section 2339B(h) provides:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.  Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

---

[9] I further note that at least one other court in this district has upheld a material support indictment using the exact phrasing that is used in the indictment here, though the precise issue of whether the word "including" rendered the indictment insufficiently specific was not before the court in that case.  See United States v. Pugh, No. 15 CR 116, 2015 WL 9450598, at *11-13 (E.D.N.Y. Dec. 21, 2015) (finding sufficient an indictment charging provision of material support and resources "including personnel, including Pugh himself" (capital letters omitted).)

18 U.S.C. § 2339B(h).  The government argues that section 2339B(h) is merely a definitional provision and not an element of the charge and, therefore, it need not be pleaded in the indictment.  (Govt.'s Opp. at 12-14.)

No court of appeals has ruled on the issue of whether section 2339B(h) is an element, a definition of the term "personnel," or an affirmative defense, although several, as well as the Supreme Court, have described it in dicta as being definitional.  See, e.g., Holder v. Humanitarian Law Project, 561 U.S. 1, 21 (2010) (citing, inter alia, section 2339B(h) and explaining that "Congress also took care to add narrowing definitions to the material-support statute over time. These definitions increased the clarity of the statute's terms."); United States v. Augustin, 661 F.3d 1105, 1121 (11th Cir. 2011) ("[W]e first observe that it is not clear that the definition of personnel provided under § 2339B applies equally to § 2339A.  Indeed, the terms of § 2339B(h)—insofar as they refer to 'foreign terrorist organization[s]'—do not fit neatly with § 2339A, which does not expressly require the involvement of a 'foreign terrorist organization.'"); United States v. Farhane, 634 F.3d 127, 150 (2d Cir. 2011) (describing section 2339B(h) as "clarifying that what is proscribed is the provision of personnel 'to work under' the 'direction or control' of a terrorist organization"); United States v. Stewart, 590 F.3d 93, 118 n.21 (2d Cir. 2009) (describing section 2339B(h) as an "amended definition").

The issue has been considered directly by four district courts,[10] not one of which held section 2339B(h) to be an element: three held it to be a definition and one held it to be an affirmative defense.  See United States v. Ludke, No. 16 CR 175, 2017 WL 9772960, at *4-6 (E.D. Wis. Dec. 11, 2017) (holding that section 2339B(h) is a definition), report and

---

[10] Numerous other district courts have described section 2339B(h) as a definition in dicta.  See Pugh, 2015 WL 9450598, at *10 (collecting cases).

recommendation adopted, 2018 WL 2059556 (E.D. Wis. May 2, 2018); United States v. Shafi, 252 F. Supp. 3d 787, 793-95 (N.D. Cal. 2017) (same); United States v. Pugh, No. 15 CR 116, 2015 WL 9450598, at *7-11 (E.D.N.Y. Dec. 21, 2015) (same); see also United States v. Ahmed, No. 15 CR 49, 2015 U.S. Dist. LEXIS 171561, at *6-7 (D. Minn. Sept. 1, 2015) (holding that section 2339B(h) is an affirmative defense).

In Pugh, the only case in this district to address the issue, the court noted two statutory features of section 2339B(h) to reach the conclusion that it is a definition rather than an element or an affirmative defense.  First, it found that the provision's use of the term "personnel," with that term placed in quotation marks, indicates it "was intended to piggy-back on the statutory term 'personnel' as used in the defined term 'material support or resources.'" Pugh, 2015 WL 9450598, at *8.  Second, the court pointed to the structure of section 2339B(h), noting that its language materially tracks that of the substantive offense, as outlined in section 2339B(a)(1), with the primary distinction between the two being that, in the context of "personnel" offenses, section 2339B(h) narrows the breadth of that term.  Id.  Thus, the court concluded that section 2339B(h) "is doing nothing more than limiting the breadth of section 2339B(a)(1) with regard to personnel offenses." Id.  The courts in Ludke and Shafi each found the reasoning in Pugh persuasive, as do I.  See Ludke, 2017 WL 9772960, at *5-6; Shafi, 252 F. Supp. 3d at 793-95.  I therefore find that the indictment states an offense because it alleges that (1) defendant attempted to provide material support or resources to an FTO; (2) the FTO was designated pursuant to Section 219 of the Immigration and Nationality Act ("INA") at all relevant times; (3) defendant acted knowingly and intentionally, and with knowledge that the organization was an FTO and that it engaged in terrorist activity and terrorism; and (4) defendant was subject to the jurisdiction of the United States.  See Pugh, 2015 WL 9450598, at *11 (listing

the elements of an offense under section 2339B).  Accordingly, I respectfully recommend that

defendant's motion to dismiss for failure to state an offense be denied.

