# Federal Defenders
## O F   N E W   Y O R K ,   I N C.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

September 22, 2020

<u>By ECF and Email</u>
The Honorable Sterling Johnson, Jr.
Senior United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   <u>United States v. Bernard Augustine</u>, 18-cr-393 (SJ-RML)

Dear Judge Johnson,

Mr. Augustine was a recent high school graduate when he was arrested in Monastir, Tunisia, more than 300 miles from the Libyan border, and charged with attempting to provide material support to a terrorist organization in Libya. Viewing the evidence in the light most favorable to the government, he was walking in the direction of Libya at the time of his arrest. He had no communication with anyone remotely affiliated with ISIS—no handlers, facilitators, recruiters, or individuals who could vet him for ISIS; no plan or money for traveling the remaining hundreds of miles to the Libyan border; no plan on how to cross the tightly-controlled border; no plan on how to navigate hundreds of miles through war-torn Libya to the parts of the country where members of ISIS might be found; and no plan for "joining ISIS" (the government's formulation) once he got there.

What does the government intend to try to prove that Mr. Augustine was planning to do for a terrorist organization? Although the government once mentioned at argument it would attempt to prove that "physical fighting" was required to "join ISIS," Transcript Nov. 15,

1

2019, at 7, it has notably not conceded that the defense may rely on this comment in lieu of a bill of particulars, and has, instead, done its best to avoid any explanation of what kind of work it believes Mr. Augustine was attempting to provide as support. Is it work as a homemaker? A fighter? An administrator? A doctor? A baker? Some combination of these jobs? The government says that they intend to show that Mr. Augustine planned to attempt to "join" ISIS. But even if that were true, an attempt at mere membership in an organization is not a crime. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 23 (2010).

On September 20, 2019, the defense moved to dismiss the charges on six grounds, including that the indictment was deficient and the evidence insufficient. In a Report and Recommendation ("R&R") filed on September 8, 2020, the magistrate judge rejected Mr. Augustine's arguments, as well as the motion for a bill of particulars and to compel discovery.

We now write to request that your Honor not adopt the R&R for the reasons detailed below, and more fully discussed in the motion papers, Dkt. Nos. 36 & 40, and oral arguments held before the magistrate court. Although we object to the R&R's conclusions on all points, and incorporate all prior briefing herein by reference, we focus below only on several salient points.

## Standard of Review

Where specific objections are made, a report and recommendation from a United States magistrate judge is subject to *de novo* review. 28 U.S.C. § 636(b)(1). A magistrate judge's recommendation carries "no presumptive weight." *Matthews v. Weber*, 423 U.S. 261, 270-71 (1976). Although it need not take additional evidence, the district court must arrive at its "own independent conclusion." *DeLuca v. Lord*, 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994), *aff'd*, 77 F.3d 578 (2d Cir. 1996) (quoting *Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir.1983)).

Argument

1. **Because ISIL-Libya was not yet designated as a terrorist group when Mr. Augustine was arrested for attempting to provide material support to ISIS in Libya, the charge under Section 2339B must be dismissed.**

The federal code has two similar statutes prohibiting supporting terrorism, 18 U.S.C. § 2339A and 18 U.S.C. § 2339B. For a charge under Section 2339B, the government must prove that the attempted support was for a designated group. Section 2339A, in contrast, is the appropriate charge when the government alleges support for terrorists who have not yet been officially designated. 18 U.S.C. § 2339A ("Providing material support to terrorists"). Here, Mr. Augustine is charged with attempting to support ISIL in Libya, but ISIL-Libya was designated shortly <u>after</u> Mr. Augustine's arrest. There was no other terrorist group designated in Libya at the time. Mr. Augustine, therefore, cannot be properly charged with the attempted support of the <u>designated group</u> in Libya, under 2339B.

Contrary to the R&R, this argument does not mean that Mr. Augustine's alleged conduct would be "immune from prosecution," it simply means that the alleged conduct is not properly charged as a violation of Section 2339B, as opposed to Section 2339A.

Because the government's case rests on attempted travel to join ISIL in Libya, before that group had been designated as a terrorist organization by the Secretary of State, this Court should hold that Section 2339B was not properly charged and must be dismissed.

2. **Mr. Augustine's indictment should be dismissed because it fails to allege that he attempted to work under the "direction or control" of a terrorist organization, a necessary element.**

"No person may be prosecuted" for material support of a terrorist organization through the provision of personnel "unless" the person is working under the "direction or control" of the organization. 18 U.S.C.

