DMP:CRH/JGH/JEA
F.#2016R00308

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against -                                           Docket No. 18-CR-393 (SJ)

BERNARD RAYMOND AUGUSTINE,

            Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTIONS *IN LIMINE*


JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Craig R. Heeren
Josh Hafetz
Jonathan E. Algor
Assistant U.S. Attorneys
      (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 1

I.    Background Regarding ISIS ................................................................. 1

II.   The Defendant's Attempt to Provide Material Support to ISIS ................................ 3

   A.    The Defendant's Embrace of ISIS Arose Out of His Anger Towards Women ...... 3

   B.    The Defendant's Failed Attempt to Join and Support ISIS in Libya ..................... 9

ARGUMENT ............................................................................................... 11

I.    The Court Should Advise the Defendant to Abide by Proper Courtroom Conduct .... 11

   A.    Legal Standard and Protocols for Pro Se Defendant.............................................. 11

   B.    Proposed Trial Procedures for Pro Se Defendant ................................................. 13

II.   The Court Should Permit the Government to Admit Certain Evidence as Direct
      Evidence of Attempted Material Support of ISIS or Pursuant to Rule 404(b)......... 14

   A.    Legal Standard ....................................................................................... 15

   B.    The Defendant's Own Statements Regarding ISIS, Terrorism, Radical Jihadism,
         and Violent Extremism Are Admissible ................................................... 17

   C.    ISIS-Related Materials and Similar Propaganda from the Defendant's Computer,
         Email and Social Media Accounts Are Admissible ............................................. 18

   D.    ISIS-Related Propaganda Videos That the Defendant Researched or Otherwise
         Knew About Are Admissible ............................................................... 21

   E.    Evidence of the Defendant's Derogatory Views Towards Women Is Admissible 24

   F.    Evidence of the Defendant's Arrest in Tunisia is Admissible ............................ 25

III.  Permit Expert Testimony on ISIS and Islamic Extremists ....................................... 28

IV.   Business and Official Records Certifications ........................................................... 30

V.    The Defendant's Confession Is Admissible to Impeach the Defendant .................. 33

VI.   The Defendant May Not Elicit Hearsay Statements That He Made......................... 34

VII.  The Defendant May Not Seek to Admit Information About His Conditions of
      Confinement in Tunisian Custody ....................................................................... 36

CONCLUSION.............................................................................................. 38

TABLE OF AUTHORITIES

CASES

Clark v. Perez,
  510 F.3d 382 (2d Cir. 2008) ............................................................. 12, 13

Faretta v. California,
  422 U.S. 806 (1975) ............................................................................. 12

Harris v. New York,
  401 U.S. 222 (1971) ............................................................................. 35

In re United States,
  945 F.3d 616 (2d Cir. 2019) ................................................................ 37

Kansas v. Ventris,
  556 U.S. 586 (2009) ............................................................................. 34

Melendez-Diaz v. Massachusetts,
  557 U.S. 305 (2009) ............................................................................. 32

Oregon v. Hass,
  420 U.S. 714 (1975) ............................................................................. 35

Stone v. Powell,
  428 U.S. 465 (1976) ............................................................................. 34

United States v. Abu-Jihaad,
  553 F. Supp. 2d 121 (D. Conn. 2008) .................................................. 23

United States v. Abu–Jihaad,
  630 F.3d 102 (2d Cir.2010) ............................................................ 20, 23

United States v. Carboni,
  204 F.3d 39 (2d Cir. 2000) .................................................................. 15

United States v. Colon,
  880 F.2d 650 (2d Cir. 1989) ................................................................ 16

United States v. Concepcion,
  983 F.2d 369 (2d Cir. 1992) ................................................................ 15

United States v. Davidson,
  308 F. Supp. 2d 461 (S.D.N.Y. 2004) ................................................. 35

United States v. Douglas,
  525 F.3d 225 (2d Cir. 2008) ................................................................ 34

United States v. Ellis,
  460 F.3d 920 (7th Cir. 2006) ............................................................... 32

United States v. El–Mezain,
  664 F.3d 467 (5th Cir. 2011) ............................................................... 20

United States v. Farekh,
  No. 15-CR-268 (BMC) ........................................................................ 29

United States v. Farhane,
   634 F.3d 127 (2d Cir. 2011) ............................................................. 28, 30

United States v. Germosen,
   139 F. 3d 120 (2d Cir. 1998) ................................................................ 16

United States v. Glover,
   101 F.3d 1183 (7th Cir. 1996) ............................................................... 36

United States v. Hattaway,
   740 F.2d 1419 (7th Cir. 1984) ............................................................... 27

United States v. Inserra,
   34 F.3d 83 (2d Cir. 1994) ..................................................................... 16

United States v. Jayyousi,
   657 F.3d 1085 (11th Cir. 2011) ............................................................. 20

United States v. Johnson,
   507 F.3d 793 (2d Cir. 2007) ................................................................. 35

United States v. Johnson,
   688 F.3d 494 (8th Cir. 2012) ................................................................ 32

United States v. Kasimov,
   No. 15-CR-95 (WFK) ........................................................................... 29

United States v. Kassar,
   600 F.3d 108 (2d Cir. 2011) ................................................................. 20

United States v. Kaziu,
   559 F. App'x 32 (2d Cir. 2014) ......................................................... 29, 30

United States v. Khan,
   591 F. Supp. 2d 202 (E.D.N.Y. 2008) .................................................. 15

United States v. Komasa,
   767 F.3d 151 (2d Cir. 2014) ................................................................. 33

United States v. Levy,
   731 F.2d 997 (2d Cir. 1984) ............................................................. 16, 17

United States v. Malpeso,
   115 F.3d 155 (2d Cir. 1997) ................................................................. 37

United States v. Marin,
   669 F.2d 73 (2d Cir. 1982) ............................................................... 35, 36

United States v. Mehanna,
   735 F.3d 32 (1st Cir. 2013) .................................................................. 20

United States v. Mercado,
   573 F.3d 138 (2d Cir. 2009) ................................................................. 21

United States v. Mickens,
   926 F.2d 1323 (2d Cir. 1991) ........................................................... 16, 17

United States v. Morgan,
  505 F.3d 332 (5th Cir. 2007) ............................................................................. 32

United States v. Mustafa,
  753 F. App'x 22 (2d Cir. 2018) .................................................................... 29, 30

United States v. Nektalov,
  No. 03 CR 828 (PKL), 2004 WL 1469487 (S.D.N.Y. June 30, 2004) .................................. 28

United States v. Ortiz,
  857 F.2d 900 (2d Cir. 1988) ............................................................................. 16

United States v. Pugh,
  162 F. Supp. 3d 97 (E.D.N.Y. 2016) ..................................................................... 24

United States v. Pugh,
  No. 15-CR-116 (NGG) ..................................................................................... 29

United States v. Qualls,
  613 F. App'x 25 (2d Cir. 2015) .................................................................... 32, 33

United States v. Sacco,
  563 F.2d 552 (2d Cir. 1977) ........................................................................ 12, 13

United States v. Thai,
  29 F.3d 785 (2d Cir. 1994) .............................................................................. 15

United States v. Towne,
  870 F.2d 880 (2d Cir. 1989) ............................................................................. 15

United States v. Weeks,
  716 F.2d 830 (11th Cir. 1983) ........................................................................... 15

United States v. Weiland,
  420 F.3d 1062 (9th Cir. 2005) ........................................................................... 32

United States v. Yeley-Davis,
  632 F.3d 673 (10th Cir. 2011) ........................................................................... 32

United States. Jackson,
  180 F.3d 55 (2d Cir. 1999) .............................................................................. 36

## STATUTES

18 U.S.C. § 2339B ............................................................................... 1, 18, 20

## OTHER AUTHORITIES

Nancy A. Youssef and Shane Harris, "The Women Who Keep ISIS Running: A captured ISIS
  'bride' reveals the inner workings of a women's network responsible for recruiting, spying,
  and enforcing sexual slavery in the so-called caliphate," The Daily Beast, Jul. 5, 2015
  (updated Apr. 14, 2017) ................................................................................. 25

## RULES

Federal Rule of Evidence 106 ............................................................................. 36

Federal Rule of Evidence 401 ............................................................................. 37

Federal Rule of Evidence 402 ................................................................................................. 16, 37

Federal Rule of Evidence 403 ................................................................................................. 16

Federal Rule of Evidence 702 ................................................................................................. 28

Federal Rule of Evidence 801(d)(2)(A) .............................................................................. 26, 35

PRELIMINARY STATEMENT

The defendant, Bernard Augustine, is charged with attempting to provide material support to the Islamic State of Iraq and al-Sham ("ISIS") after he became radicalized and purchased a one-way ticket to Tunisia in order to get to the then-ISIS stronghold of Libya. The defendant is appearing pro se, and trial is scheduled to begin on August 2, 2021. The government respectfully moves in limine for several rulings from the Court regarding (i) pro se courtroom conduct; (ii) the proposed admission of certain types of relevant evidence by the government; and (iii) the proposed preclusion of certain irrelevant and inadmissible evidence by the defendant. Rulings on these issues prior to the start of trial is respectfully requested to ensure an orderly and efficient functioning of the trial process.

