

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:CRH/JGH/JEA
F.#2016R00308

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 31, 2022

By ECF, Email and USPS

The Honorable Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Bernard Raymond Augustine
            Docket No. 18-CR-393 (SJ)

Dear Judge Johnson:

      The government respectfully submits this letter regarding sentencing of the defendant Bernard Raymond Augustine, scheduled for April 6, 2022. On August 23, 2021, the defendant was found guilty by a jury of providing material support to the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization, in violation of 18 U.S.C. § 2239B. The government respectfully submits that the Court sentence the defendant to 240 months' imprisonment, which is both the recommended sentence for the defendant under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") and the statutory maximum sentence for the offense of conviction. This sentence is both appropriate and necessary. After the defendant consumed violent jihadist terrorist propaganda and preached to others about the virtues of ISIS' bloody cause, he bought a one-way ticket to join ISIS in Libya in 2016, and hoped to die a martyr in support of ISIS. Even after the defendant was caught in Tunisia and returned for trial in the United States, he remained unrepentant, testifying at trial that ISIS' beheading videos and attacks on U.S. soldiers were "good" and "cool," and that he planned to travel back to ISIS-controlled territory if he were acquitted. The defendant's total lack of remorse and stated desire to re-offend by rejoining a violent terrorist organization demonstrates that the Court should enter a sentence of 240 months' imprisonment.

I.  Background

The following information is taken from the defendant's Presentence Investigation Report ("PSR"), the documentary and testimonial evidence admitted at the defendant's trial, and other evidence gathered as part of the investigation and prosecution of the defendant.

A.  The Defendant's Attempt to Provide Material Support to ISIS

1.  The Defendant's Radicalization

Beginning around the second half of 2015, the defendant adopted a radical form of Islam and support for ISIS. ISIS is a foreign terrorist organization ("FTO") that, since 2013, has conducted terrorist attacks as part of ISIS's goal of forming an Islamic state, also referred to as a "caliphate" or "khilafah" by ISIS supporters. At various times, ISIS has controlled territory in Syria, Iraq, and Libya, and maintains a presence in other countries as well. ISIS has claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad, and was the deadliest terrorist organization in the world between 2014 and the end of the indictment period.

In October 4, 2015, for example, the defendant wrote admiringly of ISIS, stating:

> I'm not Muslim…[b]ut they are the ultimate fighters in all sense. The mongols were just as ruthless as isis and they dominated everyone. The key to winning is keeping women in check and taking no prisoners, always be on the offense and making no compromises.

Around that same time, the defendant began to conduct significant research into ISIS. Because of the importance of foreign fighters to ISIS's operations, ISIS committed significant resources to recruitment of foreign fighters, including those with ties to the United States. ISIS's recruitment efforts relied heavily on the use of the Internet, including web-distributed recruitment videos. These videos typically depicted ISIS fighters marching, training, and fighting, and also included violent acts committed by ISIS supporters, such as beheadings and other attacks. These videos also urged foreign fighters to travel to ISIS-controlled territory to join ISIS, or to carry out ISIS's objectives in other ways, such as by conducting attacks on targets of opportunity in their home nations.

The defendant searched for these types of ISIS recruitment videos and songs. He searched for "Jihadi John," a British ISIS spokesperson who appeared in numerous violent videos ordering the murder of captives and personally participating in executions. On October 9, 2015, the defendant searched and appeared to watch "Flames of War," one of ISIS' best-known English-language propaganda videos. A few days later, on October 11, 2015, the defendant searched for information about Abu Bakr al-Baghdadi, at that time the leader of ISIS. In November 2015, the defendant searched for and reviewed materials online about the recent coordinated attacks by ISIS supporters in Paris, France, which left more than 130 people dead, and again searched for the "Flames of War" propaganda video.