     2.  **Designation of ISIL-Libya as an FTO**

     In order to support a charge under section 2339B, the government must allege that

defendant attempted to materially support an organization designated as an FTO by the

Department of State.  See 18 U.S.C. § 2339B(g)(6) (defining "terrorist organization" as "an

organization designated as a terrorist organization under section 219 of the Immigration and

Nationality Act"; 8 U.S.C. § 1189 (authorizing the Secretary of State to designate an

organization as an FTO and establishing standards and procedures for making such

designations).  Defendant argues that the indictment must be dismissed because the ISIS affiliate

operating in Libya ("ISIL-Libya") was not designated as an FTO until after his arrest.  (Def.'s

Mot. at 12-16.)  The government counters that it does not intend to prove attempted material

support of ISIL-Libya; rather, as the indictment charges, it intends to prove attempted material

support of ISIS, which was undisputedly designated as an FTO during the relevant period.

(Govt.'s Opp. at 14-19.)

     Defendant sets forth the history of the ISIS designation in his papers as follows:

In 2004, the Department of State designated "al-Qaida in Iraq" as an alias of the group Jam'at al

Tawhid wa'al-Jihad.  See Designation of Jam'at al Tawhid Wa'al-Jihad et al., 69 Fed. Reg.

75,587, 2004 WL 2912470 (Dec. 17, 2004).  In 2012, it modified that designation to include the

alias "Islamic State in Iraq."  See Review and Amendment of the Designation of al-Qa'ida in

Iraq, 77 Fed. Reg. 4082, 2012 WL 219134 (Jan. 26, 2012).  It further modified that designation

in 2014 to include the additional aliases "Islamic State of Iraq and the Levant," "Islamic State of

Iraq and al-Sham," and "Islamic State of Iraq and Syria."  See Amendment of the Designation of

al-Qa'ida in Iraq, 79 Fed. Reg. 27,972, 2014 WL 1917818 (May 15, 2014).  Additional aliases

were added in 2015, including the Islamic State, ISIS, and ISIL.  See Amendment of the

Designation of Islamic State of Iraq and the Levant, 80 Fed. Reg. 58,804, 2015 WL 5695781

(Sept. 30, 2015).  A number of regional ISIS groups have also been designated, including ISIL-

Libya, ISIS in the Greater Sahara, ISIS-West Africa, ISIS-Philippines, ISIS-Bangladesh, and

ISIL Khorasan.  (Def.'s Mem. at 15.)  ISIL-Libya was designated on May 20, 2016.  See

Designation of ISIL-Libya, 81 Fed. Reg. 32,004, 2016 WL 2910388 (May 20, 2016).

   The crux of the parties' disagreement has to do with the geographic scope of the

original ISIS designation and the extent to which the subsequent designations of regional, ISIS-

affiliated groups affects the government's ability to charge material support of ISIS in regions

where a regional group has been designated.  Defendant argues that the various ISIS aliases

indicate that it is "located" in Iraq and Syria.  (Def.'s Mem. at 14.)  He further argues that the

specific manner in which ISIL-Libya was designated—in a separate designation rather than as an

alias of ISIS—indicates that the Secretary of State intended it to be distinct from ISIS and

precludes the government from charging attempted material support of ISIS premised on intent

to do so in Libya prior to May 20, 2016.  (See Def.'s Mem. at 14-16.)  The government,

meanwhile, maintains that it can attempt to prove material support of ISIS occurring anywhere in

the world and that, in this case, it is prepared to prove at trial both that ISIS had a presence in

Libya during the relevant time period and that it was defendant's intent to support ISIS, rather

than ISIL-Libya.  (Govt.'s Opp. at 14-19.)

   I find defendant's argument that ISIS is located in a particular set of countries,

and that the government may not charge material support of that FTO occurring elsewhere,

unpersuasive.  Even if it were the case, as defendant argues, that ISIL-Libya was intended to be

distinct from ISIS, there is no evidence that the designation of the former was intended to remove the government's ability to charge material support of the latter in that country.  If defendant's argument were followed to its logical extreme, each subsequent designation of a regional ISIS group would render conduct that would otherwise have been chargeable as material support for ISIS, absent the regional designation, effectively immune from prosecution, if that conduct occured after the designation of ISIS but before the designation of the regional group.  I find this interpretation untenable, and thus I interpret the ISIL-Libya designation as expanding, rather than restricting, the number of terrorist groups that, in the State Department's view, were operating in Libya at the time of the designation.