§ 2339B(h). Congress added the statutory requirement that the charged individual work under the "direction or control" of the terrorist organization in response to the Ninth Circuit's finding that section 2339B was unconstitutional. The Supreme Court then upheld the constitutionality of section 2339B because of the language requiring "direction or control." *See Humanitarian Law Project*, 561 U.S. 1. Because "direction or control" goes to the "very core of criminality" under the statute, it must be pleaded in the indictment. *See Russell v. United States*, 369 U.S. 749, 750 (1962).

In his motion, Mr. Augustine argued that his indictment was deficient in failing to allege that he had attempted to work under the "direction or control" of a foreign terrorist group. There is no controlling case law on this topic by the Supreme Court or the Second Circuit.

The R&R concluded that "direction or control" is merely a "definition" of "personnel," that may be omitted from the indictment, finding the reasoning of the one Eastern District of New York court to discuss the issue, *United States v. Pugh,* No. 15-CR-116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015) *8, "persuasive." Dkt. No. 83 at 10. The R&R, however, ignores that, after *Pugh* was decided, the Supreme Court addressed the difference between elements and "the various factual means" of committing an offense, explaining that "'[e]lements' are the 'constituent parts' of a crime's legal definition . . . they are what the jury must find beyond a reasonable doubt to convict the defendant." *Mathis v. United States*, 136 S.Ct. 2243, 2248 (2016). Given that subsection (h) was added by Congress to ensure the constitutionality of the statute, it cannot be "extraneous to the crime's legal requirements." *Mathis*, 136 S.Ct. at 2248 (defining facts as "mere real-world things—extraneous to the crime's legal requirements," in contrast to "elements"). Instead, subsection (h) clearly meets the *Mathis* definition of an element that must be charged in the indictment.

The *Pugh* court lacked the guidance of the Supreme Court about the difference between elements and facts, as *Mathis* was decided subsequently to *Pugh*, and, even so, *Pugh* itself acknowledged "that plausible alternative readings of the statute are defensible." *Pugh,* No. 15-CR-116 (NGG), 2015 WL 9450598, at *8. The R&R's reliance on

4

*Pugh* is, therefore, misplaced. Based on *Mathis*, as well as the plain language of 2339B(h) (fully discussed in Mr. Augustine's original motion papers, Dkt. No. 36), this Court should hold that 2339B(h) is an element of the offense that needed to be charged in Mr. Augustine's indictment.

3. **The indictment must be dismissed because no reasonable jury could find Mr. Augustine guilty of attempting to provide material support to ISIS.**

The Second Circuit has held that in circumstances in which the government has made what can "fairly be described" as a full proffer of the evidence, courts may appropriately address "the sufficiency of the evidence . . . on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998). Here, because the facts are essentially undisputed, the Court should find the evidence is insufficient.

In reaching the opposite conclusion, the R&R incorrectly takes the government at its word that it has not proffered all of its trial evidence in concluding that the sufficiency of the evidence claim is premature. But while, of course, there is always testimony the government elicits at trial which it has not yet proffered, here, none of that testimony would change the core deficiencies in the government's proof, namely that there is no allegation—nor will there be—that Mr. Augustine was ever in touch with a member or affiliate of ISIS, that he ever had an intent to work under ISIS' direction and control, or that he took a substantial step towards providing material support while working under the FTO's direction and control, as required under the statute and attempt law. It is also indisputable that he was arrested in Tunisia, as opposed to Libya where the government says ISIS was located. No trial evidence can change that fact. The evidence before the Court can thus "fairly be described" as a full proffer for purposes of determining the legal insufficiency of the charges. *See Alfonso*, 143 F.3d at 776-77.

On the merits, which the R&R does not address, the evidence is woefully insufficient to constitute attempted material support to ISIS.

5

Viewed in the light most favorable to the government, Bernard was a 19-year-old recent high school graduate, living with his mother and sisters in California, when over the course of several weeks he researched online topics related to Islamic states and made some inflammatory comments on social media and to his family before flying to Tunisia. He was touring through Tunisia in the general direction of Libya before he was arrested in Monastir, a town far closer to Tunisia's border with Algeria than with Libya. He had no connection with anyone remotely affiliated with ISIS; no plan or money for traveling the remaining hundreds of miles to the Libyan border; no plan on how to cross the tightly-controlled border; no plan on how to navigate the remaining hundreds of miles through war-torn Libya to the parts of the country where members of ISIS might be found; and no plan for "joining ISIS" (the government's formulation) once he got there.

On these facts, no reasonable jury could find three of the essential elements of the charged offense: (1) that Mr. Augustine had the intent to provide material support to ISIS, (2) that he had taken a substantial step towards doing so, and (3) that he attempted to work under the "direction and control" of ISIS.