FACTUAL AND PROCEDURAL BACKGROUND

The defendant is charged in an indictment with one count of attempting to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. The charge arises from the defendant's efforts to provide material support to ISIS in the form of personnel, i.e. by providing himself. The defendant traveled on February 18, 2016 from the United States to North Africa with the goal of joining ISIS, where he expected to fight and die for its cause. The defendant was arrested by Tunisian government authorities on February 22, 2016, before he could make it to ISIS-controlled territory across the border in Libya.

I.      Background Regarding ISIS

ISIS is a foreign terrorist organization ("FTO") that, since 2013, has conducted terrorist attacks as part of ISIS's goal of forming an Islamic state, also referred to as a "caliphate" or "khilafah" by ISIS supporters. At various times, ISIS has controlled territory in Syria, Iraq, and Libya, and maintains a presence in other countries as well. As discussed further below, the

defendant conducted research on ISIS and espoused statements consistent with ISIS's philosophy of forming an Islamic state.

ISIS has claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad, and was the deadliest terrorist organization in the world between 2014 and the end of the indictment period. ISIS supporters often traveled from countries around the world, including the United States, to ISIS-controlled territory, such as Syria and Libya, and often took steps to cover their tracks to avoid detection by law enforcement personnel. Among other services in support of ISIS, many individuals who traveled to ISIS-controlled territory became fighters responsible for defending ISIS territory from attacks by forces arrayed against ISIS, attempting to gain further territory for the caliphate, or otherwise conducting attacks in support of ISIS' violent cause. As discussed further below, the defendant knew about ISIS-related terrorist attacks like the 2015 Paris attack, researched ISIS recruitment activity and sought out information on how to "safely join" ISIS, and made statements consistent with an interest in fighting on behalf of ISIS.

Because of the importance of foreign fighters to ISIS's operations, ISIS committed significant resources to recruitment of foreign fighters, including those with ties to the United States. ISIS's recruitment efforts relied heavily on the use of the Internet, including web-distributed recruitment videos. These videos typically depicted ISIS fighters marching, training, and fighting, and also included violent acts committed by ISIS supporters, such as beheadings and other attacks. These videos also urged foreign fighters to travel to ISIS-controlled territory to join ISIS, or to carry out ISIS's objectives in other ways, such as by conducting attacks on targets of opportunity in their home nations. ISIS also released multiple audio and video messages purporting to be from its then-leader, Abu Bakr al-Baghdadi, advocating continued violence by

ISIS supporters.  As discussed below, the defendant sought out and knew about ISIS propaganda videos, including videos that targeted English-language speakers, and researched ISIS leadership figures like Baghdadi.

Women faced unique hardship in ISIS-controlled territory, and were used as recruitment tools.  Females living in areas under ISIS control were typically given subordinate roles to men, often married off to men and sometimes provided to men as sex slaves.  ISIS propaganda employed to recruit foreign fighters included material promising men that they would be rewarded with wives and sex slaves.  The evidence is expected to show that the defendant was particularly interested in ISIS because of its treatment of women.

ISIS has a presence in, among other places, Libya.  ISIS sought to use Libya as a base of operations for its terrorist activities and to impose its strict version of Islamic Law on its residents.  Moreover, numerous foreign fighters seeking to join ISIS traveled to Libya in order to join the "caliphate" proclaimed by ISIS, which initially existed primarily in Iraq and Syria, but which ISIS expanded to places in Libya and throughout the Middle East and Africa.  One common method by which these foreign fighters tried to join ISIS in Libya was by entering Libya through the neighboring country of Tunisia.  As discussed below, the evidence shows that the defendant attempted to join ISIS by traveling to Libya by way of Tunisia.

II.     The Defendant's Attempt to Provide Material Support to ISIS

A.     The Defendant's Embrace of ISIS in 2015

The government expects to prove at trial that the defendant began to adopt a radical form of Islam and support for ISIS in the second half of 2015.  Several months after breaking up with his then-girlfriend, in September 2015, the defendant wrote in an online comment that he was

"atheist," but that "if I believed god existed I would be in line with islam. They seem to be pretty patriarchal."[1]   A week later, on October 4, 2015 the defendant wrote admiringly of ISIS, stating:

> I'm not Muslim…[b]ut they are the ultimate fighters in all sense.  The mongols were just as ruthless as isis and they dominated everyone.  The key to winning is keeping women in check and taking no prisoners, always be on the offense and making no compromises.

Around that same time, the defendant began to conduct significant research into ISIS.  The defendant searched for ISIS recruitment videos and songs on October 3, 2015.  The following day, the defendant searched for "Jihadi John," a British ISIS spokesperson who appeared in numerous violent videos ordering the murder of captives and personally participating in executions.  Six days later, on October 9, 2015, the defendant searched and appeared to watch "Flames of War," one of ISIS' best-known English-language propaganda videos.  A few days later, on October 11, 2015, the defendant searched for information about Abu Bakr al-Baghdadi, at that time the leader of ISIS.  In November 2015, the defendant searched for and reviewed materials online about the recent coordinated attacks by ISIS supporters in Paris, France, which left more than 130 people dead, and again searched for the "Flames of War" propaganda video.

By the end of 2015, the defendant expressed greater interest in extremist beliefs and a radical form of Islam, writing on December 1, 2015:

> **Every day I believe even more in sharia law** or a law system and culture similar to help men of all races. **Women are property** and while they do deserve respect and lI've , giving it to them will only bring you misery and failure in your relationships and future. **A man must dominate every part of his wife and daughters life. There is no middle ground. There is no giving in. There is no fucking sympathy. Because the results of those weakness will be what we have today.**
>
> I don't believe in god but **I believe men of the west need to adopt sharia law** and adapt it to fit all religions and ideologies. I believe neo masculinity and the red pill will eventually keep going and evolving until the most extreme and powerful

---

[1] All spelling and grammar is in original, unless otherwise indicated by bracketed alteration.

> ideologies will dominate the Manosphere. Many think the Arabs are backwards but they are actually greater. Fuck modern western civilization. I'm not white but I feel for my white brothers. White men need to embrace extremism and their true Christian values if they want a future. Fuck diversity and multiculturalism. Multiculturalism is a degenerative disease to any group that accepts it. Hope that with the Internet and global awareness men will never forget these crimes against true humanity and their will be a global patriarchy that will lead humans into a greater future for a long time.

(Emphasis added).

The next day, December 2, 2015, the defendant searched for "do isis recruits get wives." Several days later, on December 9, 2015, the defendant search again for al-Baghdadi, and also searched for "daqib," a misspelling of "Dabiq," the online propaganda magazine published by ISIS. The following day, December 10, 2015, the defendant wrote in an online comment that he was going to "join Islam and have 4 virgin wives." In response to an online article and comments about women in the military, the defendant wrote on December 13, 2015 "I wanna see them face off against the Islamic state fighters." In a subsequent comment on that same article, the defendant wrote:

> **You have to be extreme. You fight extremism with extremism**…You must take everything you want with force. **And yes I am avocation revolution [advocating revolution]. And if it must be violence.** But I don't think they are strong enough to physically resist the young men of this nation. They only have power over you minds.

(Emphasis added).

Two days later, on December 15, 2015, the defendant searched for "how to safely join isis" and reviewed a website titled "How does a Westerner join ISIS? Is there a recruitment or application process?" Internet searches by the defendant over the following week in December are consistent with further radicalization, support of ISIS, and interest in traveling to the Middle East. Notably, on December 24, 2015, the defendant had searched for "al hayat media center," the name of the media wing of ISIS, which produces large amounts of its propaganda materials.