2

By December 2015, the defendant began to research how he could join and directly support ISIS. ISIS supporters often traveled from countries around the world, including the United States, to ISIS-controlled territory, such as Syria and Libya, and often took steps to cover their tracks to avoid detection by law enforcement personnel. Among other services in support of ISIS, many individuals who traveled to ISIS-controlled territory became fighters responsible for defending ISIS territory from attacks by forces arrayed against ISIS, attempting to gain further territory for the caliphate, or otherwise conducting attacks in support of ISIS' violent cause.

The defendant searched for "do isis recruits get wives," looked for the online propaganda magazine published by ISIS and wrote in an online comment that he was going to "join Islam and have 4 virgin wives." In a comment that he wrote to an internet article, the defendant stated:

> **You have to be extreme. You fight extremism with extremism**…You must take everything you want with force. **And yes I am avocation revolution [advocating revolution]. And if it must be violence.**

(Emphasis added). Two days later, on December 15, 2015, the defendant searched for "how to safely join isis" and reviewed a website titled "How does a Westerner join ISIS? Is there a recruitment or application process?" Internet searches by the defendant over the following week in December are consistent with further radicalization, support of ISIS, and interest in traveling to the Middle East. Notably, on December 24, 2015, the defendant had searched for "al hayat media center," the name of the media wing of ISIS, which produces large amounts of its propaganda materials. By the end of 2015, the defendant fully embraced ISIS and radical jihadism, writing on December 28, 2015, "the Islamic State is the true Islam." See PSR ¶ 11.

The defendant's search history on and after December 28, 2015 continued to reflect extensive interest in ISIS and ISIS-related propaganda materials, and showed that the defendant's support of ISIS was rooted in, at least in part, ISIS's treatment of women. On January 17, 2016, a month before he traveled to join ISIS in Libya, the defendant articulated his views about how women would be treated under ISIS rule:

> Western women wouldn'tt be married but enslaved. Who said about western muslim daughters having a choice lol. **Western or not , the sharia will be established. It's a man's world.** When the west, which is on an unstoppable decile and sped up by the power of the Internet and modern travel, collapses, islam will take over. **The kilafah would expand. Women's illusion of power would vanish.** I hope you understand and would take some homemaking classes. Because that's all that you would be doing. And you would probably

even like it. **And you should be grateful, you were not like the men who opposed the sharia and lost their heads**.[1]

(Emphasis added). That same day, the defendant evangelized further about ISIS, posting a link to an English-language ISIS propaganda video and an article about the treatment of non-Muslims living in an Islamic caliphate.

Around this time, the defendant was specifically warned about the dangers of ISIS and radical jihadism. An Imam at a local mosque that the defendant attended on a few occasions in 2015 and 2016, concerned about the defendant's state of mind, provided the defendant with several anti-radicalization brochures. For example, one brochure, titled "A Warning Against Terror Groups ISIS & al-Qaedah and the Correct Islamic Position Regarding Them!" described the beheadings and other terrorist acts of ISIS as being "barbaric" and quoted a Muslim religious scholar's statement that "The terrorism of ISIS & al-Qaeda[] is Islam's No. 1 enemy."

Despite these unambiguous warnings, the defendant continued to consume ISIS propaganda and research information about how to successfully travel to join ISIS. On January 30, 2016, the defendant researched the differences between ISIS and al-Nusra Front, an al-Qaeda affiliated terrorist organization in Syria that sometimes clashed with ISIS. That same day, the defendant again searched for information about then-ISIS leader al-Baghdadi, as well as Abu Musab al-Zarqawi, the former head of al-Qaeda in Iraq, whose activity in Iraq and Syria and belief in the need to found a radical Islamic state is largely credited as the precursor to ISIS. The next day, the defendant searched for information and maps related to Syria, as well as "support for al nusra."

Images found on the defendant's computer also indicate that he watched, or was knowledgeable about, violent ISIS propaganda videos. For example, the defendant's computer contained images of video files associated with ISIS and Islamic extremism, including an image associated with speech by al-Baghdadi, as well as an image from an infamous ISIS propaganda video showing the beheading of Christians in Libya by ISIS members.