   In this case, the government has charged attempted material support of ISIS, an FTO that was unquestionably designated during the relevant period, and has proffered that it is prepared to prove at trial both that ISIS was operating in Libya during the relevant time period and that it was defendant's intent to materially support ISIS, not ISIL-Libya.  (See Govt.'s Opp. at 16-19; Jan. 3 Tr. at 22-23.)  Whether it can ultimately prove these allegations is an issue of fact for trial, rather than an issue for resolution on a pretrial motion.  Accordingly, I respectfully recommend that defendant's motion to dismiss on this basis be denied.

   3.  **Sufficiency of the Evidence**

   Defendant next argues that the indictment must be dismissed because the evidence is insufficient for a reasonable jury to find him guilty of the offense charged.  (Def.'s Mem. at 16-24.)  The government argues that defendant's challenge to the sufficiency of the evidence is premature because it has not yet made a full proffer of the evidence that it plans to present at trial.  (Govt.'s Opp. at 19-21; Jan. 3 Tr. at 61:21-24.)

    "There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context."  United States v. Yakou, 428 F.3d 241, 246 (D.C. Cir.

2005).  Accordingly, the sufficiency of the evidence is not appropriately addressed on a pretrial

motion "[u]nless the government has made what can fairly be described as a full proffer of the

evidence it intends to present at trial."  United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir.

1998); see also United States v. Gambino, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("It is

axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior

to trial for insufficient evidence. Instead a defendant must await a Rule 29 proceeding or the

jury's verdict before he may argue evidentiary insufficiency.").

Having already found the indictment legally sufficient, and in light of the

government's representation that it has not yet made a full proffer of its trial evidence, I find it

premature to make a finding as to the sufficiency of the evidence and respectfully recommend

that defendant's motion to dismiss on this basis be denied.[11]

4. **First and Fifth Amendment Challenges**

Defendant further argues that section 2339B, as applied to the conduct alleged in

this case, violates his rights to free speech and association under the First Amendment and his

right to travel under the Fifth Amendment.  (Def.'s Mot. to Dismiss at 25-30.)  I will consider

these arguments separately below.

---

[11] Defendant asserts in his reply that "had there been additional evidence relevant to [his] insufficiency claims, the government clearly would have proffered it" and that, even if there were additional testimony to be elicited at trial, it would not be relevant to the deficiencies in the government's proof.  (See Defendant's Reply in Support of Motion to Dismiss, dated Nov. 12, 2019, Dkt. No. 40, at 16.)  The government is not required to make a full proffer of its trial evidence in its indictment.  See Alfonso, 143 F.3d at 776 ("[A]n indictment need do little more than to track the language of the statute[.]") (internal quotation marks and citations omitted).  I take the government at its word that it has not done so here and decline to speculate as to the potential relevance of evidence that is not before the court.

a. *First Amendment*

Defendant argues that the non-speech evidence against him, namely his travel to Tunisia, is so thin that the government's case at trial will necessarily rest on the admission into evidence of protected speech, namely his text messages, social media postings, and Internet search history.  (Def.'s Mem. at 26-28.)  The government argues that the speech evidence will go towards establishing *mens rea*, a permissible use of such evidence.  (Govt.'s Opp. at 24-26.)

While "[t]he First Amendment protects against government regulation and suppression of speech on account of its content,"  United States v. Caronia, 703 F.3d 149, 162-63 (2d Cir. 2012), it "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent,"  Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993); see also United States v. Kaziu, 559 F. App'x 32, 35 (2d Cir. 2014) (in a material support case, holding that defendant "was not convicted for his speech; rather, his political beliefs were introduced to prove the *mens rea* element of the charged crimes").

In order to prove the *mens rea* element of the charge under section 2339B, the government must show that: (1) defendant knowingly and intentionally attempted to provide material support to an FTO and (2) knew that the organization was designated as an FTO, or that it engaged in terrorist activity or terrorism.  See Pugh, 2015 WL 9450598, at *11.  According to the government, defendant's statements will be used as evidence that, inter alia,: (1) he knew ISIS was an FTO and was involved in terrorist activity; (2) he intended to travel for the express purpose of joining ISIS, and not to simply research the organization, as he claims; and (3) his intent was to provide a benefit to ISIS in the form of working on its behalf upon his arrival. (Govt.'s Opp. at 26.)  Such use of speech evidence is clearly permissible and directly relevant to establishing the *mens rea* element of the charge, particularly in light of defendant's assertion that

15

he was simply "interest[ed] in ISIS but confus[ed] about the group's status and aims." (Def.'s Mem. at 20.) I further decline defendant's invitation to disregard the non-speech evidence in order to reach a finding that he is being prosecuted based solely on protected speech. Without weighing the evidence, as would be premature at this stage, I note that it is the combination of speech evincing intent and subsequent action on defendant's part—attempting to travel on a one-way ticket to Libya, a location that the government has proffered it is prepared to prove was an ISIS stronghold—that form the basis of the charge against him.