In an attempt to salvage its prosecution, the government can point only to three cases that are radically different than Mr. Augustine's—cases that involved real intent and real steps towards committing acts of terrorism.[1] Unlike the government's three cases, which have nothing

---

[1] In *Pugh*, the defendant was a military veteran who vowed to use the skills he acquired as an Air Force mechanic and avionics instrument system specialist to develop weapons systems for ISIS and help develop its combat capabilities; described himself as a "terrorist" and "mujahid" who intended to "establish and defend the Islamic State;" attempted to recruit an undercover agent to ISIS and advised the agent on how to travel to ISIS territory; and at the time of arrest was found with substantial tactical combat gear. 937 F.3d 108 (2d Cir. 2019).

In *Farhane*, the defendant swore his allegiance to al Qaeda; promised to work as a "soldier" for al Qaeda by serving as an on-call doctor for wounded combatants in Saudi Arabia; conspired to help another individual travel to Saudi Arabia to join al Qaeda; discussed using his personal vehicle to aid al Qaeda in Riyadh; and provided his encoded phone number so that al Qaeda fighters in need of assistance could contact him. 634 F.3d 127 (2d Cir. 2011).

to do with Mr. Augustine, defense counsel provided a far wider field of material support cases in its motion papers. *See* Def. Reply Brief 21-23, Dkt. No. 40. Of the almost 80 convictions we reviewed across the country for attempted or material support for ISIS, we found no case where the defendant lacked contact with individuals they knew or believed to be members of ISIS. In every case, the defendant was in touch with recruiters, facilitators, handlers, or other members of ISIS, or themselves recruited and facilitated for co-conspirators who intended to provide material support for ISIS. And in every case, courts have required a level of engagement, activity, and intent far surpassing Mr. Augustine's. Mr. Augustine's case stands alone.

The government concedes, as it must, that dismissal of an indictment for failure to state a crime is plainly provided for under Federal Rule of Criminal Procedure 12(b)(3). Requiring that every non-material fact be exhaustively proffered before a motion to dismiss is cognizable would make a nullity of *Alfonso* and the plain reading of the Federal Rules. It would allow the government to proclaim that it has not made a full proffer, and withhold such a full proffer, to keep someone in jail for years, as it has done in this case. In the midst of a global pandemic, in a case where the government's case-in-chief entails foreign witnesses, the danger of adopting this R&R is that Mr. Augustine – who has already waited over 4 years without a trial – is forced to wait even longer to be vindicated by a jury, with no recourse to the Court's determination of the legal sufficiency of the evidence. This, surely, *Alfonso* did not contemplate.

a) A bill of particulars is necessary.

The R&R faults the defense for "asking for the government to detail the precise manner in which it intends to prove its case," and

---

And in *Kaziu*, 559 Fed. App'x 32 (2d Cir. 2014), the defendant conspired with another individual to travel to the Middle East to kill American and Somali troops on behalf of al Shabaab; expressed his intent to purchase assault rifles; traveled to Cairo in furtherance of the plan; and was in close communication with other members of al Shabaab while overseas in an attempt to travel to Pakistan, Afghanistan, and Somalia to wage jihad.

concludes no bill of particulars is necessary because the "government has confirmed that personnel is the only form of support at issue in this case." Dkt. 83 at 26. In support, it cites *United States v. Sattar*, 314 F. Supp. 2d 279, 318–19 (S.D.N.Y. 2004), in which the government made oral representations in response to the motion for a bill of particulars, "conced[ing]" that the additional factual representations it had made in its briefs and at argument could be taken as a bill of particulars." The opposite is true here. The government has not conceded that their representations during the motion process may be taken as a bill of particulars. Instead, the government just says that Mr. Augustine wanted to travel to Libya to "join" ISIS and to "work" under ISIS' direction and control. Nowhere do they say what they mean by this, or what they think Mr. Augustine wanted to do. In light of the uncertainly about what the government believes Mr. Augustine intended to do to work under the direction or control of a terrorist organization, a bill of particulars is necessary.

### 4. As applied, the material support statute is void for vagueness and violates Mr. Augustine's rights to travel, expression, and association.

If the evidence in this case were sufficient to support a conviction, then the material statute would be void for vagueness and violate Mr. Augustine's right to due process as applied, because no ordinary person would be on notice about what constitutes criminally proscribed conduct. As the Supreme Court has made clear, mere membership or association in a foreign terrorist organization is not sufficient to satisfy the criminal material support statute, nor is independent advocacy. *Holder v. Humanitarian Law Project* ("*HLP*"), 561 U.S. 1 (2010). The fact that the government's theory of criminal liability here is that Mr. Augustine intended to do something—to "join ISIS"—that is categorically not a crime, is a testament to the vagueness of the statute when applied to conduct that falls outside of what Congress meant to proscribe and could constitutionally proscribe. The government's view that Mr. Augustine is criminally liable for attempting to "join ISIS" runs afoul of the First and Fifth Amendments.