By the end of 2015, the defendant fully embraced ISIS and radical jihadism, writing on December 28, 2015, "the Islamic State is the true Islam."  The defendant's search history on and after December 28, 2015 continued to reflect extensive interest in ISIS and ISIS-related propaganda materials, and showed that the defendant's support of ISIS was rooted in, at least in part, ISIS's treatment of women.  On January 17, 2016, a month before he traveled to join ISIS in Libya, the defendant articulated his views about how women would be treated under ISIS rule:

> Western women wouldn'tt be married but enslaved.  Who said about western muslim daughters having a choice lol. **Western or not , the sharia will be established. It's a man's world.** When the west, which is on an unstoppable decile and sped up by the power of the Internet and modern travel, collapses, islam will take over. **The kilafah would expand. Women's illusion of power would vanish.** I hope you understand and would take some homemaking classes. Because that's all that you would be doing. And you would probably even like it. **And you should be grateful, you were not like the men who opposed the sharia and lost their heads**.[2]

(Emphasis added).  That same day, the defendant evangelized further about ISIS, posting a link to an English-language ISIS propaganda video and an article about the treatment of non-Muslims living in an Islamic caliphate.

Around this time, the defendant was specifically warned about the dangers of ISIS and radical jihadism.  An Imam at a local mosque that the defendant attended on a few occasions in 2015 and 2016, concerned about the defendant's state of mind, provided the defendant with several anti-radicalization brochures.  For example, one brochure, which was associated with "IslamAgainstExtremism.com," was titled "ISIS: Jihad in the Path of Satan," and advised that ISIS and jihadist terrorism was in opposition to the "most basic foundations" of Islam.  A second brochure, titled "A Warning Against Terror Groups ISIS & al-Qaedah and the Correct Islamic Position Regarding Them!" described the beheadings and other terrorist acts of ISIS as being

---

[2] "Kilafah" is a misspelling of "khilafah," a term for the Islamic state commonly used by ISIS and also used by the defendant, as discussed herein.

"barbaric" and quoted a Muslim religious scholar's statement that "The terrorism of ISIS & al-Qaedas is Islam's No. 1 enemy."

Despite these unambiguous warnings, the defendant continued to consume ISIS propaganda and research information about how to successfully travel to join ISIS.  On January 30, 2016, the defendant researched the differences between ISIS and al-Nusra Front, an al-Qaeda affiliated terrorist organization in Syria that sometimes clashed with ISIS.  That same day, the defendant again searched for information about then-ISIS leader al-Baghdadi, as well as Abu Musab al-Zarqawi, the former head of al-Qaeda in Iraq, whose activity in Iraq and Syria and belief in the need to found a radical Islamic state is largely credited as the precursor to ISIS.  The next day, the defendant searched for information and maps related to Syria, as well as "support for al nusra."

Images found on the defendant's computer also indicate that he watched, or was knowledgeable about, violent ISIS propaganda videos.  For example, the defendant's computer contained images of video files associated with ISIS and Islamic extremism, including an image associated with speech by ISIS's now deceased leader, Omar Abu Bakr al-Baghdadi, as well as an image from an infamous ISIS propaganda video showing the beheading of Christians in Libya by ISIS members.

By February 2016, shortly before he acted on his plan to travel to ISIS in Libya, the defendant articulated his belief that truly devout Muslims needed to travel to the ISIS-controlled territory and fight for the Islamic State.  In an online comment posted on February 2, 2016, the defendant described "Syrian regugges" [refugees] (i.e. those who fled the fighting in that area instigated by ISIS), as "hypocrites" who are "not worthy to be called men and muslim," because "[t]hey left the the country, abandoned their women, and ignored the call to the struggle for the

Khilifah." He further explained his view that "the lowest of Jahannam(hellfire) is for them," whereas, by contrast, "[t]he Muslims who leave the west, travel in the opposite direction of these 'refugees' , answer the call for the struggle, and march until they are victorious or martyred are the true believers." On February 11, 2016, a week before the defendant left for Tunisia, he further wrote about his apocalyptic worldview and support of ISIS, writing in part:

> I was an atheist before I learnt about the sharia and justice of Islam and it is the best way of life for all humans , Muslims or non muslims. All non muslims are allowed to live under khilafah and will be protected under the shariah. Stop living and sacrificing your live for man made laws and the profit of global elite. **Islam will destroy the global banking elite and will bring justice to the entire world, because how can you fight those who do not live for worldly gain., how can you fight those who love death more than life.**

> The whole world is against the Muslims and although they were a minority they couldn't be defeated in Afghanistan. **And now they rose up to conquer Iraq and syria. And within a 100 year's it will be the wh[o]le world, Inshaallah.**

(Emphasis added).

The defendant's research the week before he traveled was consistent with a desire to support ISIS by joining the terrorist organization in Libya and providing himself as personnel. On February 11, 2016, the defendant searched for "isis" and, the following day, reviewed a map of Khartoum, Sudan, a country that borders Libya that is known to contain ISIS facilitation networks. On February 13, 2016, the defendant searched for "kuffar," an Arabic word often translated as "nonbeliever," but which is commonly used by radical jihadists like ISIS supporters to refer to any individual, including Muslims, whom they do not believe to be sufficiently devout. On February 16, 2016, just two days before he left, the defendant searched for "egypt department of state," and reviewed the State Department country page for travel requirements to Egypt, another country that borders Libya.

Around this time, the defendant also began to engage his mother on the topics of Islam and ISIS. The defendant sent his mother various ISIS videos that extolled the virtues of

living in the Islamic State.   The defendant also sent text messages to his mother that expressed his desire to travel to the Islamic State.   For example, on February 10, 2016—eight days before he traveled to Tunisia—the defendant sent his mother the following messages:

> If I ever get lucky enough to live in khilafah, I'll burn my own passport lol.

> There's a lot you don't know about the justice of the sharia.[3]   If Mabey you understood it you wouldn't want to live here either.  [sic]

### B.   The Defendant's Failed Attempt to Join and Support ISIS in Libya

On February 18, 2016, the defendant traveled on Turkish Airlines Flight No. 80, which departed San Francisco, California and arrived in Tunis, Tunisia (via Istanbul, Turkey).  The defendant's one-way ticket was purchased on February 17, 2016 – i.e., the day before he traveled. However, when the defendant arrived at the San Francisco International Airport on February 18, 2016, Turkish Airlines representatives required him to purchase a return ticket to the United States. Records indicate that the defendant purchased the cheapest available return ticket to San Francisco, which had a return date of March 3, 2016.  Prior to departing the United States, the defendant was interviewed by a United States Customs and Border Protection ("CBP") officer at the San Francisco International Airport.   The defendant told the CBP officer that he was planning to travel to Tunisia for vacation.

On the same day as he left California, February 18, 2016, the defendant contacted his sister via Facebook, and asked her to deliver the following message to his mother:

> I'm on the plane. I already left. Don't ask me any questions over Facebook please. Don't try to contact me. If anyone calls to talk to you don't talk to them expect for mama and natasha. I'm safe . In 3 days I will message you again. I love you guys. Mama knows what I'm talking about Don't try to find me or anything. I'll be fine. I won't message back after this. Until 3 days when I reach where I'm supposed to go.

---

[3] Sharia is a system of Islamic religious law.

When his sister asked him "what are you doing," the defendant responded that he would "answer any questions after 3 days" and to "just trust your brother."

Shortly after arriving in Tunisia on February 20, 2016, the defendant contacted his family via a social media platform and stated that he was "in north africa bodering the mediterrainarian [sic]." The defendant then indicated that he would block his family members from his Facebook account, further demonstrating his consciousness of operational security. That same day, the defendant sent another message via Facebook to his family, where he continued to avoid specifically mentioning where he was traveling to, but noted that it would be "Internet free areas," and while he might be able to send an email in the future, "the length between these emails could vary and delivery is not always gauranteed."

The following day, on February 21, 2016, the day after arriving in Tunisia, the defendant sent his mother an email that revealed his interest in fighting and dying for ISIS, writing, in relevant part:

> **My purpose in life is to seek the ultimate justice.** I see a lot of very wrong and truly evil things happening in this world, things you dont know about**, im not mad or mentally ill.** I really truly am on a path to fight for justice and if I see unjustified where I'm going I promise I will fight that also. True justice. I can't … sit in ignorance. There is no other meaning in life to me. There is two reasons why this is the best path in life for me.
>
> **1. When I die, if God accept me. We will all live in paradise forever.**
>
> 2. If I pass on before you, you and [name redacted] and [name redacted] will learn to see the injustice and because of you being able to see it you will be able to defend yourselves against it. I'm doing this so you [name redacted] and [name redacted] will learn how to protect yourselves from the manipulation of the masters of evil and their lies. . . .
>
> The good people in this world bring balance and push back against evil. **And give their lives freely in the process.** Today in this day and age I believe this is the right path. . . .