By February 2016, shortly before he acted on his plan to travel to ISIS in Libya, the defendant articulated his belief that truly devout Muslims needed to travel to the ISIS-controlled territory and fight for the Islamic State. In an online comment posted on February 2, 2016, the defendant described "Syrian regugges" [refugees] (i.e. those who fled the fighting in that area instigated by ISIS), as "hypocrites" who are "not worthy to be called men and muslim," because "[t]hey left the the country, abandoned their women, and ignored the call to the struggle for the Khilifah." He further explained his view that "the lowest of Jahannam(hellfire) is for them," whereas, by contrast, "[t]he Muslims who leave the west, travel in the opposite direction of these 'refugees', answer the call for the struggle, and march until they are victorious or martyred are

---

[1] "Kilafah" is a misspelling of "khilafah," a term for the Islamic state commonly used by ISIS and also used by the defendant, as discussed herein.

4

the true believers." On February 11, 2016, a week before the defendant left for Tunisia, he further wrote about his apocalyptic worldview and support of ISIS, writing in part:

> I was an atheist before I learnt about the sharia and justice of Islam and it is the best way of life for all humans , Muslims or non muslims. All non muslims are allowed to live under khilafah and will be protected under the shariah. Stop living and sacrificing your live for man made laws and the profit of global elite. **Islam will destroy the global banking elite and will bring justice to the entire world, because how can you fight those who do not live for worldly gain., how can you fight those who love death more than life.**
>
> The whole world is against the Muslims and although they were a minority they couldn't be defeated in Afghanistan. **And now they rose up to conquer Iraq and syria. And within a 100 year's it will be the wh[o]le world, Inshaallah.**

See PSR ¶ 12 (Emphasis added).

Around this time, the defendant also began to engage his mother on the topics of Islam and ISIS. The defendant sent his mother various ISIS videos that extolled the virtues of living in the Islamic State. The defendant also sent text messages to his mother that expressed his desire to travel to the Islamic State. For example, on February 10, 2016—eight days before he traveled to Tunisia—the defendant sent his mother the following messages:

> If I ever get lucky enough to live in khilafah, I'll burn my own passport lol.
>
> There's a lot you don't know about the justice of the sharia.[2] If Mabey you understood it you wouldn't want to live here either. [sic]

PSR ¶ 9.

### 2. The Defendant's Advocacy for Violence

In addition to the violent propaganda consumed by the defendant, and his violent rhetoric in support of ISIS and jihadist radicalism, the defendant also advocated for violence against specific individuals. On or about October 9, 2015, the defendant participated in a telephone call with his father, Samuel Ejaz, who at that time was in custody at a prison facility operated by the Monterey County Sheriff's Office. The defendant's father had been charged with several state

---

[2] Sharia is a system of Islamic religious law.

5

offenses arising out of the attempted murder of his estranged wife[3] and her cousin, and the murder of his estranged wife's aunt and uncle. During the telephone call, which was recorded by the prison facility, the defendant discussed his father's conduct, and the defendant stated that he wished his father had successfully murdered his father's wife. During the call, the defendant stated in relevant part:

| | |
|---|---|
| AUGUSTINE: | Fuck that bitch. You should've fucking saw somebody. You should… |
| EJAZ: | I was, I was |
| AUGUSTINE: | You should've killed her. |
| EJAZ: | Huh? |
| AUGUSTINE: | Fuck that bitch. You should've finished her off. |

\* \* \*

| | |
|---|---|
| EJAZ: | I know. I'm sorry I put you through so much. |
| AUGUSTINE: | It's cool. It ain't -- you don't got to be sorry now. Actually, you know what I think? I think fuck that bitch. She -- you should've fucking killed her. I think you should've -- she – you know where she lived, right? |
| EJAZ: | What's that? |
| AUGUSTINE: | You know she lived, right? She survived, right? You know that, right? |
| EJAZ: | Yeah. |
| AUGUSTINE: | You should've finished her off. |
| EJAZ: | No, she – |
| AUGUSTINE: | That's what she deserved. |
| EJAZ: | Listen. She will, she will -- she will suffer. |
| AUGUSTINE: | Yeah, fuck that bitch. |
| EJAZ: | (U/I) |
| AUGUSTINE: | She needs to suffer. |