With respect to association, defendant claims that he is being prosecuted for merely attempting to join ISIS. (See Defendant's Reply in Support of Motion to Dismiss, dated Nov. 12, 2019, Dkt. No. 40, at 25-26.) As the Supreme Court has made clear, "[s]ection 2339B does not criminalize mere membership in a designated foreign terrorist organization. It instead prohibits providing 'material support' to such a group." Humanitarian Law Project, 560 U.S. at 18. In this case, defendant is not charged with merely attempting to join ISIS; he is charged with attempting to provide material support to ISIS by offering himself as personnel. See id. at 39; see also Indictment. I therefore find that this prosecution does not violate defendant's rights to free speech or association under the First Amendment and respectfully recommend that his motion to dismiss based on the First Amendment be denied.

b. *Fifth Amendment*

Defendant additionally argues that section 2339B, as applied to the facts of this case, violates his fundamental right to travel under the Fifth Amendment. (Def.'s Mot. to Dismiss at 28-30.) The Fifth Amendment challenge fails for the reasons stated above. It is not mere travel that is at issue in this case; rather, it is travel with the intent to offer oneself to ISIS as personnel. As described above, and without weighing the ultimate sufficiency of the evidence, I

16

note that the government has submitted significant evidence of defendant's intent in undertaking his travel to Tunisia.  Accordingly, I respectfully recommend that defendant's motion to dismiss based on the Fifth Amendment right to travel be denied.

> 5.  **Double Jeopardy**

Defendant next argues that this prosecution violates the Double Jeopardy Clause of the Fifth Amendment because he was previously convicted of the same offense in Tunisia. (Def.'s Mot. to Dismiss at 30-34.)  The government argues that the "dual-sovereignty" doctrine renders the Double Jeopardy Clause inapplicable on these facts and that, even if the Double Jeopardy Clause did apply, defendant has not established that he is being prosecuted for the same offense as he was in Tunisia, as is required under Blockburger v. United States, 284 U.S. 299 (1932).[12]  (Govt.'s Opp. at 26-29.)

The "dual sovereignty doctrine," which was recently reaffirmed by the Supreme Court, typically renders the Double Jeopardy Clause inapplicable to prosecutions brought by separate sovereigns.  See Gamble v. United States, 139 S. Ct. 1960 (2019).  In Bartkus v. Illinois, 359 U.S. 121, 123-24 (1959), the Supreme Court suggested that a narrow exception to the doctrine applies in cases where one sovereign is "merely a tool" of the other or where one prosecution amounts to a "sham and a cover" for the other.  Since then, many circuits, including the Second Circuit, have recognized the "Bartkus exception" in the context of federal and state prosecutions.  See, e.g., United States v. All Assets of G.P.S. Auto. Corp., 66 F.3d 483, 494 (2d Cir. 1995); United States v. Aboumoussallem, 726 F.2d 906, 909-10 (2d Cir. 1984).

---

[12] Blockburger provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  284 U.S. at 304.

The Second Circuit has stated that the <u>Bartkus</u> exception applies only in "extraordinary" cases.  <u>G.P.S. Auto.</u>, 66 F.3d at 494-95.  The exception "is not triggered simply by cooperation between the two authorities," but rather "[one] government must have effectively manipulated the actions of the [other] government, so that [the other government's] officials retained little or no independent volition."  <u>United States v. Burden</u>, 600 F.3d 204, 229 (2d Cir. 2010) (quoting <u>United States v. 38 Whalers Cove Drive</u>, 954 F. Supp. 2d 29, 38 (2d Cir. 1992)); <u>see also</u> <u>United States v. Castro</u>, 659 F. Supp. 2d 415, 419 (E.D.N.Y. 2009) ("A defendant asserting this narrow exception carries the burden to show that the state and federal prosecutions are so intertwined as to undermine the assumption that two supposedly independent criminal actions were prosecuted by separate sovereigns." (internal quotation marks omitted) (quoting <u>United States v. Coonan</u>, 938 F.2d 1553, 1563 (2d Cir. 1991)), <u>aff'd</u>, 411 F. App'x 415 (2d Cir. 2011).