The R&R correctly states that the First Amendment does not prohibit the evidentiary use of speech to establish the *mens rea* element of a charged crime. Contrary to the R&R's summary of our argument, however, our concern is not that the government will admit speech and travel evidence at trial, but that there is no evidence of an *actus reus* beyond that speech and travel.[2] The R&R's error is based on a misstatement of the elements of the charged crime. The R&R states that Mr. Augustine's speech will be used as evidence that "he intended to travel for the express purpose of *joining ISIS*," and that "his intent was to provide a benefit to ISIS in the form of working on its behalf upon his arrival." But as *HLP* and Section 2339B itself make clear, traveling to "join" ISIS, residing in the Islamic State, or even working on ISIS' behalf (absent a showing that the work would be under the organization's direction and control), cannot be criminalized without infringing on core rights of speech, travel, and association. The government's tautological argument, which the R&R adopts, would amount to a criminalization of the very evidence it purports to be using to prove some elusive *actus reus* that it has never attempted to articulate. They have never said what they think Bernard was intending to *do*.

Finally, the R&R asserts, without explaining, that Mr. Augustine is "not charged with merely attempting to join ISIS; he is charged with attempting to provide material support to ISIS by offering himself as personnel." R&R 16. Thus, according to the R&R, the prosecution does not violate Augustine's First Amendment rights. To reach this conclusion though, the R&R ignores the government's own characterization of the crime in this case. At every turn the government has formulated its theory of liability in just such constitutionally prohibited terms: that Mr. Augustine was on his way to Libya to "join ISIS." *See* Gov't Opp. 1, 3, 4, 5, 6, 7, 8, 14, 16, 22, 26, 28, 34.

---

[2] We assume that where the R&R incorrectly states that Mr. Augustine attempted to "travel on a one-way ticket to Libya" R&R at 16, that it meant Tunisia, since Mr. Augustine has never been nor booked travel to Libya.

## 5. This prosecution violates the Double Jeopardy Clause.

Because the current United States prosecution follows a Tunisian prosecution for the same crime, Mr. Augustine has been put twice in jeopardy for the same offense. Although the dual sovereignty doctrine ordinarily renders the double jeopardy clause inapplicable to prosecutions brought by separate sovereigns, under the "*Bartkus* exception," where one country's prosecution is used as a tool of the other, or where one prosecution is a "sham and a cover" for the other, they cannot be said to be separate sovereigns and double jeopardy bars the second prosecution. *Bartkus v. Illinois*, 359 U.S. 121, 123-24 (1959).[3]

After the Tunisian authorities arrested Mr. Augustine in February 2016, they asked the United States to take custody of him instead of charging him in Tunisia. The United States refused, and instead ensured that he remained in Tunisian detention for more than two years, with no valid process and no recourse to the U.S. courts. The United States promoted and orchestrated this Tunisian prosecution, with numerous FBI agents and Assistant U.S. Attorneys involved and present in the Tunisian court proceedings, and allowed Tunisian authorities to subject Mr. Augustine to all manner of physical coercion and torture. The U.S. government preferred to keep Mr. Augustine detained in Tunisia at least in part because they had no case that could be made against him at the time of his arrest. Tunisian detention, coupled with unlawful interrogation methods, bought them the two years they needed to develop a case against Mr. Augustine in the United States, without having to consider the strictures of American due process. *See United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000) (noting that the *Bartkus* exception may apply where there are signs of "[a] prosecutorial advantage, coupled with some evidence that

---

[3] Contrary to the R&R, it is the government's burden to show that the *Bartkus* exception does not apply. *See United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996) (If the defendant can "produce some evidence tending to prove that the rule should not apply because one sovereign was a pawn of the other," then "the government must shoulder the burden of proving that one sovereign did not orchestrate both prosecutions"). The government has not disputed its burden, nor has it contested any of the facts that establish the exception.

the United States had helped bring it about, or that its existence had induced the United States to prefer and promote the foreign prosecution").