**I hope this isn't my last message to you but I trying to summarize all my emotions and thoughts into this for you just in case anything happens.** For you to read to remember me if you haven't heard from me. . . .
. . . you are the source of my strength **in the battle's to come in my future, because I had to sacrifice my life with you who were precious to me for this path**. So please pray for me that **I will be victorious over my and Gods enemies.**

(Emphasis added).

On February 22, 2016, the defendant was detained by Tunisian law enforcement on the suspicion that he was attempting to travel to Libya to join ISIS. Following his arrest, the defendant was interviewed by U.S. law enforcement, and admitted that he had traveled to Tunisia for the purpose of joining ISIS in Libya, after initially intending to join ISIS in Syria. The defendant admitted to knowing that ISIS required military service, that he would have to fight for ISIS, and that ISIS was responsible for multiple terrorist attacks.[4] The defendant was convicted under Tunisian law of terrorism-related offenses, and served approximately two years in Tunisian custody. The defendant was subsequently expelled from Tunisia and returned to the United States, first landing at John F. Kennedy International Airport, in Queens, New York. On February 27, 2018, the defendant was charged by the United States with one count of attempting to provide material support to ISIS.

<u>ARGUMENT</u>

I.    <u>The Court Should Advise the Defendant to Abide by Proper Courtroom Conduct</u>

    A.    <u>Legal Standard and Protocols for Pro Se Defendant</u>

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." <u>Faretta v. California</u>,

---

[4] As discussed below, because those statements were not made pursuant to a <u>Miranda</u> waiver of rights, the government only intends to use them to impeach the defendant should he choose to testify or in a rebuttal case should he make arguments or elicit testimony inconsistent with such statements.

422 U.S. 806, 819 (1975).  Where, as here, the defendant has knowingly and intelligently invoked the right to appear pro se, he "may mount a defense consisting of nothing more than a protest against the court's legitimacy and a refusal to attend trial."  Clark v. Perez, 510 F.3d 382, 390 (2d Cir. 2008) (holding that he has no right to be protected from the prejudice that may result). Nevertheless, "the right to self-representation is not without limits."  Id.  Those limits include compliance with certain procedures, protocols and conduct at trial, and the possibility that self-representation may be terminated if the defendant fails to obey the court.  See Faretta, 422 U.S. at 834 n.46; United States v. Sacco, 563 F.2d 552 (2d Cir. 1977).

The Second Circuit has identified several procedures to follow when a defendant elects to proceed pro se.[5]  The defendant should be instructed that:

(1) he will be treated "as an attorney" and "[will] be held to the rules of law and evidence";

(2) "he should refrain from speaking in the first person as though he were testifying, or voicing personal observations in his comments on the evidence";

(3) he should "refrain from commenting upon matters not in evidence or solely within his personal knowledge of belief;"

(4) any time he "stray[s] beyond bounds, the [Court], either at the government's objection or sua sponte, [will] caution the jury in appropriate terms";

(5) "anything [the defendant] says in his 'lawyer' role is not evidence against him…and his remarks are to be regarded no differently than those of the attorneys in the case."

(6) "if he deliberately fails to obey or willfully engages in obstructionist misconduct, his self-representation may be terminated."

---

[5] The procedures identified herein were discussed by the Circuit in the context of potential prejudice to a co-defendant, but are equally applicable to a single-defendant trial.

<u>Sacco</u>, 563 F.2d at 556-57.  Additionally, the jury should be instructed "in [the Court's] closing remarks before summation, during summations and in its final instructions that nothing that lawyers [say is] evidence in this case."

Failure to comply with the Court's instructions, or otherwise disrupt proceedings, may permit the Court to terminate the defendant's right to self-representation and order standby counsel to continue trial on the defendant's behalf.  See <u>Clark</u>, 510 F.3d at 395 ("A trial court may deny the right to act <u>pro se</u> where the defendant deliberately engages in serious and obstructionist misconduct, or is not able and willing to abide by rules of procedure and courtroom protocol." ) (citations omitted).

B.    <u>Proposed Trial Procedures for Pro Se Defendant</u>

In light of the above principles, the government respectfully requests that the Court take the following measures to ensure that the defendant's <u>pro se</u> status does not interfere with the proper function of the trial, or otherwise improperly prejudice the jury:

First, the Court should instruct the defendant about how he is to conduct himself at trial, in accordance with <u>Sacco</u>, including the above-described instructions that he will be held to the rules of law and evidence, cannot speak in the first person or make personal observations on the evidence, and refrain from commenting on matters not in evidence.  The Court should further advise the defendant that he may be admonished if he violates those instructions and that the Court may provide the jury with a corrective instruction.  The Court should also advise the defendant that, if he engages in continued violations of the Court's instructions, his right to self-representation may be terminated.

Second, the Court should advise the jury that what the defendant says when he is operating as a lawyer does not constitute evidence and that the only evidence the jurors may consider are testimony and other evidence admitted at trial.  The Court should remind the jury that

the defendant has a constitutional right to remain silent, and does not have any obligation to testify, but that his statements can only be considered as evidence if he decides to testify. The jury should be given this instruction before both openings and summation, and at any time during the trial, if necessary, to correct any improper conduct by the defendant.

Third, the government respectfully requests that the defendant be required to remain at the defense table or at the podium during questioning of witnesses, and that the defendant not be permitted to approach any witness or member of the jury. Should the defendant need to provide any materials to a witness, or seek to publish a document to the jurors, the government submits that standby counsel can hand the material to the witness or show it to the jury. The government further requests that, if the Court conducts a sidebar, a member of the U.S. Marshals Service be present and near the defendant during such a sidebar. To the extent it is requested by the defendant, the government agrees that the defendant may wear civilian clothing during trial in the presence of the jury.

Fourth, if the defendant does not comply with the Court's instructions or is disruptive, the Court should advise the defendant of the risk that his self-representation may be terminated and, if improper conduct continues, the court should terminate his self-representation and order standby counsel to operate as the defendant's trial counsel.

II. The Court Should Permit the Government to Admit Certain Evidence as Direct Evidence of Attempted Material Support of ISIS or Pursuant to Rule 404(b)

On July 13, 2021, the government notified the defendant of certain categories of evidence that it would seek to admit at trial as direct evidence of the charged crime or pursuant to Federal Rule of Criminal Procedure 404(b). See ECF No. 163. As set forth in this section, the categories of evidence identified in that notice should be admitted at trial.

A.      Legal Standard

Evidence is admissible if it is relevant, meaning that it has a tendency to make a fact more or less probable, and that fact is of consequence to the action.  See Fed. R. Evid. 401, 402.  Evidence of uncharged acts, even uncharged acts that amount to criminal activity, is admissible as direct evidence of the crime charged in the indictment.  See, e.g., United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989).  In Towne, the Second Circuit specifically identified three categories of uncharged criminal activity that constitute direct evidence of the charged offense:

> Evidence of uncharged criminal activity is not considered "other crimes" evidence under Fed. R. Evid. 404(b) if it "arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial."

Towne, 870 F.2d at 886 (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983)); see also Carboni, 204 F.3d at 44; United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997); United States v. Khan, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (Irizarry, J.) (quoting Carboni).

Moreover, the Second Circuit has stated that evidence is "not other act evidence within the meaning of Rule 404(b)" if it is "admissible to prove material facts other than [the defendant's] propensity to commit a crime."  United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992).  Indeed, relevant evidence is "not confined to that which directly establishes an element of the crime."  Gonzalez, 110 F.3d at 941.  "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  Id.; see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story

of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

   Alternatively, under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts" is admissible when offered for any purpose other than the defendant's criminal propensity. See, e.g., United States v. Germosen, 139 F. 3d 120, 127 (2d Cir. 1998); United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984). Rule 404(b) itself contains a non-exhaustive list of proper purposes for which "other act or crime" evidence may be admitted, including "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Fed. R. Evid. 404(b); see also Levy, 731 F.2d at 1002. Although the government "must explain in detail the purposes for which the evidence is sought to be admitted," the Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application. Levy, 731 F.2d at 1002 ("We have adopted the inclusionary or positive approach to [Rule 404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

   A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under Rule 404(b). First, the evidence must be offered for a purpose other than to prove the defendant's bad character or criminal propensity. See United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991) (citing United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989)). Second, the evidence must be relevant under Rules 401 and 402 and more probative than prejudicial in accordance with Rule 403. See Mickens, 926 F.2d at 1328 (citing United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988)); Levy, 731 F.2d at 1002. Third, if the defendant requests a jury instruction as to the limited purpose for which the government's evidence is admitted, the court must furnish such an instruction. See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.