       3.       **The Defendant's Failed Attempt to Join and Support ISIS in Libya and Stated Interest in Martyrdom**

ISIS has a presence in, among other places, Libya. ISIS sought to use Libya as a base of operations for its terrorist activities and to impose its strict version of Islamic Law on its

---

[3] The defendant's father re-married the victim of this crime, after separating from the defendant's mother.

residents. Moreover, numerous foreign fighters seeking to join ISIS traveled to Libya in order to join the "caliphate" proclaimed by ISIS, which initially existed primarily in Iraq and Syria, but which ISIS expanded to places in Libya and throughout the Middle East and Africa. One common method by which these foreign fighters tried to join ISIS in Libya was by entering Libya through the neighboring country of Tunisia.

On February 18, 2016, the defendant traveled on Turkish Airlines Flight No. 80, which departed San Francisco, California and arrived in Tunis, Tunisia (via Istanbul, Turkey). See PSR ¶ 5. The defendant's one-way ticket was purchased on February 17, 2016 – i.e., the day before he traveled. Prior to departing the United States, the defendant was interviewed by a United States Customs and Border Protection ("CBP") officer at the San Francisco International Airport. The defendant told the CBP officer that he was planning to travel to Tunisia for vacation. On the same day as he left California, February 18, 2016, the defendant contacted his sister via Facebook, and asked her to deliver the following message to his mother:

> I'm on the plane. I already left. Don't ask me any questions over Facebook please. Don't try to contact me. If anyone calls to talk to you don't talk to them expect for mama and natasha. I'm safe . In 3 days I will message you again. I love you guys. Mama knows what I'm talking about Don't try to find me or anything. I'll be fine. I won't message back after this. Until 3 days when I reach where I'm supposed to go.

PSR ¶ 13. When his sister asked him "what are you doing," the defendant responded that he would "answer any questions after 3 days" and to "just trust your brother."

Shortly after arriving in Tunisia on February 20, 2016, the defendant contacted his family via a social media platform and, after only describing his general location, indicated that he would block his family members from his Facebook account. That same day, the defendant sent another message via Facebook to his family, where he continued to avoid specifically mentioning where he was traveling to, but noted that it would be "Internet free areas," and while he might be able to send an email in the future, "the length between these emails could vary and delivery is not always gauranteed."

The following day, on February 21, 2016, the day after arriving in Tunisia, the defendant sent his mother an email that revealed his interest in fighting and dying for ISIS, writing, in relevant part:

> **My purpose in life is to seek the ultimate justice.** I see a lot of very wrong and truly evil things happening in this world, things you dont know about**, im not mad or mentally ill.** I really truly am on a path to fight for justice and if I see unjustified where I'm going I promise I will fight that also. True justice. I can't … sit in ignorance. There is no other meaning in life to me. There is two reasons why this is the best path in life for me.

7

> **1. When I die, if God accept me. We will all live in paradise forever.**
>
> 2. If I pass on before you, you and [name redacted] and [name redacted] will learn to see the injustice and because of you being able to see it you will be able to defend yourselves against it. I'm doing this so you [name redacted] and [name redacted] will learn how to protect yourselves from the manipulation of the masters of evil and their lies. . . .
>
> The good people in this world bring balance and push back against evil. **And give their lives freely in the process.** Today in this day and age I believe this is the right path. . . .
>
> **I hope this isn't my last message to you but I trying to summarize all my emotions and thoughts into this for you just in case anything happens.** For you to read to remember me if you haven't heard from me. . . .
>
> . . . you are the source of my strength **in the battle's to come in my future, because I had to sacrifice my life with you who were precious to me for this path**. So please pray for me that **I will be victorious over my and Gods enemies.**

See PSR ¶ 8 (emphasis added).