While several courts have considered the applicability of the <u>Bartkus</u> exception in the context of sequential foreign and domestic prosecutions, none have held it to apply.  <u>See, e.g.</u> <u>United States v. Rashed</u>, 234 F.3d 1280, 1281 (D.C. Cir. 2000); <u>United States v. Guzman</u>, 85 F.3d 823, 826-28 (1st Cir. 1996); <u>United States v. Baptista–Rodriguez</u>, 17 F.3d 1354, 1360-62 (11th Cir. 1994); <u>United States v. McRary</u>, 616 F.2d 181, 185 (5th Cir. 1980); <u>United States v. Richardson</u>, 580 F.2d 946, 947 (9th Cir. 1978) (per curiam).  In <u>Rashed</u>, which is cited by both parties in support of their respective positions, the defendant was arrested by Greek authorities, at the request of the United States, in connection with the bombing of a Pan Am flight from Tokyo to Honolulu, which killed one passenger and injured fifteen.  234 F.3d at 1281.  After Rashed's arrest, the United States sought extradition, but Greece refused and prosecuted Rashed itself.  <u>Id.</u>  He was found guilty of intentional homicide and placement of explosive devices in an

aircraft, and served eight and a half years of a fifteen year sentence in Greece before being released and re-arrested by the FBI.  Id.  In rejecting Rashed's arguments that Greece was a "tool" of the United States and that the Greek trial was a "sham," the D.C. Circuit noted that the Bartkus exception requires more than mere privity or control; rather, it requires "a relationship with a strong element of manipulation."  Id. at 1283 (citing, inter alia, Guzman, 85 F.3d at 827 (emphasizing that the Bartkus exception is limited to situations in which one sovereign "thoroughly dominates or manipulates the prosecutorial machinery of another")).

   In this case, unlike in Rashed, the Tunisian government initially offered to return defendant to the United States for prosecution, but the United States declined to accept him. (Def.'s Mem. at 32.)  Defendant argues that, by declining to take custody, the government sought to "orchestrate or promote" the Tunisian prosecution and gain prosecutorial advantage by (a) buying time to build its case against him and (b) benefitting from the use of interrogation techniques that would be unlawful in the United States.  (Id.); see also United States v. Liddy, 542 F.2d 76, 79 (D.C. Cir. 1976) ("Bartkus, as we view it, stands for the proposition that federal authorities are proscribed from manipulating state processes to accomplish that which they cannot constitutionally do themselves." (underline added)).  He additionally points to the fact that an Assistant United States Attorney flew to Tunisia on several occasions throughout his detention there, as well as the fact that Department of Justice personnel were present at all of his hearings, as evidence that the United States and Tunisia were "coordinating closely."  (See Dec. 19 Tr. at 39:13, 40:19-23; Jan. 3 Tr. at 7:21-23)  The government, for its part, maintains that the Bartkus exception is simply inapplicable to foreign prosecutions.  (See Jan. 3 Tr. at 13:3-6.)

   I need not reach the broader question of whether the Bartkus exception could theoretically apply in future cases involving foreign prosecutions because I find that it does not

apply here.  Defendant has not shown that the government's decision to decline to take custody in the first instance amounted to "manipulation" of the Tunisian officials, such that they "retained little or no independent volition."  Burden, 600 F.3d at 229.  I am furthermore not persuaded by the evidence of alleged coordination between the United States and Tunisia in the form of travel to Tunisia by various Department of Justice officials.  The case law is clear that even "significant cooperation" between two governments does not provide a basis for applying the Bartkus exception.  G.P.S. Auto., 66 F.3d at 495.  I therefore find that the dual sovereignty doctrine bars the application of the Double Jeopardy Clause in this case and respectfully recommend that defendant's motion to dismiss on this basis be denied.  Having found that the Double Jeopardy Clause does not apply, I reach no finding as whether the Blockburger test has been satisfied.

6. **Non-Delegation Doctrine**

Finally, defendant argues that section 2339B(g)(6), which sets forth the definition of "terrorist organization" by reference to section 219 of the INA, codified as 8 U.S.C. § 1189, unconstitutionally delegates legislative power to the executive branch.  (Def.'s Mem. at 34-49.)  Without challenging the constitutionality of section 1189 itself, defendant argues that the provision fails to state an "intelligible principle" for the purpose of its incorporation in section 2339B(g)(6) because it does not provide sufficiently clear guidance to the Secretary of State, who is authorized to make FTO designations, as to what constitutes a "terrorist organization."  (Id.)  Thus, defendant asserts that section 2339B(g)(6), through its cross reference to section 1189, "endows the Secretary of State with the power to write her [or his] own criminal code."  (Id. at 47 (citing Gundy v. United States, 139 S. Ct. 2116, 2131 (2019) (Gorsuch, J., dissenting)).  The government argues that the detailed statutory definitions of "terrorist activity" and "terrorism," coupled with procedural mechanisms designed to ensure Congressional control over

the designation process, are sufficient to cabin the Secretary's discretion with respect to FTO designations.  (Govt.'s Opp. at 29-31.)