Although some degree of law enforcement coordination between foreign sovereigns can be expected, this was far more than mere cooperation. The Tunisian Ministry of Justice was deeply entangled with, and was receiving vast resources and support, from the United States at the time of Mr. Augustine's arrest. When the United States asked Tunisia to continue its detention of Mr. Augustine, it is impossible to imagine a scenario in which the Tunisians could have said 'no.' Indeed, the United States and Tunisia have the sort of special relationship involving financial aid that counsels in favor the of the *Bartkus* exception. See *Rashed*, 234 F.3d at 1283.[4] Instead, the United

---

[4] After the Jasmine Revolution in 2011, the Tunisian constitution was adopted in 2014, little more than a year before Mr. Augustine's arrest. Congressional Research Service, *Tunisia: In Brief*, The United States Dep't of Justice (Nov. 1, 2019), https://www.justice.gov/eoir/page/file/1217536/download. During that period, the United States

- committed more than $1.4 billion in aid to Tunisia. Bureau of Near Eastern Affairs, *U.S. Relations With Tunisia*, United States Dep't of State (Sep. 20, 2019), https://www.state.gov/u-s-relations-with-tunisia/; *see also* Office of the Press Secretary, *FACT SHEET: Enduring U.S.-Tunisian Relations*, The White House (May 21, 2015), https://obamawhitehouse.archives.gov/the-press-office/2015/05/21/fact-sheet-enduring-us-tunisian-relations.
- provided extensive support to Tunisia to secure its border with Libya. *See* United States Department of State Publication, *Country Reports on Terrorism 2018*, United States Dep't of Justice, 154 (October 2019), https://www.justice.gov/eoir/page/file/1215411/download#page=152; Congressional Research Service at 12.
- assisted Tunisia in the purchase of 12 Black Hawk helicopters in 2014, along with body armor, rifles, night vision goggles, reconnaissance aircraft, patrol boats, radios, and other military devices to Tunisia. Security Assistance Monitor, *Country Profile: U.S. Security Assistance to Tunisia*, Ctr. for Int'l Policy, 3 (Apr. 2015), http://www.securityassistance.org/publication/country-profile-us-security-assistance-tunisia. In 2017, the value of military supplies delivered to Tunisia was $119 million, an increase from $12 million in 2012. Lillia Blaise et. al., *Why the U.S. and Tunisia Keep Their Cooperation Secret*, N.Y. Times (Mar. 2, 2019), https://www.nytimes.com/2019/03/02/world/africa/us-tunisia-terrorism.html.

States effectively used the Tunisian prosecution as a "tool." *Rashed*, 234 F.3d at 1285. The United States encouraged and relied on the Tunisian prosecution knowing full well that Tunisia's counterterrorism policies and pretrial detention scheme violate human rights and basic international norms. *See* Def. Mot. to Suppress 7-9. And without first orchestrating the Tunisian detention, the U.S. would not have been able to prosecute Mr. Augustine here in the Eastern District of New York. Therefore "the notion of two supposedly independent prosecutions is merely a sham." *United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996). This second prosecution must be dismissed.

Even if the Double Jeopardy Clause didn't compel dismissal—and it does—the Court should dismiss the indictment to preserve the integrity of the U.S. courts, principles of comity, and international cooperation in law enforcement. The Tunisian Ministry of Justice stated in no uncertain terms to the United States their understanding that Mr. Augustine "would NOT face charges in the United States for the same crime." *See* Def. Mot. to Dismiss 33-34.

---

The United States has also provided extensive training to Tunisian military and counterterrorism personnel, and at the time of Mr. Augustine's arrest the U.S. military was actively participating in counterterrorism operations in Tunisia. The State Department has trained over 1,000 officers and 200 commanders of the Tunisian National Police and National Guard. Bureau of International Narcotics and Law Enforcement Affairs, *Tunisia Summary*, United States Dep't of State (Accessed Feb. 15, 2020), https://www.state.gov/bureau-of-international-narcotics-and-law-enforcement-affairs-work-by-country/tunisia-summary/; *see also* Blaise, *supra*. Finally, the U.S. Department of Justice has touted that its Office of Overseas Prosecutorial Development, Assistance and Training has "developed critical contacts with Tunisian investigating magistrates and the Tunisian Magistrate Judges School . . . ." Office of Overseas Prosecution, Development, Assistance and Training (OPDAT), *Worldwide Activities: Near East*, The United States Dep't. of Justice (Accessed Feb. 15, 2020), https://www.justice.gov/criminal-opdat/worldwide-activities/near-east.

<u>Conclusion</u>

For the foregoing reasons, the Court should not adopt the R&R, and should grant Mr. Augustine's motions.

_____/s/_____
Samuel Jacobson
Allegra Glashausser
Assistant Federal Defenders
Federal Defenders of New York

cc:    all counsel of record (via ECF)