16

B.   The Defendant's Own Statements Regarding ISIS, Terrorism, Radical Jihadism, and Violent Extremism Are Admissible

The government intends to introduce the defendant's own statements about ISIS, terrorism, and radical jihadism as direct evidence of the defendant's attempt to provide material support to ISIS.  As discussed above, the defendant made numerous statements online and to family members that reflect his support for ISIS and his embrace of its violent ideology.  The defendant discussed his support for sharia law and his hope for its spread, his belief in violent revolution and extremism, that "the Islamic State is the true Islam," that men who opposed sharia "lost their heads," and that Muslim men who fled from the violence caused by ISIS were "hypocrites" while those who traveled to ISIS and be martyred (like he tried to do) were the "true believers," and that ISIS had "conquer[ed] Iraq and [S]yria" and would eventually conquer "the whole world, Inshaalah."  In written messages to his family, the defendant discussed how he hoped to be "lucky enough to live in" the ISIS caliphate and his desire to burn his U.S. passport if he made it to ISIS territory.  After he had traveled to Tunisia, the defendant sent a letter to his mother expressing his hope to die a martyr: writing, among other things that his goal was to "seek the ultimate justice," that he and his family would "all live in paradise forever" when he died, that good people like himself "give their lives freely," and that his family would be his strength in the "battles to come" where he hoped to be "victorious over my and God['] s enemies."

To find the defendant guilty of attempted material support for ISIS, the government must prove, among other things, that the defendant attempted to provide himself as "personnel" for ISIS and that he acted knowingly and intentionally, including knowing that ISIS was an FTO or engaged in terrorism or terrorist activities.  See 18 U.S.C. § 2339B(a)(1) (government must prove that the defendant has "knowledge that the organization is a designated terrorist organization . . . has engaged or engages in terrorist activity . . . or . . . has engaged or engages in

terrorism.").  The defendant's statements to others about ISIS, his radical jihadist ideology, and his views about people who travel to provide support to ISIS is direct evidence of the defendant's intent to provide such support himself.

Although this evidence unambiguously constitutes direct evidence of the defendant's knowledge and intent to support ISIS, the evidence would also be admissible as "other act" evidence under Rule 404(b).  The evidence provides the motive for the defendant's ultimate decision to travel to Tunisia to support ISIS.  It also helps prove a lack of mistake.  The defendant may argue that he was only traveling on vacation, or because he wanted to report on what ISIS was doing, and this evidence demonstrates that, to the contrary, he expressly wanted to join and support ISIS' goal of expanding its territory by violent means.

C.   ISIS-Related Materials and Similar Propaganda from the Defendant's Computer, Email and Social Media Accounts Are Admissible

The government also seeks to admit materials recovered from the defendant's laptop computer and accessed by the defendant through social media as direct evidence of the defendant's attempt to provide material support to ISIS or, in the alternative, as "other act" evidence offered to prove the defendant's preparation, plan, knowledge, motive, and intent pursuant to Rule 404(b).

The defendant's computer, internet search history, and social media activity reflect substantial consumption of ISIS and other radical jihadist propaganda.  For example, the defendant searched for "how to safely join ISIS," sought to watch ISIS propaganda videos like "Flames of War," and researched leaders of ISIS like al-Baghdadi.  The defendant also researched other terrorist organizations, like al-Qaeda and al-Nusra Front, often seeking out information about how they differed from ISIS and why they were in conflict.  The defendant's computer also contained images of figures who preached radical jihadist ideology such as al-Baghdadi, Abu Haleema, Musa

Cerantonio and Abdullah el-Faisal, as well as images of figures who had conducted acts of Islamic terrorism, all of which is directly relevant to his knowledge that ISIS was an FTO, and engaged in acts of terrorist activity or terrorism.

The government intends to argue that the defendant radicalized and formed his decision to travel and support ISIS after searching for and reviewing the jihadist materials found on his computer, email and social media accounts, as described in part above.  The defendant's immersion in such materials in the days, weeks, and months before he departed for Tunisia was a part of an ongoing process of indoctrination that culminated in the defendant's decision to travel to Libya, via Tunisia, to join ISIS.  The evidence recovered from the defendant's computer, email and social media accounts tend to show that the defendant was motivated by a jihadist ideology, shared the aims of ISIS in particular, understood their violent and terroristic activity, and was interested in joining and being recruited by ISIS.  The evidence therefore is highly probative of the defendant's motive and intent in traveling to Libya by way of Tunisia.

The evidence also constitutes direct evidence of the charged attempt to provide material support to ISIS because it is inextricably intertwined with other evidence of the charged offense and is necessary to enable the jury to understand the complete story of the defendant's conduct and intent.  In order for the jury to understand the defendant's radicalization, his embrace of ISIS's goals, and his willingness and intention to travel through Tunisia to the Libyan border to join ISIS, the jury must understand the radical propaganda materials the defendant absorbed and embraced during the weeks and months before his journey.  Such evidence is regularly admitted in trials involving terrorism and material support of an FTO.  See United States v. Abu–Jihaad, 630 F.3d 102, 133–34 (2d Cir.2010) (affirming conclusion that "pro-jihadist contents of the videos were relevant to understanding [the defendant's] motive and intent"); United States v. Mehanna,

735 F.3d 32 (1st Cir. 2013) (holding pictures, videos and literature the defendant "absorbed and endorsed" admissible to establish that the defendant, "inspired by terrorist rants, developed an anti-American animus" culminating in his decision to travel to Yemen to join al-Qaeda); United States v. El–Mezain, 664 F.3d 467, 509-10 (5th Cir. 2011) (holding that material seized from the defendant, "including images of violence and videos glorifying Hamas and depicting Hamas leaders, was probative of the motive or intent of the [defendant] to support Hamas"); United States v. Jayyousi, 657 F.3d 1085, 1108 (11th Cir. 2011) (holding that televised interview with Osama bin Laden was properly admitted as "state of mind evidence").

Second, the materials are highly probative of the defendant's knowledge that ISIS was a designated FTO, and that ISIS engaged in terrorist activity and terrorism. See 18 U.S.C. § 2339B(a)(1); United States v. Kassir, 600 F.3d 108, 129 (2d Cir. 2011) (observing that statute requires proof that the defendant knows that "the organization he is aiding is a terrorist organization or engages in acts of terrorism"). Here, the defendant researched and reviewed pro-ISIS propaganda, compared ISIS to other terrorist organizations, and researched the leadership of ISIS. These materials thus constitute direct evidence of the defendant's knowledge that ISIS was an FTO and engaged in terrorism and terrorist activity.

While the government respectfully submits that the pro-ISIS materials recovered from the defendant constitute direct proof of the charged crimes, the evidence also is admissible pursuant to Federal Rule of Evidence 404(b) as "other act" evidence of preparation, plan, knowledge, motive, and intent. As set forth above, the evidence is highly probative of the defendant's knowledge of ISIS's existence, goals, and terrorist activities. That the defendant viewed materials promoting ISIS's ideology and glorifying its methods and means is probative of the defendant's motive to join ISIS and his intent to join the group when he traveled to Tunisia.

With regard to a Rule 403 analysis, the potentially prejudicial impact of the materials does not outweigh their probative value, much less substantially outweigh it. The defendant is charged with attempting to join a violent terrorist organization; that organization's conduct is not more inflammatory than the charged attempt, provided the attempt is placed in context, as it must be. To the extent the Court is concerned that the evidence presents a risk of undue prejudice, that concern – either in the context of direct or 404(b) evidence – can be addressed through a limiting instruction to the jury. See United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where challenged evidence "not especially worse or shocking than the transactions charged" and where district court "gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence"). In sum, the evidence is highly probative of the charged offenses and should be admitted at trial.

D.    ISIS-Related Propaganda Videos That the Defendant Researched or Otherwise Knew About Are Admissible

In a similar vein, the government also moves to introduce excerpts of ISIS and other radical jihadist propaganda videos that the defendant viewed or had knowledge about.

As noted above, the government anticipates introducing image files recovered from the defendant's computer that appear to be images from certain propaganda videos, which tends to prove that the defendant knew about these videos. Additionally, the government will introduce evidence of the defendant's internet search history, which includes searches for ISIS propaganda videos like "Flames of War," as well as online posts by the defendant of other ISIS propaganda videos. The government's expert witness on ISIS has reviewed the images files from the defendant's computer, the search terms used by the defendant, and the names of the files that were posted by the defendant, and identified the videos that each of these are associated with. The government anticipates that the expert will be able to testify about the content of the videos and

their relationship to ISIS recruitment and propaganda. Finally, the government anticipates admitting and publishing excerpts of some of the videos to the jury.