### 4. The Defendant's Arrest

On February 22, 2016, the defendant was detained by Tunisian law enforcement on the suspicion that he was attempting to travel to Libya to join ISIS. The defendant was convicted under Tunisian law of terrorism-related offenses, and served approximately two years in Tunisian custody. The defendant was subsequently expelled from Tunisia and returned to the United States, first landing at John F. Kennedy International Airport, in Queens, New York. On February 27, 2018, the defendant was charged by the United States in an Indictment with one count of attempting to provide material support to ISIS, in violation of Title 18, United States Code, Section 2339B. See PSR ¶¶ 1, 16-17.

### B. The Defendant's Trial Testimony Demonstrating His Support for ISIS

At trial, the defendant testified in his own defense. The defendant admitted to conducting numerous online searches tied to ISIS, ISIS propaganda, and how to join ISIS. See Trial Tr. at 397-99 (explaining how he knew that ISIS members "are required to participate in public throat slitting sessions and beheadings"). He also admitted to most of the facts surrounding his decision to travel to Libya, by way of Tunisia, to join ISIS, admitting that he lied about the reasons for his travel to the airline representative, U.S. border officers, and his own family, and in reality had planned to stay in Libya and live in the Islamic State. See Trial Tr. at 379-85. The

defendant testified that he knew ISIS killed American soldiers; was responsible for killing hundreds in the November 2016 terrorist attack in Paris; and called for people to come and fight in Syria and Libya. Id. at 386-88. The defendant testified that videos of ISIS members executing Syrian captives who had just dug their own graves, and videos where ISIS beheaded people were "good" and "a really cool video." Id. at 395-96. The defendant admitted knowing that ISIS practiced ethnic cleansing. When asked about ISIS' practice of keeping and selling captured non-Muslim women as sex slaves, the defendant responded that they were "just slaves." Id. at 391-92.

The defendant also testified about his own intended support for ISIS. He admitted that one way in which he could provide material support to ISIS would be to participate in ISIS propaganda videos, by providing the necessary English-language voice over, and stating that he would "do it pretty well." Id. at 403. When asked to confirm his testimony on direct examination that he "would do it all again and would go back today," the defendant responded "No, tomorrow, when they let me off." Id. at 400.

### C. The Defendant's Post-Trial Statements and Conduct

Following his trial conviction, the defendant continued to espouse his support for ISIS and radical extremist views. On or about August 23, 2021, the same day the jury returned a guilty verdict, the defendant can be heard on a recorded prison phone call that what ISIS does is not murder, but rather "justice" and further stating that he was "committed until the very end." On August 24, 2021, during another recorded prison call, the defendant stated "I don't feel like life has anything else to offer me other than fighting." The defendant's comments were not merely overheated rhetoric following his conviction. Months later, on November 25, 2021, the defendant stated on a recorded prison call that, although he would not "do anything against the United States" or "join back with that group," he "wants to fight jihad…it's part of my religion," and that he "want[s] to revoke citizenship and…become a citizen of the Islamic State." The defendant's prison disciplinary record also reflects that he remains willing and ready to engage in violent, criminal conduct. He has been charged with assault on three occasions between and possessing a dangerous weapon on two occasions. See PSR ¶ 49. Collectively, the defendant's post-trial statements and conduct reflect a lack of remorse and interest in rehabilitation.

### II. Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." United States v. Sindima,

9

488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." United States v. Aldeen, 792 F.3d 247, 251-252 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct; [and]
>
> (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding to arrive at the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

III. The Advisory Guidelines Sentence

In the PSR, the United States Probation Department ("Probation") calculated the defendant's advisory Guidelines sentencing range as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2M5.3) | | 26 |
| Plus: | Material Support with Intent, Knowledge or Reason to Believe They Were To Be Used to Commit Violent Act (§ 2M5.3(b)(1)) | +2 |
| Plus: | Terrorism Enhancement (§ 3A1.4(a)) | +12 |
| Plus: | Obstruction of Justice (§ 3C1.1) | +2 |
| **Total Offense Level** | | **42** |

(PSR ¶¶ 25-34, 67). Probation likewise correctly determined that the defendant's criminal history category is VI because the offense involved, or was intended to promote, a federal crime of terrorism. See U.S.S.G. § 3A1.4(b). Thus, the defendant's advisory Guidelines range is 360 months to life imprisonment. (PSR ¶ 67). Because the count of conviction has a statutory maximum sentence of 20 years, the defendant's effective Guidelines range is 240 months' imprisonment. (PSR ¶ 66).