While Congress is typically prohibited from delegating its legislative power to other branches of government, the Supreme Court has recognized that Congress may "obtain[] the assistance of its coordinate Branches," so long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform[.]"  Mistretta v. United States, 488 U.S. 361, 372 (1989) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)).  An "intelligible principle" is one that "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."  United States v. Henry, 888 F.3d 589, 596 (2d Cir. 2018) (quoting Am. Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946)).  In other words, Congress may not grant another branch "unfettered discretion" to make law.  See A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 537-38 (1935).

Since the articulation of the intelligible principle test, "impermissible delegation has been rarely found."  United States v. Dhafir, 461 F.3d 211, 215 (2d Cir. 2006).  Indeed, "[o]nly twice in this country's history . . . [has the Supreme Court] found a delegation excessive—in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion."  Gundy, 139 S. Ct. at 2129 (quoting Mistretta, 488 U.S. at 373 n.7 and citing Schechter Poultry, 295 U.S. 495; Panama Refining Co. v. Ryan, 293 U.S. 388 (1935)).  In contrast, the Supreme Court has "over and over upheld even very broad delegations."  Id.  For example, it has approved delegations to agencies to regulate in the "public interest," see, e.g., Nat'l Broad. Co. v. United States, 319 U.S. 190, 216 (1943); N.Y. Cent. Sec. Corp. v. United States, 287 U.S. 12, 24 (1932); authorizations for agencies to set  "fair and equitable" prices and

"just and reasonable" rates, <u>Yakus v. United States</u>, 321 U.S. 414, 422, 427 (1944); <u>FPC v. Hope</u>

<u>Nat. Gas Co.</u>, 320 U.S. 591 (1944); and a delegation to an agency to issue whatever air quality

standards are "requisite to protect the public health," <u>Whitman v. Am. Trucking Assocs.</u>, 531

U.S. 457, 472 (2001).  Delegations relating to foreign affairs are granted even greater deference

than those relating to domestic policy.  <u>See</u> <u>Zemel v. Rusk</u>, 381 U.S. 1, 17 (1965) ("Congress—

in giving the Executive authority over matters of foreign affairs—must of necessity paint with a

brush broader than that it customarily wields in domestic areas.").

Section 2339B(g)(6) defines "terrorist organization" as "an organization

designated as a terrorist organization under [section 1189]."  18 U.S.C. § 2339B(g)(6).  Section

1189, in turn, authorizes the Secretary of State to designate an organization as an FTO if he or

she finds that:

> (A) the organization is a foreign organization;
> (B) the organization engages in terrorist activity (as defined in [8
> U.S.C. § 1182(a)(3)(B)]) or terrorism (as defined in [22 U.S.C. §
> 2656f(d)(2)]), or retains the capability and intent to engage in
> terrorist activity or terrorism; and
> (C) the terrorist activity or terrorism of the organization threatens
> the security of United States nationals or the national security of
> the United States.

8 U.S.C. § 1189(a)(1) (footnote omitted).  "Terrorist activity" is defined as "any activity which is

unlawful under the laws of the place where it is committed (or which, if it had been committed in

the United States, would be unlawful under the laws of the United States or any State)" and

which involves any of a number of specifically enumerated activities, such as hijacking,

kidnapping, assassination, or use of a nuclear weapon.  <u>See</u> <u>id.</u> § 1182(a)(3)(B)(iii).  "Engag[ing]

in terrorist activity" is further defined by reference to specific activities and, in some cases,

specific mental states.  <u>See</u> <u>id.</u> § 1182(a)(3)(B)(iv).  "Terrorism" is defined as "premeditated,

politically motivated violence perpetrated against noncombatant targets by subnational groups or

clandestine agents." 22 U.S.C. § 2656f(d)(2).  Finally, "terrorist organization" is defined as "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in [terrorist activity]" and which has been designated following the procedures proscribed in section 1189.[13]  See 8 U.S.C. § 1182(a)(3)(B)(vi).

Pursuant to section 1189, the Secretary is required to notify Congress in writing seven days prior to making a designation, presenting his or her findings regarding the organization in question and the factual basis of those findings.  8 U.S.C. § 1189(a)(2)(A).  Congress retains the authority to "block or revoke a designation."  Id. at §1189(a)(5).

Given the detailed statutory guidance regarding the types of activities in which a group must engage to qualify as a "terrorist organization," coupled with procedural mechanisms to ensure Congressional oversight over the delegation process, I find that the Secretary's discretion in making FTO designations is sufficiently constrained and that section 2339B(g)(6) states an intelligible principle.  As the Ninth Circuit has explained:

> The statute authorizes the Secretary to designate only those groups that engage in terrorist activities. This standard is not so vague or indeterminate as to give the Secretary unfettered discretion. For example, the Secretary could not, under this standard, designate the International Red Cross or the International Olympic Committee as terrorist organizations. Rather, the Secretary must have reasonable grounds to believe that an organization has engaged in terrorist acts-assassinations, bombings, hostage-taking and the like-before she can place it on the list. . . . And, because the regulation involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context.