This evidence is admissible for the same reason as the aforementioned materials found on the defendant's computer, internet history and social media accounts:  it is direct evidence of the defendant's radicalization and decision to support ISIS by traveling to a country where he could submit as personnel to their terrorist cause.  For example, the ISIS propaganda video filmed on a beach in Libya, which the defendant had an image of on his computer, is proof of the defendant's knowledge of ISIS activity in Libya, and his knowledge that ISIS engaged in acts of violent terrorism.

The admission of the above-described evidence does not run afoul of Rule 403 because the probative value of the evidence is not outweighed, much less "substantially outweighed," by any risk of unfair prejudice.  The government does not intend to show the jury the entire content of videos depicting graphic violence, such as the rounding up of captives to be beheaded, but rather proposes to play only excerpts of such violence so that the jury understands what the defendant was viewing prior to his travel to Tunisia. Evidence that the defendant watched videos and related materials glorifying and promoting ISIS's violent tactics is highly probative of the defendant's knowledge and intent in attempting to join a brutally violent terrorist organization.

In United States v. Abu-Jihaad, the Second Circuit affirmed the trial court's determination that the probative value of video excerpts depicting violent combat scenes, "including an execution and a suicide truck bombing," on the question of the defendant's motive and intent outweighed the risk of undue prejudice.  Id. at 113 n.12, 132-34.  The Second Circuit observed that, "[a]lthough these excerpts included depictions of violence, as was necessary not to distort the sense of the films as a whole, the depictions were limited and, as the district court

accurately observed, less gruesome than many seen on nightly news dispatches from Baghdad." Id. at 102 (internal quotation marks omitted).  The district court, in the ruling affirmed by the Second Circuit, held that because the videos glorified martyrdom and the killing of non-believers, they provided circumstantial information of the defendant's intent.  United States v. Abu-Jihaad, 553 F. Supp. 2d 121, 128 (D. Conn. 2008).  The same is true here.  See also id. ("[I]t is difficult – if not impossible – for the Government to give the jury an accurate sense of the nature of these video without playing for the jury some of the violent and graphic portions of the videos. Otherwise the jury would have an inaccurate sense of their content.").

Specifically, the government proposes to introduce excerpts of the video evidence and to describe other portions – executions and beheadings, for example – through agent testimony rather than playing those portions to the jury.  The government will provide the Court and the defendant with the proposed exhibits in advance of trial.  See, e.g., Abu-Jihaad, 553 F. Supp. 2d at 128 (admitting excerpted portions of terrorist videos and permitting explanation about an excerpted video that contained "dead martyrs that are bloody.").  Notably, a similar practice was permitted by Judge Garaufis in United States v. Pugh, a prior case in this district where the defendant was charged with attempt to provide material support to ISIS by traveling to a location held by the FTO and volunteering himself as personnel.  See United States v. Pugh, 162 F. Supp. 3d 97, 117-18 (E.D.N.Y. 2016), aff'd, 937 F.3d 108 (2d Cir. 2019), opinion amended and superseded, 945 F.3d 9 (2d Cir. 2019), and aff'd, 945 F.3d 9 (2d Cir. 2019) (permitting admission of edited clip that "shows executioners, wielding knives, in the moments before an unseen execution" because it was "highly relevant").  Similar to the videos admitted in Pugh, the videos in this case are largely "intended for an English-speaking audience . . . recount[] the history of

ISIL" and also "depicts the actions of ISI[S] fighters in a battlefield," which therefore "speaks directly to the charged conduct." Id.

    E.    Evidence of the Defendant's Derogatory Views Towards Women Is Admissible

The government also intends to introduce evidence of the defendant's derogatory views towards women, because those views are a foundational element of his radicalization and are inextricably intertwined with his decision to provide material support to ISIS.

The government intends to argue at trial that the defendant embraced radical jihadist ideology and ISIS due in part to their negative views towards women. The defendant became more interested in extremist forms of Islam and ISIS after he broke up with his girlfriend. The defendant himself wrote statements connecting his support for ISIS and radical jihadist ideology to their inferior treatment of women, such as the view that they are "property." The defendant also expressed the belief that, with the spread of an ISIS caliphate, "women's illusion of power would vanish."

The defendant also conducted searches for information about the treatment of women under ISIS, such as whether ISIS recruits were given wives, and also commented online that he would have "4 virgin wives." The defendant's search history reflects that he reviewed an article about a "women's network within ISIS that's responsible for recruitment, retention, intelligence, and sexual slavery in the so-called caliphate."[6]

---

[6]    See Nancy A. Youssef and Shane Harris, "The Women Who Keep ISIS Running: A captured ISIS 'bride' reveals the inner workings of a women's network responsible for recruiting, spying, and enforcing sexual slavery in the so-called caliphate," The Daily Beast, Jul. 5, 2015 (updated Apr. 14, 2017) (available at https://www.thedailybeast.com/the-women-who-secretly-keep-isis-running) (last visited July 12, 2021)

The government also anticipates presenting testimony from an ISIS expert that ISIS' treatment of and views about women, including marrying women off to ISIS fighters or treating them as sex slaves, were used as as recruiting tools for foreign fighters.

In light of the defendant's own statements, and the fact that ISIS used these beliefs to recruit foreign fighters, evidence of the defendant's derogatory views towards women is direct evidence of his knowledge of ISIS and his intent to join the FTO in Libya.  The defendant specifically connected his support for ISIS to his views towards women, making such evidence directly relevant to this case.

This material is also admissible under Rule 404(b).  The defendant's negative views toward women provide a motive for why he turned towards an ideology and terrorist orgnaization with a history of treating women as inferior to men.  The evidence also demonstrates the defendant's intent and knowledge, as it tends to rebut any alternative claims that he was interested in ISIS for purely academic reasons.

F.    Evidence of the Defendant's Arrest in Tunisia Is Admissible

The government seeks to admit evidence that the defendant was arrested in Tunisia. The evidence is expected to consist of (1) testimony of FBI agents who visited the defendant shortly after his arrest by Tunisian officials; and (2) the defendant's own statements to FBI agents, during a flight from Tunisia to the United States, where he discussed his period of incarceration in Tunisia.  The former is admissible because it is based on the first-hand observations of the FBI agents who observed the defendant in custody, and the latter is admissible as a non-hearsay statement by an opposing party.  See Fed. R. Evid. 801(d)(2).[7]

---

[7]    The defendant's statement was made spontaneously and voluntarily, and was not the product of any question posed by a law enforcement officer.  Neither the defendant, nor his prior counsel have moved to suppress the statement on any basis.

The fact that the defendant was arrested in Tunisia is directly relevant to prove that he attempted to provide material support to ISIS.  Most obviously, the defendant's arrest establishes that the defendant was in Tunisia.  Proving that the defendant traveled to Tunisia is important to demonstrate that the defendant took the necessary "substantial step" sufficient to prove attempted material support.  As the Second Circuit explained in United States v. Pugh, "a defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed."  937 F.3d 108 (2d Cir. 2019).

In Pugh, the district court permitted the introduction of similar evidence—that Turkish officials stopped and apprehended the defendant at the airport, denied him entry to Turkey, and compelled his return to Egypt where he was ultimately arrested.  Notably, the Circuit in Pugh rejected the defendant's argument that there was insufficient proof of a substantial step based in part on the fact that he had been "apprehended" by foreign officials:

> The evidence, taken together and viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Pugh engaged in a substantial step toward providing material support to ISIS.  **Although he was apprehended by Turkish officials before he was able to complete his plan**, the evidence supports the finding that he was traveling to Turkey to cross the Syrian border in an effort to join ISIS.  Although he did not have an ISIS contact, nor had he sworn a formal oath of allegiance to the organization, the steps he had completed were nonetheless substantial and were "planned to culminate" in his support of ISIS….**But for the interference of Turkish officials,** there is no indication that Pugh would not have completed his journey to Syria to join ISIS.  Accordingly, there was sufficient evidence to sustain the jury's conclusion that Pugh took a substantial step toward providing material support to a foreign terrorist organization.  His conviction on count one is affirmed.