IV. The Court Should Sentence The Defendant To The Statutory Maximum Sentence

The sentence imposed on the defendant must reflect the seriousness of the conduct, deter the defendant specifically from committing further crimes, deter others from traveling to join ISIS and conducting attacks on behalf of or at the direction of ISIS, and promote respect for the law. These factors all counsel in favor of a Guidelines sentence for the defendant, a statutory maximum 240 month term of imprisonment.

As the facts described above indicate, the criminal conduct at issue is exceptionally serious. The defendant bought a one-way ticket to join and support ISIS, a terrorist organization the defendant knew was committed to the murder and subjugation of those who did not subscribe to its extreme religious worldview and submit to its political control. The defendant made clear, prior to his travel, that he personally supported ISIS' actions, that violent acts of terrorism were justifiable, and personally advocated for violence and murder. At trial, the defendant consistently praised the beheadings and other acts of terror by ISIS, and expressly stated that, had he made it to ISIS controlled territory, he would have been able to help create more violent ISIS propaganda materials. The defendant is a fully-radicalized ISIS supporter who sought to join ISIS and assist its campaign of violence against westerners, and would have done so had he not been stopped in Tunisia. The Sentencing Guidelines recommend that the defendant be sentenced to 240 months imprisonment, and the facts of this particular case further cement that such a sentence is necessary and appropriate.

The sentence in this case should also be sufficiently serious to deter the defendant from committing future crimes, as well as deter others contemplating similar criminal conduct from joining a foreign terrorist organization to wage violent jihad. The defendant's total lack of remorse for his conduct was on full display at trial, where he repeatedly espoused the virtues of ISIS, and admitted that he would travel back to ISIS-controlled territory if he were acquitted and permitted to leave the country. The defendant must be detained for the statutory maximum period of 240 months' imprisonment to deter him from re-joining ISIS anytime in the near future. Such a sentence is also necessary to show any other person interested in supporting ISIS that they will receive appropriately severe consequences if they attempt to join ISIS.

Finally, a statutory maximum sentence would be proportionate with sentences imposed for other similar conduct in the United States. For example, in United States v. Saleh, No. 15-CR-517 (WFK), the defendant was sentenced to 360 months' imprisonment for attempting to provide material support to ISIS after making several attempts to travel overseas and join ISIS. In United States v. Redzepagic, No. 17-CR-228 (DRH), the defendant, who also made several unsuccessful attempts to travel and join ISIS, pled guilty to providing material support to ISIS and al-Nusrah Front, and received a 200 month term of imprisonment. Here, the defendant has an avowed interest in violence, unambiguously intended to support ISIS, nearly made it to ISIS-controlled territory to provide that support and continues to unrepentantly support this terrorist organization even after a swift trial conviction. The defendant's total lack of remorse and continued desire to join a violent terrorist organization demonstrates that a Guidelines sentence of 240 months' imprisonment is most appropriate in this case.

V. Conclusion

In short, the need for punishment for Augustine's offense, the need for specific as well as general deterrence and the need to protect the public calls for a significant sentence. The government respectfully requests that the Court impose a sentence of 240 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/ Craig R. Heeren
Craig R. Heeren
Josh Hafetz
Jonathan E. Algor
Assistant U.S. Attorney
(718) 254-7000

cc: Clerk of Court (by ECF)
Bernard Augustine (pro se defendant) (by USPS)
Gary Villanueva and Susan Kellman (standby counsel) (by email)