---

[13] The organization may additionally be designated "upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in [terrorist activity]."  18 U.S.C. § 1182 (a)(3)(B)(vi)(II).

Humanitarian Law Project v. Reno, 205 F.3d 1130, 1137 (9th Cir. 2000)[14]; see also United States v. Ali, 799 F.3d 1008, 1020 (8th Cir. 2015) ("The statutory scheme governing the designation of foreign terrorist organizations provides an intelligible principle. . . . [T]he statute permits the Secretary to make a designation only after making three discrete findings."); Taleb-Jedi, 566 F. Supp. 2d at 172 ("Congress has established detailed procedures to designate organizations as FTOs and it retains the power to revoke such a designation when made."); United States v. Assi, 414 F. Supp. 2d 707, 726 (E.D. Mich. 2006) ("Nor is it constitutionally impermissible for Congress to delegate this designation decision to the Executive Branch, where Congress has established detailed procedures to govern this process and retains the authority to revoke a designation, and where judicial review is available to challenge a designation.").[15]

Having considered each of the bases for dismissal that defendant has presented, I respectfully recommend that defendant's motion to dismiss the indictment be denied.

## B. Motion for a Bill of Particulars

Defendant additionally moves under Federal Rule of Criminal Procedure 7(f) for a bill of particulars.  (See Motion for a Bill of Particulars, dated July 14, 2019 ("Mot. for Bill of Particulars"), Dkt. No. 32.)  The purpose of a bill of particulars is to "inform a defendant of [the] charges [against him or her] with sufficient precision to allow preparation of a defense, to avoid unfair surprise, and to preclude double jeopardy."  United States v. GAF Corp., 928 F.2d 1253,

---

[14] While this language from Reno arose with respect to a First Amendment challenge, see 205 F.3d at 1136-37, I find its reasoning relevant and applicable to the question of whether section 2339B(g)(6) states an intelligible principle.

[15] A number of courts have additionally held that section 2339B(g)(6) does not violate the non-delegation doctrine for permitting judicial review of FTO designations only upon a challenge by the organization itself, rather than an individual defendant.  See, e.g., United States v. Chandia, 514 F.3d 365, 371 (4th Cir. 2008); United States v. Hammoud, 381 F.3d 316, 331 (4th Cir. 2004) (en banc).

1260 (2d Cir. 1991) (citing Wong Tai v. U.S., 273 U.S. 77, 82 (1927)); accord United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).  A bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  United States v. Chen, 378 F.3d 151, 163 (2d  Cir. 2004) (quoting Walsh, 194 F.3d at 47).  A bill of particulars is generally not necessary if information sought is available in some acceptable alternate form.  Bortnovsky, 820 F. 2d at 574.

"[T]he ultimate test in determining whether a bill of particulars is appropriate is whether the information is necessary, not whether it is helpful to the defendant."  United States v. Wilson, 493 F. Supp. 2d 364, 370 (E.D.N.Y. 2006) (internal quotation marks and citation omitted).  A bill of particulars "is not a discovery device and should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense."  United States v. Perryman, 881 F. Supp. 2d 427, 430-31 (E.D.N.Y. 2012) (quoting United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994)). The decision whether to grant a bill of particulars "rests within the sound discretion of the district court."  United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).

Here, defendant argues that a bill of particulars is necessary for two reasons. First, he argues that the indictment fails to provide notice of the type of support he is charged with attempting to provide because it uses "hedging language" (i.e. the phrase "including personnel, including Augustine himself").  (Mot. for Bill of Particulars at 3.)  Second, he argues that the indictment, complaint, and discovery fail to provide notice of whether and how he attempted to work under the direction or control of an FTO, which he argues is an essential element of the offense.  (Id. at 4-5); see also 18 U.S.C. § 2339B(h).  He therefore argues that the

government should be required to "provide additional information about how it intends to prove the 'direction or control' element of the charge." (Mot. for Bill of Particulars at 5.)

With respect to defendant's first argument, as explained above, the government has confirmed that personnel is the only form of support at issue in this case. (See Govt.'s Opp. at 12.) I therefore find that no bill of particulars is needed as to this issue.[16] With respect to defendant's second argument, I have already found that section 2339B(h) is not an essential element of the offense; therefore, it was not necessary for the government to plead it in the indictment. Defendant is ultimately asking for the government to detail the precise manner in which it intends to prove its case. This is not a permissible use for a bill of particulars. See United States v. Sattar, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories."); United States v. Albunio, No. 91 CR 403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established.") Accordingly, I respectfully recommend that defendant's motion for a bill of particulars be denied.