Pugh, 937 F.3d at 119–20 (citations omitted) (emphasis added).  Just as the fact that the defendant in Pugh was apprehended and deported for later arrest by the U.S. was relevant and properly

admitted in that case, so too is the fact of the defendant's arrest and subsequent expulsion to the United States in the present case.

Second, the evidence is also admissible because it is "inextricably intertwined" with the facts of the case.  In order to avoid confusion and understand the facts of this case, the government should be permitted to introduce evidence (1) that the defendant was prevented from traveling beyond Tunisia to another country (like his intended destination, Libya) because he was arrested and detained before he could do so and (2) the defendant was only returned to the United States two years later by the Tunisian government.  In addition to providing direct proof of an element of the offense, as described above, this information is admissible because it fills a "chronological and conceptual void" that would otherwise exist in the facts of the case.  United States v. Hattaway, 740 F.2d 1419, 1425 (7th Cir. 1984).  In Hattaway, a case involving a kidnapping, the court permitted the introduction of much more inflammatory evidence—a prior murder by the defendants that occurred immediately prior to the charged kidnapping.  The court concluded that the evidence "helped the jury understand many important factors" surrounding the victim's abduction, and was necessary to include since it was the basis for why the victim ultimately called law enforcement.  Id.  Here, the prejudice to the defendant is minimal because the arrest is for the same set of conduct he is charged with in this case; by comparison, the evidence in Hattaway had much greater risk of prejudice given it involved the introduction of evidence about a prior murder, a separate and much more serious crime.

Finally, any residual risk of undue prejudice can be remedied by an instruction to the jury.  The government does not object to an instruction advising the jurors that they should not treat the defendant's arrest as evidence of his guilt, only that he was unable to travel any further beyond Tunisia after 2016, and was returned to the United States in 2018.

27

III.    Permit Expert Testimony on ISIS and Islamic Extremists

The government intends to present expert testimony from Professor William Braniff, an expert on ISIS and Islamic extremists, including the use of certain key concepts and terms, as well as ISIS and Islamic extremist-related materials associated with the defendant.[8]

Expert testimony is permitted where a witness who is qualified to testify about their specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue."  See Fed. R. Evid. 702.  "The Second Circuit has routinely upheld the admission of expert testimony offered by the government to explain the workings of criminal transactions and enterprises—such as narcotics trafficking, organized crime, and money laundering—that, without explanation, would be esoteric or otherwise beyond the understanding of the average juror." United States v. Nektalov, No. 03 CR 828 (PKL), 2004 WL 1469487, at *2 (S.D.N.Y. June 30, 2004) (collecting cases).  The Second Circuit has also routinely permitted expert testimony on foreign terrorist organizations and terrorism in cases involving material support for foreign terrorist organizations like ISIS.  See, e.g., United States v. Farhane, 634 F.3d 127, 159 (2d Cir. 2011) (holding that expert testimony on al-Qaeda history and structure, as well as on jihadist propaganda materials, was properly admitted in case charging material support to al-Qaeda, and explaining that the rationale for permitting expert testimony on criminal organizations "applies with equal force to terrorist organizations"); United States v. Mustafa, 753 F. App'x 22, 32-33 (2d Cir. 2018) (summary order) (affirming admission of expert testimony "regarding al Qaeda's history, structure, and methods"); United States v. Kaziu, 559 F. App'x 32, 38 (2d Cir. 2014) (summary order) (holding that expert testimony was properly admitted regarding how two

---

[8]      The government previously provided notice to the defendant of its intent to offer this expert testimony and particular witness by letter, dated May 4, 2021.

different foreign terrorist organizations "distribute their propaganda through 'media wings,' and how outsiders' familiarity with such material facilitates their assimilation into terrorist groups").

Here, the government intends to introduce the same type of expert testimony as has been previously upheld as admissible in similar prosecutions.  Professor Braniff is expected to testify about (i) the history, leadership and activities of ISIS during the relevant time period; (ii) ISIS's conduct in Libya and attempted recruitment of foreign fighters; (iii) means and methods of travel to ISIS-controlled territories like Libya; (iv) the treatment of women living under the control of ISIS; (v) particular types of propaganda disseminated by ISIS and other Islamic extremists; and (vi) an explanation and definitions of specialized terms and concepts—such as caliphate, Dawla, dunya, jihad, hijra, kuffar, and others—that are used by or in the context of ISIS and Islamic extremism.  Similar testimony has frequently been permitted in material support for FTO cases in this district.  See, e.g., United States v. Kasimov, No. 15-CR-95 (WFK), Trial Tr. at 148-49 (ECF No. 433) (admitting expert testimony on "ISIS, specifically its history, leadership, and activities, the role of foreign fighters within ISIS, and the means and methods by which foreign fighters travel to ISIS-controlled territory"); United States v. Farekh, No. 15-CR-268 (BMC), Trial Tr. at 1132 (ECF No. 168) (admitting expert on "Islam[ic] extremism and al-Qaeda"); United States v. Pugh, No. 15-CR-116 (NGG), Trial Tr. at 850 (ECF No. 132) (admitting expert testimony on "militant jihadist groups, including ISIS and its backgrounds, methods and means").

This testimony is relevant because it is directly related to the defendant's knowledge of ISIS; his intent to support ISIS (including the fact that his interest is based in part on their treatment of women); the defendant's reason for and method by which he traveled to Tunisia, a country adjacent to Libya (an ISIS stronghold at the time); the defendant's research of ISIS leadership, ISIS-related propaganda and ISIS recruitment materials;  and the defendant's

repeated usage of a variety of terms and concepts like caliphate, kalifah, kuffar, which have specialized meanings among ISIS supporters.  The testimony is helpful to the jury because none of this information is within the ken of the ordinary juror.  See Farhane, 634 F.3d at 159 (finding expert testimony about al Qaeda history and structure helpful to jury and noting that contrary claim "requires little discussion"); Kaziu, 559 F. App'x at 38 (holding that "a lay witness could not have attested to the same issues as [the expert on foreign terrorist organizations], who based his testimony on specialized research and training removed from the instant case").  Finally, the testimony is not unduly prejudicial, because the testimony is limited to conduct and information that the defendant himself researched, discussed with others, or otherwise engaged in when he attempted to support ISIS.  And any potential remaining prejudice can be eliminated by an appropriate instruction about the testimony of an expert witness, either at the time the expert testifies or during the final jury charge.  See Farhane, 634 F.3d at 160 (finding that expert testimony "as to generally available information about al Qaeda's terrorist activities in Saudi Arabia was more probative than prejudicial on this knowledge element of § 2339B"); Mustafa, 753 F. App'x at 33 (finding expert testimony about al Qaeda terror attacks to not be unduly prejudicial given "the evidence's relevance to [the defendant's] intent in taking actions related to the charged crimes").

Accordingly, the government respectfully requests that the court permit expert testimony on the aforementioned subjects.

IV.    Business and Official Records Certifications

The government moves in limine to admit evidence pursuant to business records certifications.  The government seeks to admit records from Facebook, Google, Disqus, Oath Holdings, Inc. (i.e. "Yahoo!"), Wells Fargo, the U.S. Department of State and the Internet Archive (i.e. the Wayback Machine).  The government has previously provided notice to the defendant of

the specific records at issue and provided copies of the relevant certifications, and will provide any additional certifications upon receipt from the relevant entity. The government brings this motion to simplify and shorten the jury trial in this matter.

As discussed above, the defendant made a substantial number of statements related to his support for ISIS, and his decision to travel to join ISIS, through various email, internet sites, and social media accounts. The defendant's search history and computer also reveals substantial research related to ISIS, terrorism and radical jihadist propaganda. For example, the defendant emailed his martyrdom letter to his family from his Gmail account, searched on Google for how to safely join ISIS and ISIS propaganda, extolled the virtues of ISIS on his "Disqus" internet comment account, and notified his family of his travel through a Facebook account. Accordingly, the contents of the defendant's email and social media accounts will necessarily be a significant part of this trial. Additionally, a number of other business records, such as the defendant's bank records, airline records, and U.S. passport records are necessary to prove that the defendant bought a one-way trip to Tunisia to join ISIS in Libya.

The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation. See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id. at 324.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible. See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States

31

v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005).  As the Seventh Circuit explained in United States v. Ellis, an authenticating certification under Rule 902(11) is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record."  Ellis, 460 F.3d at 927.  It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business records by certification and sets forth specific requirements for their admission.  Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification.  Similarly, Title 18, United States Code, Section 3505 expressly permits the authentication of foreign business records by certification.  And courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial.  See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming district court decision to allow government to offer into evidence foreign business records based upon a certification, absent a live witness to authenticate the documents).