C. Motion to Compel

Finally, defendant moves under Federal Rule of Criminal Procedure 16 to compel the government to produce additional documents pertaining to his arrest and prosecution in Tunisia. (See Motion to Compel, dated Nov. 13, 2019, Dkt. No. 41.) Specifically, defendant

---

[16] The government is furthermore not required to plead beyond the word "personnel." See Pugh, 2015 WL 9450598, at *13.

claims that the documents produced to date from the Tunisian investigative file contain references to other potentially discoverable documents that are missing; therefore, he infers that the government has made an incomplete production.  (See Transcript of Status Conference, dated Feb. 24, 2020 ("Feb. 24 Tr."), Dkt. No. 80, at 7:15-8:13.)

   The government avers that it requested copies of the Tunisian investigative file and produced to defendant all documents received in response to this request.  It further states that it understands its obligations under the applicable law, including Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and will produce any additional discoverable material that it receives from Tunisia.[17]  (See Government's Opposition to Motion to Compel, dated Nov. 27, 2019, Dkt. No. 51; Letter of AUSA Craig Heeren, dated Mar. 2, 2020, Dkt. No. 68.)  These representations are sufficient to satisfy the government's discovery obligations at this time.  See United States v. Estevez Gonzalez, 19 CR 123, 2020 WL 1809293, at *5 (S.D.N.Y. Apr. 9, 2020) ("The Government has represented that '[t]o the extent that any notes or drafts constitute

---

[17] At a status conference, held on February 24, 2020, the court inquired as to whether the government would object to requesting the missing documents from Tunisia.  (See Feb. 24 Tr. at 11:9-12:18.)  The government stated that it did not object and would make the request.  (See id.)  By letter dated March 2, 2020, the government stated that it had "inquired about the feasibility of contacting Tunisian authorities to determine whether their production of materials pursuant to the U.S. government's request is complete" and confirmed that it would produce any additional discoverable material it receives.  (Letter of AUSA Craig Heeren, dated Mar. 2, 2020, Dkt. No. 68.)  It is unclear from this letter whether the request to the Tunisian government was ultimately made.  The court may not compel the government to make this request, as documents held by a foreign country are not within its "possession, custody, or control."  Fed. R. Crim. P. 16(a)(1)(E); see also United States v. Lee, 723 F.3d 134, 141 (2d Cir. 2013) (defendant not entitled to materials in the possession of the Jamaican government because the materials were not within the U.S. government's possession, custody, or control); United States v. Cotroni, 527 F.2d 708, 712 (2d Cir. 1975) (same, where the materials were in the possession of the Canadian government).  The court trusts, however, that the government will follow through in making this request, if feasible and if it has not already done so, and requests a status report as to the results of its efforts to obtain the missing documents from the Tunisian government by September 18, 2020.

exculpatory information pursuant to Rule 16, or to <u>Brady v. Maryland</u> and its progeny, the

Government has fully complied with its discovery obligations in this case, and will continue to

do so.'  That representation satisfies the Government's present obligations under Rule 16 and

<u>Brady v. Maryland</u>." (internal citation omitted)); <u>United States v. Garcia-Pena</u>, No. 17 CR 363,

2018 WL 6985220, at *6 (S.D.N.Y. Dec. 19, 2018) ("Courts in this circuit have repeatedly

denied requests for discovery orders where the government represents that it has produced

discovery to defendants pursuant to Rule 16 and has made a good faith representation to the

defense that it recognizes and has complied with its obligations under <u>Brady</u> and its progeny."

(brackets, quotation marks, and ellipses omitted)); <u>United States v. Shkreli</u>, No. 15 CR 637, 2016

WL 8711065, at *2 (E.D.N.Y. Dec. 16, 2016) ("Mr. Greebel's request for *Brady* materials is

denied because the court is satisfied with the Government's representation that it has met, and

will continue to meet, its *Brady* obligations."); <u>Pugh</u>, 2015 WL 9450598, at *30 ("In light of the

Government's representation that it recognizes and will comply with its obligations under <u>Brady</u>

and <u>Giglio</u>, this portion of Pugh's motion [requesting production of <u>Brady</u> and <u>Giglio</u> materials]

is DENIED without prejudice.").  Accordingly, I respectfully recommend that defendant's

motion to compel discovery be denied.

**CONCLUSION**

For the reasons described above, I respectfully recommend that defendant's motions to dismiss the indictment, for a bill of particulars, and to compel discovery be denied. Any objections to this Report and Recommendation must be filed electronically within fourteen (14) days.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See 28 U.S.C. § 636(b)(1); FED. R. CRIM. P. 59(b)(2).

Respectfully submitted,


_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge


Dated: Brooklyn, New York
        September 8, 2020

29