The government should be permitted to authenticate and admit the records of the defendant's email accounts, social media accounts, bank accounts, travel records and other business records using certifications because it is entirely proper under the law.  In addition, such a process would eliminate unnecessary persons from the courtroom, shorten the amount of time that jurors will need to sit for trial, and ensure that witnesses who may reside outside New York

need not travel to New York to appear at trial.  Thus the proposed process not only promotes efficiency, it is completely sensible in light of ongoing concerns about COVID-19.

        The government will submit the certifications in its possession, which have already been produced to the defense, for the Court's inspection and submits that they satisfy the relevant requirements.  The government notes that it may receive additional certifications and expects those certifications to likewise satisfy the relevant requirements.

V.      <u>The Defendant's Confession Is Admissible to Impeach the Defendant</u>

        As discussed above, after the defendant was taken into Tunisian custody, he was interviewed by members of U.S. law enforcement.  During this interview, the defendant admitted, in sum and substance and relevant part, that:  he was traveling in Tunisia on his way to the Islamic State; he initially wanted to travel to the Islamic State in Syria but could not due to passport issues, and so instead attempted to travel to ISIS in Libya; after arriving in Tunisia, the defendant attempted to locate someone who could assist in his travel to Libya and after this attempt was unsuccessful, decided to travel on foot to Libya, with the goal of reaching the ISIS-held city of Sirte; he was aware that the Islamic State required compulsory military service and that he may have to fight for the Islamic State; he knew that the Islamic State was responsible for multiple terrorist attacks in the world, including in Tunisia.  On or about September 20, 2019, the defendant, through prior counsel, moved to suppress these statements.  On July 12, 2021, the defendant, now appearing <u>pro se</u>, withdrew his motion to suppress these statements, stating on the record that he did not wish to pursue his motion because the statements were made voluntarily.  <u>See</u> July 12, 2021 Hr'g. Tr. at 3 ("I want to withdraw that motion.  Those statements were not coerced.  I made those statements voluntarily.")

        In light of the defendant's decision to withdraw his motion to suppress, based on his admission that the statements were voluntary and uncoerced, the government advises the Court

and the defendant of its intent to use the defendant's statements to impeach any testimony he give if he testifies at trial.  See, e.g., United States v. Douglas, 525 F.3d 225, 248 (2d Cir. 2008) ("statements taken from a defendant in violation of his Miranda rights, though they may not be introduced by the government during its case-in-chief, are nonetheless admissible to impeach statements made by the defendant in the course of his testimony.")  As the Supreme Court explained in Kansas v. Ventris, admitting such evidence to impeach a defendant is appropriate because the interests safeguarded by excluding improperly obtained statements are "outweighed by the need to prevent perjury and to assure the integrity of the trial process."  556 U.S. 586, 593 (2009) (quoting Stone v. Powell, 428 U.S. 465, 488 (1976)).  Put another way, "[o]nce the defendant testifies in a way that contradicts prior statements, denying the prosecution use of the traditional truth-testing devices of the adversary process is a high price to pay for vindication" of the constitutional right at issue.  Id. (internal quotation marks and citation omitted).  "The shield provided by Miranda is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances."  Oregon v. Hass, 420 U.S. 714, 722 (1975); see also Harris v. New York, 401 U.S. 222, 225 (1971) (the right of a criminal defendant to testify in his own defense "cannot be construed to include the right to commit perjury").

Accordingly, the government respectfully requests permission to use the defendant's confession as impeachment material if he were to testify at trial.

VI.   The Defendant May Not Elicit Hearsay Statements That He Made

The government moves to preclude the defendant from eliciting any of his own prior statements through the examination of witnesses, because this would constitute inadmissible hearsay without a proper exception.

Statements made by the defendant that are relevant to his crimes are admissible and not hearsay if "offered against an opposing party and . . . made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). By contrast, a defendant is generally prohibited from introducing his own out-of-court statements at trial. See United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). A defendant may not elicit his own statements as an "attempt to get [his] side of the . . . story in front of the jury without him[self] testifying and opening him[self] up to cross-examination." United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004). Moreover, the government is under no obligation to offer exculpatory statements when it offers inculpatory admissions. See United States v. Johnson, 507 F.3d 793 (2d Cir. 2007) (holding that the court properly bifurcated a defendant's post-arrest statement and precluded the defense from introducing a self-serving portion of the defendant's post-arrest statement).

The government intends to introduce statements made by the defendant at various points in time, including (1) statements by the defendant to friends, family and other witnesses both before and after he traveled to Tunisia; (2) statements made on the internet by the defendant; (3) search queries by the defendant; (4) emails and social media messages and postings by the defendant; (5) statements to travel agents and border officials when he traveled to Tunisia; and (6) statements made to U.S. law enforcement when he was expelled from Tunisia and taken into U.S. custody. As discussed herein, these statements relate to the defendant's radicalization and planned attempt to support ISIS.

In appropriate circumstances, the defendant may be permitted to elicit his own prior statements under the "completeness doctrine." See Fed R. Evid. 106. Such circumstances are

limited in scope.  "The completeness doctrine does not, however, require the admission of portions

of a statement that are neither explanatory of nor relevant to the admitted passages."  Marin, 669

F.2d at 84-85.  The burden rests with the defendant to demonstrate that the portions of the statement

he seeks to offer are necessary to clarify or explain the portions the government intends to offer.

See United States v. Glover, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the

additional evidence sought to be admitted must demonstrate its relevance to the issues in the case,

and must show that it clarifies or explains the portion offered by the opponent.").  The district court

has broad discretion in applying the completeness doctrine.  See United States. Jackson, 180 F.3d

55, 73 (2d Cir. 1999) (district court's application of rule of completeness is reviewed only for

abuse of discretion).

Accordingly, the government respectfully requests that the Court admit the

defendant's statements offered by the government, and preclude any separate attempts by the

defendant to elicit his own out-of-court statements unless they are explanatory or directly relevant

to the admitted passages.

VII.  The Defendant May Not Seek to Admit Information About His Conditions of
      Confinement in Tunisian Custody

The defendant, through prior counsel, has made certain representations about

improper treatment that he received while in Tunisian custody.  The government moves to preclude

the admission of any such information as it is irrelevant and unduly prejudicial.

Whether or not the defendant was the subject of harsh or otherwise improper

treatment does not tend to make any fact of relevance to the trial more or less likely, and thus is

not relevant.  See Fed. R. Evid. 401, 402.  The defendant's treatment after he was detained does

not make it more or less likely that he attempted to support ISIS, in particular for the obvious

reason that the detention occurred after he committed this crime.  See United States v. Malpeso,

115 F.3d 155, 162 (2d Cir. 1997) (excluding evidence and precluding argument on issues that had "little or no relevance" to the charged crimes and might encourage jury nullification).

Any effort by the defendant to prove that he suffered abusive treatment while in Tunisian custody would be nothing more than an effort to inflame the jury and engender sympathy, with the ultimate goal of tacitly (or explicitly) arguing for jury nullification. Evidence and argument intended to promote jury nullification—that the jury should render a verdict not in accordance with the law—is improper and should be excluded. See In re United States, 945 F.3d 616, 620 (2d Cir. 2019) (granting writ of mandamus and directing district court to deny defense counsel's request for leave to argue nullification). "Evidence admitted solely to encourage nullification is by definition irrelevant, and thus inadmissible, regardless of what other evidence might be introduced at trial." Id. at 630. A nullification argument "subverts the jury's solemn duty to 'take the law from the court, and apply that law to the facts of the case as they find them to be from the evidence,'" and therefore "[d]istrict courts have a duty to forestall or prevent such conduct." Id. at 627.

Accordingly, the defendant should be precluded from introducing evidence or eliciting testimony on his conditions of confinement in Tunisia.

CONCLUSION

For the reasons set forth above, the Court should grant the government's motions.

Dated:  Brooklyn, New York
        July 14, 2021

                                    Respectfully submitted,

                                    JACQUELYN M. KASULIS
                                    Acting United States Attorney
                                    Eastern District of New York


                          By:       _____/s/_____
                                    Craig R. Heeren
                                    Josh Hafetz
                                    Jonathan E. Algor
                                    Assistant United States Attorneys
                                     (718) 254-7000


cc:     Clerk of Court (SJ) (via ECF)
        Bernard Augustine, _pro se defendant_ (via USPS Mail)
        Susan Kellman, Esq. and Gary Villanueva, Esq., _standby counsel_ (via ECF and Email)